**K&L GATES LLP**
One Newark Center, Tenth Floor
Newark, New Jersey 07102
Tel:  (973) 848-4000
Fax:  (973) 848-4001
*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

<table>
<tr>
<td>
ADVANCED GYNECOLOGY AND
LAPAROSCOPY OF NORTH JERSEY, P.C.,
AESTHETIC & RECONSTRUCTIVE
SURGEONS LLC, ATLANTIC PEDIATRIC
ORTHOPEDICS PA, BERGEN SURGICAL
SPECIALISTS, P.A., EAST COAST
AESTHETIC SURGERY P.C., GARDEN
STATE BARIATRICS & WELLNESS CENTER
LLC, HACKENSACK VASCULAR
SPECIALISTS LLC, HERITAGE GENERAL
AND COLORECTAL SURGERY, PA,
HERITAGE SURGICAL GROUP, LLC,
JERSEY INTEGRATIVE HEALTH &
WELLNESS, P.C., MODERN
ORTHOPAEDICS OF NEW JERSEY LLC,
NEW JERSEY SPINAL MEDICINE AND
SURGERY, P.A., NJ BARIATRIC INSTITUTE
LLC, NEW JERSEY SPINE INSTITUTE, P.A.
f/k/a SOMERSET ORTHOPEDICS
ASSOCIATES, P.A., NORTH JERSEY
LAPAROSCOPIC ASSOCIATES, LLC, NEW
JERSEY BRAIN AND SPINE, P.C.,  PREMIER
OB/GYN GROUP, P.C., PROFESSIONAL
ORTHOPAEDIC ASSOCIATES, P.A., JULIE M
KELLER MD LLC d/b/a RESTORATION
ORTHOPAEDICS, SPINE SURGERY
ASSOCIATES & DISCOVERY IMAGING, PC,
STEPHEN SILVER PA, SURGXCEL LLC and
TRI-STATE SURGERY CENTER, LLC,
</td>
<td>
Hon. Esther Salas, U.S.D.J.

Hon. Michael A. Hammer,
U.S.M.J.

Civil  Action  No.  2:19-cv-
22234


**THIRD AMENDED
COMPLAINT AND JURY
DEMAND**
</td>
</tr>
</table>

Plaintiffs,

v.

CIGNA HEALTH AND LIFE INSURANCE
COMPANY and CONNECTICUT GENERAL
LIFE INSURANCE COMPANY,

Defendants.

**TABLE OF CONTENTS**

Page

THIRD AMENDED COMPLAINT AND JURY DEMAND .................................. 1

NATURE OF THE CLAIMS ............................................................................... 2

    A.    Overview of Cigna's ERISA Violations ................................................. 3

    B.    Overview of Cigna's RICO Violations .................................................. 7

THE PARTIES .................................................................................................... 14

    A.    The Plaintiffs ....................................................................................... 14

    B.    Defendants ............................................................................................ 19

JURISDICTION, VENUE, AND JOINDER ....................................................... 20

FACTUAL ALLEGATIONS .............................................................................. 22

I.    Cigna Underpays the Plaintiffs and Engages in Self-Dealing in
    Violation of the Plans and ERISA .................................................................. 22

    A.    The Plaintiffs' Out-of-Network Status ................................................. 22

    B.    The Plans' Coverage and Payment Requirements .............................. 23

        1.    Coverage and Payment Requirements for Emergency
            Care ........................................................................................... 23

        2.    Coverage and Payment Requirements for Elective Care .......... 27

            a.    MRC-1 .......................................................................... 28

            b.    MRC-2 .......................................................................... 30

    C.    Cigna's Fiduciary Status .................................................................... 32

D.    Plaintiffs Receive Complete Assignments of Benefits under the Cigna Plans for Treatment Provided to Cigna's Subscribers..............33

1.    Advanced Gynecology.................................................34

2.    AR Surgeons .............................................................37

3.    Atlantic Orthopedics ................................................38

4.    Bergen Surgical.........................................................38

5.    East Coast Aesthetic .................................................39

6.    Garden State Bariatrics .............................................40

7.    Hackensack Vascular ................................................45

8.    Heritage General .......................................................45

9.    Heritage Surgical.......................................................46

10.    Jersey Integrative .....................................................47

11.    Modern Ortho...........................................................48

12.    NJSMS .....................................................................48

13.    NJSI/Somerset Ortho ................................................50

14.    NJ Brain and Spine ...................................................51

15.    NJ Bariatric ..............................................................52

16.    North Jersey Laparoscopic.........................................52

17.    Premier OBGYN.......................................................53

18.    Professional Orthopaedic Associates.........................54

19.    Restoration Ortho......................................................55

20.   Spine Surgery Associates ...........................................................56

21.   Stephen G. Silver, P.A. .............................................................57

22.   SurgXcel ...................................................................................57

23.   Tri-State Surgery ......................................................................60

E.   None of the Cigna Plans at Issue in this Case Prohibit the Cigna Subscribers from Assigning their Benefits to Plaintiffs ......................60

F.   Cigna Fails to Reimburse Plaintiffs as Required by the Cigna Plans ...........................................................................................63

Advanced Gynecology ........................................................................68

AR Surgeons ........................................................................................68

Atlantic Orthopedics ...........................................................................69

Bergen Surgical ...................................................................................69

East Coast Aesthetic ............................................................................70

Garden State Bariatrics ........................................................................70

Hackensack Vascular ...........................................................................70

Heritage General ..................................................................................71

Heritage Surgical .................................................................................71

Jersey Integrative ................................................................................72

Modern Ortho ......................................................................................72

NJSMS ................................................................................................72

NJSI/Somerset Ortho ...........................................................................73

NJ Brain and Spine.................................................................73

NJ Bariatric..........................................................................74

North Jersey Laparoscopic .................................................74

Premier OBGYN ................................................................74

Professional Orthopaedic Associates .................................75

Restoration Ortho ...............................................................75

Spine Surgery Associates ...................................................76

Stephen G. Silver, P.A. ......................................................76

SurgXcel.............................................................................76

Tri-State Surgery ................................................................77

G.    Plaintiffs Exhaust Available Internal Appeals Remedies .................77

II.  Cigna's Multiple RICO Violations.................................................80

A.    Overview .........................................................................80

B.    The RICO Enterprises .....................................................81

C.    Cigna's Pattern of Racketeering Activity .........................82

1.    Relatedness.................................................................83

2.    Continuity...................................................................85

D.    Cigna Uses the Mails and Wires in Furtherance of Multiple Schemes to Defraud, in Violation of 18 U.S.C. §§ 1341 and 1343 ..................................................................................85

1.    The Contradictory EOB Scheme .............................88

2.      The Fictitious Contracting Scheme..............................................94

3.      The Repricing Reduction Scheme ............................................96

4.      The Fraudulent Negotiations Scheme......................................100

5.      More Examples of Cigna's Uses of the Mails and Wires
        in Furtherance of its Fraudulent Schemes..............................107

E.      Cigna Embezzles and Converts Funds from the ERISA ASO
        Plans, in Violation of  18 U.S.C. § 664...............................113

F.      The Impact of Cigna's Conduct .........................................116

CAUSES OF ACTION ...............................................................118

COUNT ONE
(Violation of ERISA § 502(a)(1)(B)) ..........................................118

COUNT TWO
(Breach of Fiduciary Duties of Loyalty
and Due Care in Violation of ERISA)..........................................123

COUNT THREE
(Violation of 18 U.S.C. § 1962(c)) ...........................................125

COUNT FOUR
(Violation of 18 U.S.C. § 1962(d) by
conspiring to violate 18 U.S.C. § 1962(c))...................................129

COUNT FIVE
(Violation of 18 U.S.C. § 1962(a)) ..........................................134

COUNT SIX
(Violation of 18 U.S.C. § 1962(d) by
conspiring to violate 18 U.S.C. § 1962(a))..................................136

COUNT SEVEN
(Breach of Contract – non-ERISA)........................................................................139

COUNT EIGHT
(Breach of the Covenant of Good Faith and
Fair Dealing – non-ERISA) ................................................................143

JURY DEMAND ................................................................147

PRAYER FOR RELIEF ............................................................ 147

CERTIFICATION UNDER LOCAL CIVIL RULE 11.2....................................151

LOCAL CIVIL RULE 201.1 CERTIFICATION.................................................152

## THIRD AMENDED COMPLAINT AND JURY DEMAND

Plaintiffs Advanced Gynecology and Laparoscopy of North Jersey, P.C. ("Advanced Gynecology"), Aesthetic & Reconstructive Surgeons, LLC ("AR Surgeons"), Atlantic Pediatric Orthopedics PA ("Atlantic Orthopedics"), Bergen Surgical Specialists, P.A. ("Bergen Surgical"), East Coast Aesthetic Surgery, P.C. ("East Coast Aesthetic"), Garden State Bariatrics & Wellness Center LLC ("Garden State Bariatrics"), Hackensack Vascular Specialists LLC ("Hackensack Vascular"), Heritage General and Colorectal Surgery, PA ("Heritage General"), Heritage Surgical Group, LLC ("Heritage Surgical"), Jersey Integrative Health & Wellness, P.C. ("Jersey Integrative"), Modern Orthopaedics of New Jersey LLC ("Modern Ortho"), New Jersey Spinal Medicine and Surgery, P.A. ("NJSMS"), New Jersey Spine Institute, P.A. f/k/a Somerset Orthopedics Associates, P.A. ("NJSI/Somerset Ortho"), New Jersey Brain and Spine, P.C. ("NJ Brain and Spine"), NJ Bariatric Institute LLC ("NJ Bariatric"), North Jersey Laparoscopic Associates, LLC ("North Jersey Laparoscopic"),   Premier OB/GYN Group, P.C. ("Premier OB/GYN"), Professional Orthopaedic Associates, P.A. ("Professional Orthopaedic Associates"), Julie M Keller MD LLC d/b/a Restoration Orthopaedics ("Restoration Ortho"), Spine Surgery Associates & Discovery Imaging,  PC ("Spine Surgery Associates"), Stephen G. Silver, PA, SurgXcel LLC ("SurgXcel"), and Tri-State Surgery Center, LLC ("Tri-State Surgery") (collectively, "Plaintiffs"), by and through their

attorneys, K&L Gates LLP, bring their Third Amended Complaint with leave of Court, pursuant to Fed. R. Civ. P. 15(a)(2), against Cigna Health and Life Insurance Company and Connecticut General Life Insurance Company (collectively, "Cigna"), and allege as follows:

## NATURE OF THE CLAIMS

1.     Plaintiffs bring this lawsuit to obtain redress for Cigna's misconduct in its administering of health insurance plans it insures or administers.  Cigna cheats out-of-network healthcare providers, like Plaintiffs, by dramatically underpaying them for medically necessary services provided to patient beneficiaries of the health insurance benefit plans administered or insured by Cigna (the Cigna Plans"). Cigna then unlawfully retains Cigna Plan funds that are due and owing to Plaintiffs and uses them for its own purposes while obstructing Plaintiff's access to those funds.

2.     After numerous detailed communications with Cigna management in which Plaintiffs protested Cigna's unlawful processes and procedures, Cigna informed Plaintiffs that it has no compliance department capable of addressing these issues, and encouraged Plaintiffs to initiate legal action in order to prompt Cigna to act.  Plaintiffs have decided to follow Cigna's suggestion.

3.     Plaintiffs practice in different medical specialties throughout the State of New Jersey, but they have been similarly victimized by the same pattern of unscrupulous conduct by Cigna.

4.      Cigna provides healthcare insurance, administration, and/or benefits to insureds or plan participants pursuant to a variety of healthcare benefit plans and policies of insurance, including employer-sponsored benefit plans and individual health benefit plans.

## A.      Overview of Cigna's ERISA Violations

5.      Cigna serves in the trusted role of third-party administrator for many of the Cigna Plans on behalf of employers who sponsor health insurance benefits for their employees.  Most of the Cigna Plans covering the Subscribers in this case are Administrative Services Only Plans, for which Cigna serves as third party administrator (the "ASO Plans").  Cigna also directly insures some of the Cigna Plans (the "Fully-Insured Plans").

6.      Other than Cigna HMO Plans, the Cigna Plans provide enrolled patients ("Cigna Subscribers" or "Subscribers") with access to out-of-network healthcare providers—for which the beneficiaries pay Cigna a handsome premium—giving patients the opportunity to seek the best treatment available in their geographic area. Cigna Subscribers regularly choose to receive treatment at Plaintiffs' facilities because of the high quality of care Plaintiffs provide.  In these situations, the Cigna Plans determine the amount Cigna is required to reimburse the out-of-network provider for the medically necessary services rendered to Cigna Subscribers.

- 3 -

7.     The Cigna Subscribers who seek medical treatment from Plaintiffs assign their rights to benefits under the Cigna Plans to Plaintiffs.

8.     For emergency treatment provided to Cigna Subscribers, under the terms of the Cigna Plans and by operation of law, all Cigna Plans must reimburse out-of-network providers such as Plaintiffs in an amount that ensures the Subscribers are not financially responsible for more than amounts for which the Subscribers would be otherwise responsible, such as co-payments, co-insurance, and deductibles (the "Patient Responsibility Amounts") had they been treated at an in-network facility.  The import of this requirement is that the Plans are obligated to reimburse the providers their normal charges, less the Patient Responsibility Amounts (calculated under the Plans as if the provider were in-network).

9.     For elective treatment provided to Cigna Subscribers, the Plans generally require that Cigna reimburse the health care providers at the "Maximum Reimbursable Charge" ("MRC"), less the Patient Responsibility Amounts calculated at the out-of-network level in accordance with the Plan documents.  The MRC is typically defined in the Plans as the lesser of the health care provider's normal charges for the service or supply or some alternative amount – either a Plan-designated percentile (ranging between the 80th and 100th percentile) of the Fair Health Database (for Plans that adopt the so-called "MRC-1" methodology), or a Plan-selected percentage of a schedule that Cigna is required to develop using a

- 4 -

methodology that is similar to that employed by Medicare (for Plans that adopt the so-called "MRC-2" methodology).

10.     However, for the claims at issue in this case (the "Cigna Claims"), described more fully for each Plaintiff on Exhibits A-1 to A-23, Cigna has intentionally failed and refused to calculate the amounts due to Plaintiffs in the manner required under the Plans, either for emergency or elective treatment.

11.     Specifically, for emergency treatment, Cigna has failed to reimburse Plaintiffs their normal charges, less the Patient Responsibility Amounts calculated under the Plans as if the provider were in-network.

12.     Moreover, for elective treatment, Cigna has failed to reimburse Plaintiffs at the appropriate MRC level, less the Patient Responsibility Amounts calculated at the out-of-network level under the Plans.

13.     Specifically, for those Plans that calculate MRC using the MRC-1 approach (i.e., based on a Plan-selected percentile of the Fair Health database), Plaintiffs typically set their normal charges at or around the 80th percentile of the Fair Health database.  This means that, in most if not all cases, Plaintiffs' normal charges for each service or supply represent the MRC-1 amount.  However, Cigna calculates the MRC-1 amount at well below the 80th percentile of the Fair Health database.

14.     Moreover, for those Plans that calculate MRC using the MRC-2 approach (i.e., based on a Plan-selected percentage of a schedule that Cigna is required to develop using a methodology that is similar to that employed by Medicare), Cigna has never developed such a schedule.  Thus, Plaintiffs' normal charges for each service or supply represent the MRC-2 amount.  However, Cigna calculates MRC-2 based upon the applicable Medicare rate.

15.      Moreover, Cigna has set up complex processes and procedures that are designed to frustrate Plaintiffs' right to be paid properly under the Cigna Plans.

16.     Simultaneously, Cigna engages in self-dealing by drawing down from the trust funds of the Cigna Plans the full amount of the healthcare providers' billed charges, and it impermissibly retains those funds for its own purposes.

17.     Cigna's conduct violates the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and state law.

18.     Attached hereto as Exhibit A-1 to A-23 are charts of the Cigna Claims broken out by each plaintiff, and each including, among other things, the date of service, the specific current procedural code ("CPT"), the plaintiff's normal charges for the particular CPT codes billed, the patient responsibility amounts as calculated by Cigna, and the amounts actually paid by Cigna, and the amounts due, on each

individual claim.[1]  Attached hereto as Exhibit B is a summary spreadsheet listing the total numbers of Cigna Claims (emergency and non-emergency) applicable to each Plaintiff, and the total amounts due and owing to each Plaintiff for the Cigna Claims.

19.    The information contained on Exhibits A-1 to A-23 and Exhibit B is based on discovery that has been conducted between the parties to date. Additionally, because Cigna Subscribers continue to seek treatment by Plaintiffs, the underpayment amounts continue to accrue. Accordingly, Plaintiffs expect the amounts due, as claimed on Exhibits A-1 to A-23, will increase.

### B.    Overview of Cigna's RICO Violations

20.    Cigna's conduct also violates the Racketeer Influenced and Corrupt Organizations Act  ("RICO"), 18 U.S.C. §§ 1961-1968, based on Cigna's conduct of the affairs of the Cigna Plans through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5).

21.    This pattern of racketeering involves Cigna's multiple and repeated uses of the mails and wires in furtherance of four distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

---

[1] To protect the private health information of the Cigna Subscribers, Plaintiffs are filing Exhibits A-1 to A-23, and Exhibit B under seal, and are sharing same with Cigna's counsel in accordance with the existing Discovery Confidentiality and HIPAA Qualified Order in this matter (ECF Dkt. No. 47).

22.     Moreover, for the ASO Plans governed by ERISA (the "ERISA ASO Plans"), Cigna's pattern of racketeering also includes Cigna's multiple acts of embezzlement, theft, and unlawful conversion or abstraction of assets of the ERISA ASO Plans, in violation of 18 U.S.C. § 664.

23.     One of Cigna's schemes to defraud under 18 U.S.C. §§ 1341 and 1343 involves its false and inconsistent statements on Cigna-issued Electronic Remittance Advice or paper Explanation of Benefits/Payment forms (collectively, the "EOB") (the "Contradictory EOB Scheme").  When processing a claim by an out-of-network provider, Cigna will state on an ERA or EOP issued to a healthcare provider (a "Provider EOP") that the amounts wrongfully retained by Cigna are not covered under the terms of the pertinent Cigna ERISA Plan or are subject to certain "adjustments" that are inconsistent with the terms of the ERISA ASO Plans.  For example:

Summary of a claim for services on May 17, 2018

for services provided by ███████████

| Amount Billed | $62,405.00 | This was the amount that was billed for your visit on 05/17/2018. |
|---|---|---|
| Discount | $0.00 | CIGNA negotiates discounts with health care professionals and facilities to help you save money. Using an in-network option is one way you can save. Visit myCIGNA.com or call Customer Service to learn more. |
| Amount not covered | $59,420.82 | This is the portion of your bill that's not covered by your plan. You may or may not need to pay this amount. See the Notes section on the following pages for more information.   The total amount of what is not allowed and/ or not covered is $59,420.82 of which you owe $59,420.82 . |
| What your plan paid | $2,088.93 | This is a correction of a previously processed claim. |
| What I owe | $60,316.07 | This is the amount you owe after your discount, your plan paid, and what your accounts paid. People usually owe because they may have a deductible, have to pay a percentage of the covered amount, or for care not covered by their plan. Any amount you paid since care was received may reduce the amount you owe. |
| You saved | 3% | You saved $2,088.93 (or 3%) off the total amount billed. This is a total of your discount and what your plan paid. To maximize your savings, visit www.myCIGNA.com or call customer service to estimate treatment costs, or to compare cost and quality of in-network health care professionals and facilities. |

24.     But on the EOBs issued to the Cigna Subscribers *for the same claims* (the "Patient EOB"), Cigna will report completely different information.   For example, Cigna may falsely state that Plaintiffs are either contracted with Cigna to accept certain rates, or have agreed with Cigna or a Repricing Company to accept a "discount"—both complete fabrications.   The following Patient EOB for the same claim as referenced in the preceding paragraph contains entirely inconsistent information:

Summary of a claim for services on May 17, 2018

for services provided by ▮▮▮▮▮▮▮

| Amount Billed | $62,405.00 | This was the amount that was billed for your visit on 05/17/2018. |
|---|---|---|
| Discount | $59,420.82 | **You saved $59,420.82.** CIGNA negotiates discounts with health care professionals and facilities to help you save money. |
| What your plan paid | $2,088.93 | Your plan paid $2,088.93 to ▮▮▮▮▮▮▮ This is a correction of a previously processed claim. |
| What I owe | **$895.25** | This is the amount you owe after your discount, your plan paid, and what your accounts paid. People usually owe because they may have a deductible, have to pay a percentage of the covered amount, or for care not covered by their plan. Any amount you paid since care was received may reduce the amount you owe. |
| You saved | 98% | You saved $61,509.75 (or 98%) off the total amount billed. This is a total of your discount and what your plan paid. To maximize your savings, visit www.myCIGNA.com or call customer service to estimate treatment costs, or to compare cost and quality of in-network health care professionals and facilities. |

25.    In this example, Cigna has told the provider that the Cigna Subscriber owes it $60,316.07 as the amount not covered under the Subscriber's Plan, but it has told the Subscriber that he/she owes the provider only $895.25 because Cigna negotiated a 98% discount with the provider. In doing this, Cigna misrepresents to Cigna Subscribers that the amounts improperly adjusted by Cigna are "discounts." This misrepresentation appears on most Cigna Claim Patient EOBs.

26.    A second and related scheme to defraud under 18 U.S.C. §§ 1341 and 1343 involves Cigna's use of the mails or wires to misrepresent to Plaintiffs, Cigna Subscribers, and the Cigna Plans, that Cigna drastically underpaid Plaintiffs' claims purportedly because of a "contract" between an individual Plaintiff and Cigna as an in-network provider, or with a third-party leasing contractor or negotiator couched as a repricing company ("Repricing Company") to accept discounted rates (the "Fictitious Contracting Scheme"). Both explanations are patently false. Plaintiffs

- 10 -

are *out-of-network providers* who have not contracted with Cigna.  No Plaintiff agreed to the drastically reduced reimbursement rates paid by Cigna.  In reliance on Cigna's misrepresentations that it had negotiated discounts with Plaintiffs, the Cigna Plans failed to pay Plaintiffs amounts due and owing to them and instead paid Cigna "cost containment fees" on the purported "savings" that Cigna had realized.

27.    Yet another of Cigna's schemes to defraud involves its conspiring with the Repricing Companies to underpay Plaintiffs' Cigna Claims via a euphemistically named "cost-containment process" that it misrepresents to the ASO Plans as a cost-savings mechanism to save the ASO Plans money on out-of-network claims administration (the "Repricing Reduction Scheme").  Through this scheme, out-of-network claims are sent through the wires to a Repricing Company where the Repricing Company recommends to Cigna that Cigna pay a deeply slashed reimbursement rate, well below the amounts due under the Cigna Plans.  Cigna invariably adopts that recommendation and processes the claim for (under)payment. Cigna uses these gross misrepresentations as cover for its embezzlement or conversion of ERISA Cigna Plan trust assets in the guise of cost-containment fees based on a percentage of the "savings."  Cigna then pays a commission to the Repricing Companies that is similarly based on a percentage of "savings."

28.    Still another scheme to defraud involves Cigna's conspiracy with the Repricing Companies to force out-of-network providers like Plaintiffs to enter into

negotiations for payment of valid claims, by misrepresenting to Plaintiffs that the Cigna Plans pay less than they actually do (the "Fraudulent Negotiations Scheme"). In conspiracy with Cigna, the Repricing Companies send offer letters through the mails designed to coerce or mislead out-of-network providers such as Plaintiffs into accepting the settlement offers.  In some instances, the Repricing Companies falsely inform Plaintiffs that the services provided to the Cigna Subscriber will not be covered at all under the Cigna Plans, or that they will receive a reimbursement of "as low as 110%" of the Medicare rate, notwithstanding that the Cigna Plans require much higher reimbursement.  And, as expected, the Repricing Companies will reimburse the providers these grossly insufficient amounts only if the provider waives all rights to additional payment.

29.     Cigna has repeatedly used the mails and wires in furtherance of each of the four schemes to defraud.  As described more fully below, this includes, among other things:

- Electronic processing of Plaintiffs' claims, including electronic bank transfers and payments, at pre-determined amounts based on improper coding combinations, mainly based on the false premise that Plaintiffs are in-network providers or have contracts with Repricing Companies to accept drastic discounts;

- Transmittal of electronic or mailing of paper Provider EOPs that state that the underpaid claim amounts retained by Cigna are not covered by the Plan, based on Plaintiffs' agreement to accept an in-network or otherwise reduced rate based on a non-existent contract with either Cigna or a Repricing Company, or other improper adjustment; and

- 12 -

- • Transmittal of electronic or mailing of paper Patient EOBs to Cigna Subscribers falsely asserting that Plaintiffs agreed to accept a deep discount and that Cigna obtained an extremely favorable savings on the claim to the Cigna Subscribers' benefit.

30.    Through these four schemes, Cigna improperly deprives Plaintiffs of monies otherwise due and payable to Plaintiffs under the Cigna Plans, and otherwise damage Plaintiffs, by engaging in any or all of the following conduct, among others: (1) embezzling and/or converting the amount characterized as a "discount" on the Patient EOB that is rightfully due and owing to the Plaintiffs under the terms of the ERISA ASO Plans; (2) earning interest on these amounts, and (3) wrongfully profiting through embezzlement and/or conversion of ERISA Cigna Plan trust assets based on cost containment fees calculated as a percentage of the "discounted" amount.

31.    In carrying out these schemes, and through other conduct detailed below, Cigna has not only engaged in predicate acts of mail and wire fraud in violation of 18 U.S.C §§ 1341 and 1343, but it has also engaged in multiple acts of embezzlement, theft, or unlawful conversion or abstraction of assets belonging to the ERISA ASO Plans, in violation of 18 U.S.C. § 664.

32.    The foregoing conduct violates RICO in that Cigna has: (1) conducted and participated in the affairs of multiple enterprises, including the ERISA ASO Plans and other Cigna Plans for which Cigna serves as third-party administrator or

- 13 -

otherwise as a Plan fiduciary, through the aforementioned patterns of racketeering activity in violation of 18 U.S.C. § 1962(c); (2) conspired with the Repricing Companies and others to do so, in violation of 18 U.S.C. § 1962(d); (3) invested the proceeds of the racketeering activities of multiple enterprises—including Cigna itself and the Repricing Companies—in violation of 18 U.S.C. § 1962(a); and (4) conspired with the Repricing Companies and others to do so, in violation of 18 U.S.C. § 1962(d).

33.    Plaintiffs have been injured in their business and property and, thus, have standing to pursue a civil RICO action against Cigna under 18 U.S.C. § 1964(c).

## THE PARTIES

### A.    The Plaintiffs

34.    Plaintiff Advanced Gynecology is a privately held company organized under the laws of the State of New Jersey, with its principal place of business at 2025 Hamburg Turnpike, Suite C, Wayne, New Jersey 07470.  Advanced Gynecology is a company whose physicians practice in the area of general gynecology.

35.    Plaintiff AR Surgeons is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 113 Essex St, Maywood, NJ 07607.  AR Surgeons is a company whose physicians practice in the area of aesthetic and reconstructive plastic surgery.

- 14 -

36.     Plaintiff Atlantic Orthopedics is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 1131 Broad Street, Suite 202, Building B, Shrewsbury, New Jersey 07702.   Atlantic Orthopedics is a company whose physicians practice in the area of pediatric orthopedic medicine.

37.     Plaintiff Bergen Surgical is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 211 Essex Street, Suite 102, Hackensack, NJ 07601.   Bergen Surgical is a company whose physicians practice in the area of vascular medicine.

38.     Plaintiff East Coast Aesthetic is a privately held company organized under the laws of the State of New Jersey, with its principal place of business at 125 Prospect Avenue, Hackensack, New Jersey 07601.   East Coast Aesthetic is a company whose physicians practice in the area of aesthetic and reconstructive plastic surgery.

39.     Plaintiff Garden State Bariatrics is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 1430 Hooper Avenue, Suite 203, Toms River, New Jersey 08753. Garden State Bariatrics is a company whose physicians practice in the area of bariatric surgery.

40.     Plaintiff Hackensack Vascular is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 211 Essex Street, Suite 102, Hackensack, NJ 07601.  Hackensack Vascular is a company whose physicians practice in the area of vascular medicine.

41.     Plaintiff Heritage General is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 261 Old Hook Road, Westwood, New Jersey 07675.  Heritage General is a company whose physicians practice in the area of general, colon and rectal surgery.

42.     Plaintiff Heritage Surgical is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 261 Old Hook Road, Westwood, New Jersey 07675.  Heritage Surgical is a company whose physicians practice in the area of general, colon and rectal surgery.

43.     Plaintiff Jersey Integrative is a privately held company organized under the laws of the State of New Jersey, with its principal place of business at 901 Route 23, Second Floor, Pompton Plains, New Jersey 07444.  Jersey Integrative is a company whose physicians practice in the areas of sports medicine and spine care.

44.     Plaintiff Modern Ortho is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 2025 Hamburg Turnpike, Suite C, Wayne, New Jersey 07470.  Modern Ortho is a

- 16 -

company whose physicians practice in the treatment of upper extremity conditions of the hand, wrist, elbow and shoulder.

45.    Plaintiff NJSMS is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 113 Essex Street, #201, Maywood, New Jersey 07607.  NJSMS is a company whose physicians practice in the area of spine surgery.

46.    Plaintiff NJSI/Somerset Ortho is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 1 Robertson Drive, Suite 11, Bedminster, New Jersey 07921.  NJSI/Somerset Ortho is a company whose physicians practice in the area of spine surgery.

47.    Plaintiff NJ Brain and Spine is a privately held company organized under the laws of the State of New Jersey, with its principal place of business at 680 Kinderkamack Road, Suite 300 (3rd Floor), Oradell, New Jersey 07649.  NJ Brain and Spine is a company whose physicians practice in the areas of brain and spine surgery.

48.    Plaintiff NJ Bariatric is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 800 Lanidex Plaza, Suite 100, Parsippany, New Jersey 07054.  NJ Bariatric is a company whose physicians practice in the area of bariatric surgery.

49.    Plaintiff North Jersey Laparoscopic is a privately held limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 222 Cedar Lane, Suite 201, Teaneck, New Jersey 07666.  North Jersey Laparoscopic is a company whose physicians practice in the area of bariatric surgery.

50.    Plaintiff Premier OBGYN is a privately held company organized under the laws of the State of New Jersey, with its principal place of business at 255 W. Spring Valley Avenue, Suite 102, Maywood, New Jersey 07607.  Premier OBGYN is a company whose physicians practice in the area of general gynecology and obstetrics.

51.    Plaintiff Professional Orthopaedic Associates is a privately held association organized under the laws of the State of New Jersey, with its principal place of business at 776 Shrewsbury Avenue, Suite 105, Tinton Falls, New Jersey 07724.  Professional Orthopaedic Associates is a company whose physicians practice in the areas of sports and orthopaedic medicine.

52.    Plaintiff Restoration Ortho is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 113 Essex Street #201, Maywood, New Jersey 07607.  Restoration Ortho is a company whose physicians practice in the areas of sports and orthopaedic medicine.

53.     Plaintiff Spine Surgery Associates is a privately held company organized under the laws of the State of New Jersey, with its principal place of business at 280 Newton Sparta Road, Newton, New Jersey 07860.  Spine Surgery Associates is a company whose physicians practice in the area of spine surgery.

54.     Plaintiff Stephen G. Silver, P.A. is a privately held association in the State of New Jersey, with a principal place of business at 360 Essex Street, Suite 303, Hackensack, New Jersey 07601.  Dr. Silver practices in the area of orthopedic surgery.

55.     Plaintiff SurgXcel is a privately held limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 15 Hoffman Avenue, Lake Hiawatha, New Jersey 07034-2320.  SurgXcel is a company who provides medically necessary physician assistant services.

56.     Plaintiff Tri-State Surgery is a limited liability company organized under the laws of the State of New Jersey, with its principal place of business at 3 Winslow Place, Paramus, New Jersey 07652.  Tri-State Surgery is a company whose physicians practice in the area of aesthetic and reconstructive plastic surgery.

**B.     Defendants**

57.     Defendant Cigna Health and Life Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of

business at 900 Cottage Grove Road, Wilde Building, Bloomfield, CT 06152, and a registered agent located at CT Corporation System, One Corporate Center, Hartford, CT 06103-3220.

58.    Defendant Connecticut General Life Insurance Company is a corporation organized under the laws of the State of Connecticut, with its principal place of business at 900 Cottage Grove Road, Wilde Building, Bloomfield, CT 06152, and a registered agent located at CT Corporation System, One Corporate Center, Hartford, CT 06103-3220.

59.    Cigna is in the business of underwriting, selling, and administering health benefit plans and policies of health insurance.  According to Cigna, it provides benefits under a variety of health benefit plans, including individual health benefit plans and group plans, including employer-sponsored plans.

## JURISDICTION, VENUE, AND JOINDER

60.    This Court has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiffs assert federal claims against Cigna, in Counts One and Two, under ERISA.

61.    This Court also has federal question subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as Plaintiffs assert federal claims against Cigna, in Counts Three, Four, Five, and Six, under RICO.

62.     This Court also has supplemental jurisdiction over Plaintiffs' state law claims against Cigna, in Counts Seven and Eight, because these claims are so related to Plaintiffs' federal claims that the state law claims form a part of the same case or controversy under Article III of the United States Constitution.   The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

63.     This Court has personal jurisdiction over Cigna because Cigna carries on one or more businesses or business ventures in this judicial district; there is the requisite nexus between the business(es) and this action; and Cigna engages in substantial and not isolated activity within this judicial district.

64.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2), because a substantial portion of the events giving rise to this action arose in this District.

65.     All Plaintiffs are properly joined in this action as Plaintiffs, pursuant to Fed. R. Civ. P. 20(a)(1), because their claims arise out of a series of transactions or occurrences (Cigna's processing of the Cigna Claims) and questions of law and fact common to all Plaintiffs will arise in this action, including, among other things: Cigna's intentional miscalculation of the emergency care, MRC-1 amounts, and MRC-2 amounts payable under the Cigna Plans; Cigna's pattern of self-dealing in its administration of the Cigna Plans; and Cigna's conducting of the affairs of the Cigna Plans through a pattern of racketeering described more fully below.

## FACTUAL ALLEGATIONS

I. **Cigna Underpays the Plaintiffs and Engages in Self-Dealing in Violation of the Plans and ERISA**

   A. **The Plaintiffs' Out-of-Network Status**

66.     Plaintiffs, described more fully below, are New Jersey provider groups who have and continue to provide medically necessary emergency and elective care to Cigna Subscribers.  Those Plaintiffs who provide emergency medical treatment are required by law to provide such care to any patient, regardless of the patient's ability to pay and regardless of the source of insurance payment.  A patient's ability to pay in no way affects or impedes Plaintiffs' delivery of emergency healthcare.

67.     Healthcare providers are either "in-network" or "out-of-network" with respect to a particular insurance carrier.  "In-network" or "participating" providers are those who contract with a health insurer that requires them to accept discounted negotiated rates as payment in full for covered services.

68.     "Out-of-network" or "non-participating" providers are those that do not have contracts with an insurance carrier to accept discounted rates and instead set their own fees for services based on a percentage of charges.

69.     Plaintiffs have been, and remain, willing to become in-network providers with Cigna, provided that Cigna is willing to provide in-network rates that would be sufficient to allow Plaintiffs to sustain themselves, meet their continuing obligations to provide quality healthcare services, and generate a reasonable profit.

To date, however, Plaintiffs have been unable to negotiate sustainable in-network rates with Cigna.

70.     Despite Plaintiffs' out-of-network status, Cigna Subscribers regularly seek treatment from Plaintiffs.  In many cases, Cigna Subscribers pay significantly higher premiums for the inclusion of "out-of-network" benefits in their Plans in order to have access to out-of-network providers and obtain necessary medical services from the providers and facilities of their choice.

**B.     The Plans' Coverage and Payment Requirements**

**1.     Coverage and Payment Requirements for Emergency Care**

71.     Federal and New Jersey law requires that anyone seeking treatment at an emergency department for what they believe to be an emergency condition be stabilized and treated, regardless of the individual's insurance status or ability to pay. Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. § 1395dd; *N.J.S.A.* 26:2H-18.64.  In New Jersey, this "take-all-comers" statute states that "[n]o hospital shall deny any admission or appropriate service to a Patient on the basis of that Patient's ability to pay or source of payment."  Violation of EMTALA and the New Jersey Mandate subjects a provider to a civil penalty of $50,000 under EMTALA, and $10,000 under the New Jersey Mandate, for each violation.

72.     EMTALA and New Jersey regulations mandate that a hospital provide an appropriate medical screening examination to all individuals who come to an

emergency department with what they believe to be an emergent or urgent condition, and stabilization treatment, if necessary. 42 U.S.C. § 1395dd(a)-(b); *N.J.A.C.* 8:43G-12.7(c).

73.     The Patient Protection and Affordable Care Act ("ACA") added Section 2719A to the Public Health Services Act ("PHS Act"), 42 U.S.C. § 300gg-19a. Section 2719A requires any group health plan, or health insurer that provides or covers benefits with respect to services in an emergency department of a hospital, to cover any emergency services: without the need for prior authorization; without regard to the provider's status as an in-network or out-of-network provider; and in a manner that ensures that the patient's cost-sharing requirement (expressed as a copayment amount or coinsurance rate) is the same requirement that would apply if such services were provided in-network. 42 U.S.C. § 300gg-19a(b)(1). These cost-sharing requirements are expressly incorporated into group health plans covered by ERISA. *See* 29 U.S.C. § 1185d(a) (certain provisions of the PHS Act, including Section 2719A, "shall apply to group health plans, and health insurance issuers providing health insurance coverage in connection with group health plans, as if included in this subpart").[2]

---

[2] These requirements do not apply to "grandfathered plans." A plan is grandfathered if it was in existence as of March 23, 2010, and did not undergo certain changes to lose its "grandfathered" status thereafter. *See* 42 U.S.C. § 18011. Upon information and belief, none of the Cigna Plans at issue in this case are grandfathered plans under the ACA.

74.     Regulations promulgated pursuant to Section 2719A provide that, to satisfy the ACA's cost-sharing obligations, a non-grandfathered plan must pay the greatest of three possible amounts for out-of-network emergency services:  (1) the amount negotiated with in-network providers for the emergency service, accounting for in-network co-payment and co-insurance obligations; (2) the amount for the emergency service calculated using the same method the plan generally uses to determine payments for out-of-network services (such as usual, customary and reasonable charges), but substituting in-network cost-sharing provisions for out-of-network cost-sharing provisions; or (3) the amount that would be paid under Medicare for the emergency service, accounting for in-network co-payment and co-insurance obligations.  29 CFR § 2590.715-2719A(b)(3)(i)(A)-(C) (the "Greatest of Three regulation").

75.     The Cigna Plans all mirror the Greatest of Three regulation and specify that the calculation of the allowed amount for Emergency Services[3] provided by OON providers such as Plaintiffs, is based on the following:

---

[3] All of the Cigna Plans define "Emergency Services" substantially as follows:

> Emergency services means, with respect to an emergency medical condition, a medical screening examination that is within the capability of the emergency department of a hospital, including ancillary services routinely available to the emergency department to evaluate the emergency medical condition; and such further medical examination

Out-of-Network Emergency Services Charges

1. Emergency services are covered at the In-Network cost-sharing level if services are received from a non-participating (Out-of-Network) provider.

2. The allowable amount used in determining benefit payments for covered emergency services provided in the emergency department of a non-participating (Out-of-Network) Hospital is the negotiated amount agreed to by the Out-of-Network provider and Cigna, or if no amount is agreed upon, the greater of the following:

(i) the median amount negotiated with In-Network providers for the emergency service (excluding In-Network copay or coinsurance);

(ii) the Maximum Reimbursable Charge; or

(iii) the amount payable under the Medicare program (not to exceed the provider's billed charges).

The member is responsible for the applicable In-Network cost-sharing amounts. The member also is responsible for all charges in excess of the allowable amount unless a negotiated amount is agreed to by the Out-of-Network provider and Cigna.

76.     Of the three prongs of the Greatest of Three regulation (as incorporated into the Cigna Plans for Emergency Services), the prong that typically results in the greatest amount payable is the "Maximum Reimbursable Charge" prong, or "MRC."

---

and treatment, to the extent they are within the capabilities of the staff and facilities available at the hospital, to stabilize the patient.

As detailed more fully in Part I.B.2 below, the MRC amount generally works out to be the provider's normal charges for the particular services or supply billed.

77.     Thus, the import of the Greatest of Three requirement, and Cigna's own plan language governing reimbursement for Emergency Services, is that Cigna must reimburse Plaintiffs for their normal charges for the particular services or supplies billed, less the Patient Responsibility Amount that the Cigna Subscriber would have incurred had the Subscriber sought emergency or urgent care treatment at an in-network hospital.

### 2.     Coverage and Payment Requirements for Elective Care

78.     In the case of non-emergency (elective) treatment, before Plaintiffs treat a Cigna Subscriber, Cigna typically pre-approves covered treatments provided by Plaintiffs.   Pre-approval from Cigna includes confirmation by Cigna that the Plaintiff is an out-of-network provider, that the Cigna Subscriber has a valid health insurance policy, that the services sought are covered under the Cigna Plan terms, and that the payment would be directed to the Plaintiff.

79.     Pre-approval also includes acknowledgement of the Cigna Subscriber's assignment of benefits and authorization forms.   During this process, Cigna also confirms that the financial responsibility of the Cigna Subscriber is limited to the applicable coinsurance and deductible.

- 27 -

80.    The Cigna Plans reimburse Cigna Subscribers for certain healthcare costs, defined in the plans as "Covered Expenses," which are expenses incurred by the Subscriber for eligible services that are covered under the plan and medically necessary.  When a claim for reimbursement for a covered expense is submitted by a Cigna Subscriber or, through assignment, by a provider or facility, Cigna determines what part of the charge is considered for coverage by the Plan.  This amount is known as the "allowed amount."

81.    With respect to elective out-of-network claims, such as those submitted by the similarly situated Plaintiffs, the Cigna Plans at issue in this case provide that the "allowed amount" represents the "Maximum Reimbursable Charge" ("MRC") for Covered Expenses.

82.    The Cigna Plans further provide that health care providers are reimbursed for elective care at the MRC amount, less the Patient Responsibility Amount for out-of-network services as calculated under the Cigna Plans.

83.    The Cigna Plans use one of two primary methodologies for calculating MRC – "MRC-1" and "MRC-2."

### a.    MRC-1

84.    For plans that adopt the "MRC-1" method, the Plans define MRC substantially as follows:

The Maximum Reimbursable Charge for covered services is determined based on the lesser of:

- 28 -

the provider's normal charge for a similar service or supply; or

a policyholder-selected percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by [Cigna].

The percentile used to determine the Maximum Reimbursable Charge is listed in The Schedule.

85.    Upon information and belief, and based on the discovery in this case, the "database selected by" Cigna for purposes of the MRC-1 methodology is the "FAIR Health" database, a database administered by the independent not-for-profit entity, "FAIR Health, Inc." (which stands for "Fair and Independent Research"). FAIR Health, Inc. was established in 2009 out of settlement of claims brought by the New York State Attorney General alleging that multiple health insurers, including Cigna, had been relying on a database known as "Ingenix," which the New York Attorney General described as a "fraudulent and conflict-of-interest ridden reimbursement system affecting millions of patients and their families and costing Americans hundreds of millions of dollars in unexpected and unjust medical costs."[4] The FAIR Health database uses information from more than 36 billion claims to

---

[4] *Attorney General Cuomo Announces Historic Nationwide Reform Of Consumer Reimbursement System For Out-Of-Network Health Care Charges*, NY AG Press Release, October 27, 2009. https://ag.ny.gov/press-release/2009/attorney-general-cuomo-announces-historic-nationwide-reform-consumer (last visited August 17, 2022).

estimate what health care providers charge, and what insurers pay, for providing healthcare to patients."[5]

86.    As detailed in Exhibits A-1 to A-23, the Cigna Plans at issue in this case that follow the MRC-1 methodology reimburse out-of-network providers for elective treatment at between the 80th and 100th percentile of the Fair Health Database.

87.    Thus, for claims covered by the Cigna Plans that follow the MRC-1 methodology, Cigna is required to reimburse Plaintiffs at between the 80th and 100th percentile of the Fair Health Database, less the Patient Responsibility Amounts for out-of-network providers as calculated under the Cigna Plans.

**b.    MRC-2**

88.    For plans that adopt the "MRC-2" method, the Plans define MRC substantially as follows:

Maximum Reimbursable Charge – Medical

The Maximum Reimbursable Charge for covered services is determined based on the lesser of:

•the provider's normal charge for a similar service or supply; or

•a policyholder-selected percentage of a schedule developed by Cigna that is based upon a methodology similar to a methodology utilized by

---

[5]    FAIR    Health    Consumer,    "About    FAIR    Health,"    accessed    at https://www.fairhealthconsumer.org/#about (last visited August 17, 2022).

- 30 -

Medicare to determine the allowable fee for the same or similar service within the geographic market.[6]

89.    Based on this MRC-2 language, in order for Cigna to justify not using "the provider's normal charge for a similar service or supply" to calculate the MRC-2 amount, Cigna must do so using a "schedule" it "developed" that is "based upon a methodology similar to a methodology utilized by Medicare."

90.    However, Cigna has never developed such as "schedule," as called for by this MRC-2 definition.  Instead, it simply relies on a database into which it has inputted the traditional Medicare rates.  This is insufficient to justify a departure from providers' normal charges in calculating the MRC-2 amount.  *See The Plastic Surgery Center P.A. v. Cigna Health and Life Ins.*, No. 3:17-cv-2055-FLW-DEA, 2021 WL 1686772, *6-7 (D.N.J. Apr. 29, 2021) (in order for Cigna to justify not calculating MRC based on the provider's normal charge or the 80th percentile of charges for similar services in the area, "it must do so using a schedule it 'developed' 'based on' a methodology 'similar to' the methodology Medicare uses—not simply by taking whatever amount Medicare would pay").

---

[6] Plans that follow the MRC-2 definition further state that, in "some cases, a Medicare based schedule will not be used and the Maximum Reimbursable Charge for covered services is determined based on the lesser of:   •the provider's normal charge for a similar service or supply; or •the 80th percentile of charges made by providers of such service or supply in the geographic area where it is received as compiled in a database selected by Cigna."

91.     Thus, for claims covered by the Cigna Plans that follow the MRC-2 methodology, Cigna is required to calculate MRC-2 as the providers' normal charges for the services or supplies, less the Patient Responsibility Amounts for out-of-network providers as calculated under the Cigna Plans.

### C.     Cigna's Fiduciary Status

92.     Cigna, among other things, insures and administers employee health and welfare benefit plans, including the Cigna Plans.

93.     As detailed more fully on Exhibits A-1 to A-23, the majority of the Cigna Plans at issue in this case are Administrative Services Only plans, for which Cigna serves as third party administrator (the "ASO Plans"). Upon information and belief, Cigna serves as the named Claims Administrator for these plans and has discretion over the payment of claims.  As the designated Claims Administrator in the ASO Plans, Cigna is an "administrator" under ERISA.   29 U.S.C. § 1002(16)(A)(i).

94.     Cigna also offers Fully-Insured plans, which are funded by Cigna itself, not the sponsoring employees.[7]

95.     ERISA provides that a person is a fiduciary with respect to a plan to the extent that "(i) he exercises any discretionary authority or discretionary control

---

[7] The Cigna Claims arising under ASO Plans are identified as "ASO" in the "Plan Type" columns of Exhibits A-1 to A-23; whereas the Cigna Claims arising under Fully-Insured Plans are identified as "Fully-Insured" in the "Plan Type" columns.

respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, ... or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A). The term "person" is defined broadly to include a corporation such as Cigna. *Id.* § 1002(9).

96.     Cigna is a fiduciary of all of the Cigna Plans because, at a minimum, it exercises authority and/or control respecting management or disposition of the Cigna Plan assets.

97.     Cigna, as an ERISA fiduciary, must "discharge its duties with respect to a plan solely in the interest of the participants and beneficiaries," including Plaintiffs, as assignees of the Cigna Subscribers. 29 U.S.C. § 1104(a)(1)(A)(i).

98.     In performing services to the ERISA ASO Plans, Cigna must not cause the Plan to engage in a transaction Cigna knows or should know constitutes a transfer to, or use by or for the benefit of, Cigna of any ERISA ASO Plans assets. 29 U.S.C. § 1106(a)(1)(D).

99.     As the Cigna Plans' fiduciary, Cigna must not "deal with the assets of the plan in [its] own interest or for [its] own account …." 29 U.S.C. § 1106(b)(1).

### D.    Plaintiffs Receive Complete Assignments of Benefits under the Cigna Plans for Treatment Provided to Cigna's Subscribers

100.    For the Cigna Claims at issue in this case, Cigna Subscribers execute Assignment of Benefits forms ("AOBs"), in which they assign to each of the

- 33 -

Plaintiffs their rights to benefits under the Cigna Plans.  The language of the AOB

forms obtained by each of the Plaintiffs provide as follows:

### 1.    Advanced Gynecology

101.   With respect to the Cigna Claims identified on Advanced Gynecology's

claim list (Exhibit A-1) with dates of service that pre-date May 26, 2020, the AOBs

state, in pertinent part, that "I assign all payments for medical services rendered, to

be made directly to Advanced Gynecology and Laparoscopy of North Jersey."

102.   With respect to the Cigna Claims identified on Advanced Gynecology's

claim list (Exhibit A-1) with dates of service on or after May 26, 2020, the AOBs

state, in pertinent part:

> I HEREBY ASSIGN TO ADVANCED GYNECOLOGY &
> LAPAROSCOPY OF NORTH JERSEY, P.C., ALL OF MY RIGHTS,
> BENEFITS, PRIVILEGES, PROTECTIONS, CLAIMS, CAUSES OF
> ACTION, INTERESTS OR RECOVERY, OF ANY TYPE
> WHATSOEVER, RECEIVABLE BY ME, OR ON MY BEHALF,
> ARISING OUT OF ANY POLICY OF INSURANCE, PLAN, TRUST,
> FUND, OR OTHERWISE PROVIDING HEALTH CARE
> COVERAGE OF ANY TYPE TO ME (OR TO ANY OTHER THIRD
> PARTY RESPONSIBLE FOR ME) FOR THE CHARGES
> RENDERED TO ME BY ADVANCED GYNECOLOGY &
> LAPAROSCOPY OF NORTH JERSEY, P.C.. THIS INCLUDES,
> WITHOUT LIMITATION, ANY PRIVATE OR GROUP
> HEALTH/HOSPITALIZATION PLAN, AUTOMOBILE
> LIABILITY, GENERAL LIABILITY, PERSONAL INJURY
> PROTECTION, MEDICAL PAYMENTS, UNINSURED OR
> UNDERINSURED MOTOR VEHICLE BENEFITS,
> SETTLEMENTS/JUDGMENTS/VERDICTS, SELF-FUNDED
> PLAN, TRUST, WORKERS COMPENSATION, MEWA
> COLLECTIVE, OR ANY OTHER THIRD-PARTY PAYOR
> PROVIDING HEALTH CARE COVERAGE OF ANY TYPE TO ME

(OR TO ANY OTHER THIRD PARTY RESPONSIBLE FOR ME) FOR THE CHARGES RENDERED TO ME BY ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C. ("COVERAGE SOURCE"). **THIS IS A DIRECT ASSIGNMENT TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C. OF ANY AND ALL OF MY LEGAL OR EQUITABLE RIGHTS TO RECEIVE BENEFITS ARISING OUT OF ANY COVERAGE SOURCE.** THESE LEGAL RIGHTS AND LEGAL CLAIMS INCLUDE, BUT ARE NOT LIMITED TO: (I) MY RIGHTS TO APPEAL ANY DENIAL OR UNDERPAYMENT OF BENEFITS ON MY BEHALF; (II) MY RIGHTS TO PURSUE LEGAL ACTION AGAINST ANY COVERAGE SOURCE FOR UNPAID OR UNDERPAID BENEFITS OR FOR VIOLATING ANY CONTRACTUAL, STATUTORY, LEGAL OR EQUITABLE DUTIES TO ME (INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS I MAY HAVE FOR UNPAID OR UNDERPAID BENEFITS, BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, DENIAL OF A FULL AND FAIR REVIEW, QUANTUM MERUIT, OR UNJUST ENRICHMENT); (III) MY RIGHTS TO REQUEST AND OBTAIN INFORMATION, INCLUDING ANY AND ALL PLAN DOCUMENTS, FROM ANY APPLICABLE COVERAGE SOURCE OR OTHER THIRD-PARTY RESPONSIBLE FOR PROVIDING OR ADMINISTERING HEATH INSURANCE BENEFITS; AND (IV) MY RIGHTS TO FILE A COMPLAINT WITH ANY APPLICABLE FEDERAL, STATE, OR LOCAL REGULATORY AGENCY AGAINST ANY APPLICABLE COVERAGE SOURCE OR OTHER THIRD-PARTY RESPONSIBLE FOR PROVIDING HEALTH INSURANCE BENEFITS. I UNDERSTAND THAT THIS ASSIGNMENT OF BENEFITS IS IRREVOCABLE. THIS ASSIGNMENT OF BENEFITS FULLY AND COMPLETELY ENCOMPASSES ANY LEGAL CLAIM I MAY HAVE AGAINST ANY COVERAGE SOURCE, INCLUDING, BUT NOT LIMITED TO MY RIGHTS TO APPEAL ANY UNDERPAYMENT OR DENIAL OF BENEFITS ON MY BEHALF, TO REQUEST AND OBTAIN PLAN DOCUMENTS, TO PURSUE LEGAL ACTION AGAINST ANY COVERAGE SOURCE, AND/OR TO FILE A COMPLAINT WITH THE NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE.

I AUTHORIZE AND DIRECT PAYMENT BE MADE BY ANY AND ALL COVERAGE SOURCE DIRECTLY TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C. OF ALL BENEFITS, PAYMENTS, MONIES CHECKS, FUNDS, WIRE TRANSFERS OR RECOVERY OF ANY KIND WHATSOEVER FROM ANY COVERAGE SOURCE. I ALSO AGREE TO ASSIST ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C. IN PURSUING PAYMENT FROM ANY COVERAGE SOURCE THIS INCLUDES, WITHOUT LIMITATION, SIGNING DOCUMENTS REQUESTED OR NEEDED TO PURSUE CLAIMS AND APPEALS, GETTING DOCUMENTS FROM COVERAGE SOURCE, OR OTHERWISE TO SUPPORT PAYMENT TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C.. I ALSO DIRECT AND AGREE THAT ANY PAYMENTS OF ANY KIND (E.G., CHECKS, FUNDS, PAYMENTS, MONIES, BENEFITS OR RECOVERY FOR COVERAGE OF SERVICES BY ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C., THAT IS SENT DIRECTLY TO ME (OR TO ANOTHER THIRD PARTY RESPONSIBLE FOR ME) WILL BE SENT AND TURNED OVER IMMEDIATELY BY ME TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C., THROUGH WHATEVER MEANS NECESSARY THIS INCLUDES, WITHOUT LIMITATION, ME AND IF NEEDED ANY GUARDIAN ENDORSING OVER ANY CHECKS AND/OR OTHER DOCUMENTS TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C.. I ALSO UNDERSTAND THAT IF I FAIL TO TURN OVER TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C. ANY SUCH PAYMENTS SENT DIRECTLY TO ME (OR TO ANOTHER THIRD PARTY RESPONSIBLE FOR ME), I WILL BE FINANCIALLY RESPONSIBLE TO ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C., FOR THE AMOUNT OF SUCH PAYMENTS, AND I MAY ALSO BE SUBJECT TO CIVIL OR CRIMINAL PROSECUTION TO THE FULLEST EXTENT PERMITTED BY LAW.

I HEREBY AUTHORIZE AND DESIGNATE ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C., AS

MY AUTHORIZED AGENT AND REPRESENTATIVE TO ACT ON MY BEHALF IN ALL MATTERS RELATED TO ALL OF MY RIGHTS, BENEFITS, PRIVILEGES, PROTECTIONS, CLAIMS, CAUSES OF ACTION, INTERESTS OR RECOVERY ARISING OUT OF ANY COVERAGE SOURCE THIS INCLUDES, WITHOUT LIMITATION, ADVANCED GYNECOLOGY & LAPAROSCOPY OF NORTH JERSEY, P.C., REQUESTING VERIFICATION OF OVERAGE / PRE-CERTIFICATION /AUTHORIZATION, FILING PRE-SERVICE AND POST-SERVICE CLAIMS AND APPEALS, RECEIVING ALL INFORMATION, DOCUMENTATION, SUMMARY PLAN DESCRIPTIONS, BARGAINING AGREEMENTS, TRUST RULES, GUIDELINES, PROTOCOLS, OR OTHER CRITERIA CONSIDERED BY THE COVERAGE SOURCE, IN CONNECTION WITH ANY CLAIMS, BENEFIT DETERMINATIONS, APPEALS, OR NOTIFICATIONS RELATED TO CLAIMS OR APPEALS.

## 2.    AR Surgeons

103.   The AOBs for Plaintiff AR Surgeons state, in pertinent part:

I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any penalties or equitable relief) under my health insurance policy or benefit plan to Aesthetic & Reconstructive Surgeons, LLC and Richard Winters MD, Stephanie Cohen (collectively, the "Providers") with respect to any and all medical/facility services provided by the Providers to me for all dates of service, including without limitation, the right of one or more of the Providers, or their attorney (or other representative) to (i) execute, in my name and on my behalf, any form, document or Instrument required under any applicable insurance policy or benefit plan to further evidence my intent as set forth herein and to avoid any delay in pursuing rights under applicable Federal and State Laws, rules, regulations or requirements (collectively, "Laws"), (ii) pursue penalties for and exclusively on behalf of Providers against any insurance policy or benefit plan for failure of the plan administrator (or other fiduciary) to timely produce or respond to requests (including appeals) for all information relating to any plan documents as required by any applicable Laws, (iii) to assert claims and initiate legal action for breach of fiduciary duty against and person or entity, and (iv) to

- 37 -

endorse for me any checks made payable to me for benefits and claims collected toward my account.

104.   AR Surgeons also obtains Limited Powers of Attorney ("LPOAs") from the Cigna Subscribers they treat.  The AR Surgeons LPOA states:

> In the event the insurance carrier responsible for making medical payments to Aesthetic & Reconstructive Surgeons, LLC and Richard Winters MD, Stephanie Cohen for medical services rendered to me does not accept my assignment of benefits rights, or my assignment is challenged or deemed invalid, I execute this limited/special power of attorney and appoint and authorize Provider and his/her/its attorney (or other representative) as my agent and attorney in fact, to assert any and all of my benefit and non-benefit rights for and on my behalf, including, without limitation, to bring any appeal, pre-litigation demand, demand for payment, arbitration, lawsuit, independent dispute resolution or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination and payment of benefits under any insurance policy or benefit plan, I agree that any recovery shall be applied to payment due my Provider, and attorney fees and costs. To this end, Provider has exclusive settlement authority.

### 3.   Atlantic Orthopedics

105.   The AOBs for Plaintiff Atlantic Orthopedics state, in pertinent part:

> I authorize Atlantic Pediatric Orthopedics, P.A. and Dr. Stankovits to furnish information concerning my illness and treatment to any insurance company. I further assign to the physician all payments the insurance carrier are obligated to make on my behalf for medical/surgical services rendered by Dr. Stankovits and this office.

### 4.   Bergen Surgical

106.   Plaintiffs Bergen Surgical renders the majority of its services to patients, including Cigna Subscribers, on an emergent basis at Hackensack University Medical Center.  The AOB form used by Hackensack University Medical

Center, which includes an assignment of Bergen Surgical's insurance rights and

benefits, states, in pertinent part:

>**ASSIGNMENT OF BENEFITS:** I authorize my health insurance benefits to be paid directly to Hackensack University Medical Center. Under the terms of my policy this payment may not exceed the balance due for services performed during this period or treatment.  I further authorize Hackensack University Medical Center to appeal on my behalf any denial by my insurance carrier.

>**FINANCIAL AGREEMENT:**  When billed, I agree to make prompt payment to **Hackensack University Medical Center** for all charges not paid by my insurance or benefits program, to the fullest extent permitted by law.  I understand that in addition to my bill from the Medical Center, I will receive separate bills from physicians for professional services (i.e., anesthesia, emergency services, pathology, radiology, etc.).  I authorize payment directly to my physicians for benefits otherwise payable to me for such services.  I understand that (i) these separate physician charges may not be covered, in whole or in part, by my insurance or benefits program and (ii) that I am financially responsible for all Medical center and physician charges not paid by my insurance or benefits program.  Regardless, I agree that I am financially responsible for all Medical Center and physician charges not paid by my insurance or benefits program.  I understand [that I] should call my insurance company or benefits program if I have questions about insurance coverage.

>**5.      East Coast Aesthetic**

107.   The AOBs for Plaintiff East Coast Aesthetic state, in pertinent part:

**ASSIGNMENT OF BENEFITS & LIMITED POWER OF ATTORNEY**

I irrevocably assign to you, my medical provider, all of my rights and benefits under my insurance contract for payment for services rendered to me.  I authorize you to file insurance claims on my behalf for services rendered to me and this specifically includes filing arbitration/litigation in your name on my behalf against the PIP carrier/healthcare

carrier/worker's compensation carrier. I irrevocably authorize you to retain an attorney of your choice on my behalf for collection of your bills. I direct that all reimbursable medical payment go directly to you, my medical providers. I authorize and consent to your acting on my behalf in this regard and in regard to my general health insurance coverage pursuant to the "benefit denial appeals process" as set forth in the New Jersey Administrative Code.

108.    East Coast Aesthetic also obtains from Cigna Subscribers LPOAs that

state, in pertinent part:

> In the event the insurance carrier responsible for making medical payments in this matter does not accept assignment, or my assignment is challenged or deemed invalid, I execute this limited/special power of attorney and appoint and authorize your collection attorney as my agent and attorney to collect payment for your medical services directly against the carrier in this case, in my name, including filing an arbitration demand or lawsuit. I specifically authorize the attorney to file directly against that carrier in my name or in your name as a medical provider rendering services to me and designate your collection attorney as my attorney in fact. I further grant limited power of attorney to you as my medical provider to receive and collect directly from the insurance carrier money due you for services rendered to me in this matter, and hereby instruct the insurance carrier to pay you directly any monies due for medical services you rendered to me. I authorize you and your attorney to receive from my insurer, immediately upon verbal request, all information regarding last payment made by said Insurer on my claim, including date of payment and balance of benefits remaining.

**6.     Garden State Bariatrics**

109.    With respect to the Cigna Claims identified on Garden State

Bariatrics's claim list (Exhibit A-6) with dates of service prior to May 22, 2018, the

AOBs state, in pertinent part:

**LEGAL          DESIGNATION          OF          AUTHORIZED REPRESENTATIVE     AND     POWER     OF     ATTORNEY,**

- 40 -

**ASSIGNMENT OF RIGHTS TO PURSUE ERISA AND OTHER LEGAL AND ADMINISTRATIVE CLAIMS ASSOCIATED WITH MY HEALTH INSURANCE AND/OR HEALTH BENEFIT PLAN (INCLUDING BREACH OF FIDUCIARY DUTY) AND DESIGNATION OF AUTHORIZED REPRESENTATIVE AND RELEASE OF MEDICAL AND PLAN DOCUMENTS**

In considering the amount of medical expenses to be incurred, I the understand have insurance and/or employee health care benefits coverage with the above captioned, and hereby assign and convey directly to the above named healthcare provider(s), **as my designated Authorized Representative(s) and Power of Attorney**, all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services rendered from such provider(s), regardless of such provider's managed care network participation status. I understand and agree that I am legally responsible for any and all actual total charges authorized by me regardless of any applicable insurance or benefit payments.  I hereby authorize the above named provider(s) to release all medical information necessary to process my claims under HIPAA. I hereby authorize any plan administrator or fiduciary, insurer and my attorney to release to such provider(s) any and all benefits, reimbursement or any applicable remedies. I authorize the use of this signature on all my insurance and/or employee health benefits claims submissions. I hereby convey to the above named provider(s), to the full extent permissible under the law, including but not limited to, any ERISA claim for benefits, breach of ERISA fiduciary duty, and ERISA claim for statutory penalties for failure to produce documents or information in accordance with ERISA §502(a)(1)(B), §502(a)(3) and §502(c)(1)(B), under any applicable employee group health plan(s), insurance policies or public policies, any benefit claim, liability or tort claim, chose in action, appropriate equitable relief, surcharge remedy or other right I may have to such group health plans, health insurance issuers or tortfeasor insurer(s), with respect to any and all medical expenses legally incurred as a result of the medical services I received from the named provider(s), and to the full extent permissible under the law to claim or lien such medical benefits, settlement, insurance reimbursement and any applicable remedies including, but not limited to, (1) obtaining information about the claim to the same extent as the assignor; (2) submitted evidence; (3) making statements about facts or

- 41 -

law; (4) making any request, or giving, or receiving any notice about appeal proceedings; and (5) any administrative and judicial actions by such provider(s) to pursue such claim, chose in action or right against any liable party or employee group health plan(s), including, if necessary, bring suit by such provider(s) against any such liable party or employee group health plan in my name with derivative standing but at such provider(s) expense.  Unless revoked, this assignment is valid for all administrative and judicial reviews under PPACA, ERISA, Medicare and applicable federal or state laws.  A photocopy of this assignment is to be considered as valid as the original.  I have read and fully understand this agreement.  Should this assignment be prohibited in part or in whole under any anti-assignment provision of my policy/plan, please advise and disclose to my providers/Garden State Bariatrics in writing such anti-assignment provision within 30 days upon receipt of my assignment, otherwise this assignment should be reasonable expected to be effective and such anti-assignment is waived.

110.  With respect to the Cigna Claims identified on Garden State Bariatrics's claim list (Exhibit A-6) with dates of service on or after May 22, 2018, the AOBs state, in pertinent part:

ASSIGNMENT OF INSURANCE BENEFITS/DIRECT PAYMENT/AUTHORIZED REPRESENTATIVE/AGENT

I HEREBY ASSIGN TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC, ALL OF MY RIGHTS, BENEFITS, PRIVILEGES, PROTECTIONS, CLAIMS, CAUSES OF ACTION, INTERESTS OR RECOVERY, OF ANY TYPE WHATSOEVER, RECEIVABLE BY ME, OR ON MY BEHALF, ARISING OUT OF ANY POLICY OF INSURANCE, PLAN, TRUST, FUND, OR OTHERWISE PROVIDING HEALTH CARE COVERAGE OF ANY TYPE TO ME (OR TO ANY OTHER THIRD PARTY RESPONSIBLE FOR ME) FOR THE CHARGES RENDERED TO ME BY GARDEN STATE BARIATRICS & WELLNESS CENTER LLC. THIS INCLUDES, WITHOUT LIMITATION, ANY PRIVATE OR GROUP HEALTH/HOSPITALIZATION PLAN, AUTOMOBILE LIABILITY, GENERAL LIABILITY, PERSONAL INJURY PROTECTION, MEDICAL PAYMENTS, UNINSURED OR

- 42 -

UNDERINSURED MOTOR VEHICLE BENEFITS, SETTLEMENTS/JUDGMENTS/VERDICTS, SELF-FUNDED PLAN, TRUST, WORKERS COMPENSATION, MEWA COLLECTIVE, OR ANY OTHER THIRD-PARTY PAYOR PROVIDING HEALTH CARE COVERAGE OF ANY TYPE TO ME (OR TO ANY OTHER THIRD PARTY RESPONSIBLE FOR ME) FOR THE CHARGES RENDERED TO ME BY GARDEN STATE BARIATRICS & WELLNESS CENTER LLC ("COVERAGE SOURCE"). **THIS IS A DIRECT ASSIGNMENT TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC OF ANY AND ALL OF MY LEGAL OR EQUITABLE RIGHTS TO RECEIVE BENEFITS ARISING OUT OF ANY COVERAGE SOURCE.** THESE LEGAL RIGHTS AND LEGAL CLAIMS INCLUDE, BUT ARE NOT LIMITED TO:  (I) MY RIGHTS TO APPEAL ANY DENIAL OR UNDERPAYMENT OF BENEFITS ON MY BEHALF; (II)  MY RIGHTS TO PURSUE LEGAL ACTION AGAINST ANY COVERAGE SOURCE FOR UNPAID OR UNDERPAID BENEFITS OR FOR VIOLATING ANY CONTRACTUAL, STATUTORY, LEGAL OR EQUITABLE DUTIES TO ME (INCLUDING, BUT NOT LIMITED TO, ANY AND ALL CLAIMS I MAY HAVE FOR UNPAID OR UNDERPAID BENEFITS, BREACH OF CONTRACT, BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, DENIAL OF A FULL AND FAIR REVIEW, QUANTUM MERUIT, OR UNJUST ENRICHMENT); (III) MY RIGHTS TO REQUEST AND OBTAIN INFORMATION, INCLUDING ANY AND ALL PLAN DOCUMENTS, FROM ANY APPLICABLE COVERAGE SOURCE OR OTHER THIRD-PARTY RESPONSIBLE FOR PROVIDING OR ADMINISTERING HEATH INSURANCE BENEFITS; AND (IV) MY RIGHTS TO FILE A COMPLAINT WITH ANY APPLICABLE FEDERAL, STATE, OR LOCAL REGULATORY AGENCY AGAINST ANY APPLICABLE COVERAGE SOURCE OR OTHER THIRD-PARTY RESPONSIBLE FOR PROVIDING HEALTH INSURANCE BENEFITS. I UNDERSTAND THAT THIS ASSIGNMENT OF BENEFITS IS IRREVOCABLE. THIS ASSIGNMENT OF BENEFITS FULLY AND COMPLETELY ENCOMPASSES ANY LEGAL CLAIM I MAY HAVE AGAINST ANY COVERAGE SOURCE, INCLUDING, BUT NOT LIMITED TO MY RIGHTS TO APPEAL ANY UNDERPAYMENT OR DENIAL OF BENEFITS ON

- 43 -

MY BEHALF, TO REQUEST AND OBTAIN PLAN DOCUMENTS, TO PURSUE LEGAL ACTION AGAINST ANY COVERAGE SOURCE, AND/OR TO FILE A COMPLAINT WITH THE NEW JERSEY DEPARTMENT OF BANKING AND INSURANCE.

I AUTHORIZE AND DIRECT PAYMENT BE MADE BY ANY AND ALL COVERAGE SOURCE DIRECTLY TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC OF ALL BENEFITS, PAYMENTS, MONIES CHECKS, FUNDS, WIRE TRANSFERS OR RECOVERY OF ANY KIND WHATSOEVER FROM ANY COVERAGE SOURCE. I ALSO AGREE TO ASSIST GARDEN STATE BARIATRICS & WELLNESS CENTER LLC IN PURSUING PAYMENT FROM ANY COVERAGE SOURCE THIS INCLUDES, WITHOUT LIMITATION, SIGNING DOCUMENTS REQUESTED OR NEEDED TO PURSUE CLAIMS AND APPEALS, GETTING DOCUMENTS FROM COVERAGE SOURCE, OR OTHERWISE TO SUPPORT PAYMENT TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC. I ALSO DIRECT AND AGREE THAT ANY PAYMENTS OF ANY KIND (E.G., CHECKS, FUNDS, PAYMENTS, MONIES, BENEFITS OR RECOVERY FOR COVERAGE OF SERVICES BY GARDEN STATE BARIATRICS & WELLNESS CENTER LLC, THAT IS SENT DIRECTLY TO ME (OR TO ANOTHER THIRD PARTY RESPONSIBLE FOR ME) WILL BE SENT AND TURNED OVER IMMEDIATELY BY ME TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC, THROUGH WHATEVER MEANS NECESSARY THIS INCLUDES, WITHOUT LIMITATION, ME AND IF NEEDED ANY GUARDIAN ENDORSING OVER ANY CHECKS AND/OR OTHER DOCUMENTS TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC. I ALSO UNDERSTAND THAT IF I FAIL TO TURN OVER TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC ANY SUCH PAYMENTS SENT DIRECTLY TO ME (OR TO ANOTHER THIRD PARTY RESPONSIBLE FOR ME), I WILL BE FINANCIALLY RESPONSIBLE TO GARDEN STATE BARIATRICS & WELLNESS CENTER LLC, FOR THE AMOUNT OF SUCH PAYMENTS, AND I MAY ALSO BE SUBJECT TO CIVIL OR CRIMINAL PROSECUTION TO THE FULLEST EXTENT PERMITTED BY LAW.

I HEREBY AUTHORIZE AND DESIGNATE GARDEN STATE
BARIATRICS & WELLNESS CENTER LLC, AS MY
AUTHORIZED AGENT AND REPRESENTATIVE TO ACT ON
MY BEHALF IN ALL MATTERS RELATED TO ALL OF MY
RIGHTS, BENEFITS, PRIVILEGES, PROTECTIONS, CLAIMS,
CAUSES OF ACTION, INTERESTS OR RECOVERY ARISING
OUT OF ANY COVERAGE SOURCE THIS INCLUDES, WITHOUT
LIMITATION, GARDEN STATE BARIATRICS & WELLNESS
CENTER LLC, REQUESTING VERIFICATION OF OVERAGE /
PRE-CERTIFICATION  /AUTHORIZATION, FILING PRE-
SERVICE AND POST-SERVICE CLAIMS AND APPEALS,
RECEIVING ALL INFORMATION, DOCUMENTATION,
SUMMARY PLAN DESCRIPTIONS, BARGAINING
AGREEMENTS, TRUST RULES, GUIDELINES, PROTOCOLS, OR
OTHER CRITERIA CONSIDERED BY THE COVERAGE
SOURCE, IN CONNECTION WITH ANY CLAIMS, BENEFIT
DETERMINATIONS, APPEALS, OR NOTIFICATIONS RELATED
TO CLAIMS OR APPEALS.

### 7.   Hackensack Vascular

111.   Plaintiffs Hackensack Vascular, like Bergen Surgical (described above), renders the majority of its services to patients, including Cigna Subscribers, on an emergent basis at Hackensack University Medical Center.  The AOB form used by Hackensack University Medical Center, which includes an assignment of Hackensack Vascular's insurance rights and benefits, contains the language set forth in Part I.D.4 above with respect to Bergen Surgical.

### 8.   Heritage General

112.   The AOBs for Heritage General state, in pertinent part:

ASSIGNMENT OF BENEFITS/AUTHORIZATION FORM

Assignment of Insurance Benefits

- 45 -

I hereby assign all applicable health insurance benefits to which I and/or my dependents are entitled to Provider.  I certify that the health insurance information that I provided to Provider is accurate as of the date set forth below and that I am responsible for keeping it updated.

I hereby authorize Provider to submit claims, on my and/or my dependent's behalf, to the benefit plan (or its administrator) listed on the current insurance card I provided to the Provider, in good faith.  I also hereby instruct my benefit plan (or its administrator) to pay Provider directly for services rendered to me or my dependents.  To the extent that my current policy prohibits direct payment to the Provider, I hereby instruct and direct my benefit plan (or its administrator) to provide documentation stating such non-assignment to myself and Provider upon request.  Upon proof of such non-assignment.  I instruct my benefit plan (or its administrator) to make out the check to me and mail it directly to Provider ….

ERISA Authorization

I hereby designate, authorize, and convey to Provider to the full extent permissible under law and under any applicable insurance policy and/or employee health care benefit plan: (1) the right and ability to act as my Authorized Representative in connection with any claim, right, or cause in action that I may have under such insurance policy and/or benefit plan; (2) the right and ability to act as my Authorized Representative to pursue such claim, right, or cause of action in connection with said insurance policy and/or benefit plan (including but not limited to, the right and ability to act as my Authorized Representative with respect to a benefit plan governed by the provisions of ERISA as provided in 29 C.F.R. §2560.5031(b)(4) with respect to any healthcare expense incurred as a result of the services I received from Provider and, to the extent permissible under the law, to claim on my behalf, such benefits, claims or reimbursement, and any other applicable remedy, including fines.

A photocopy of this Assignment/Authorization shall be as effective and valid as the original.

ASSIGNMENT OF BENEFITS FORM

- 46 -

I hereby instruct and direct Insurance Company to pay by check made out and mailed to:  [Plaintiff name and address] or

If my current policy prohibits direct payments to doctor, I hereby also instruct and direct you to make out the check to me and mail it as follows:

[Plaintiff name and address]

For professional or medical expense benefits allowable, and otherwise payable to me under my current insurance policy as payment toward the total charges for the professional services rendered.  THIS IS A DIRECT ASSIGNMENT OF MY RIGHTS AND BENEFITS UNDER THIS POLICY.  This payment will not exceed my indebtedness to the above-mentioned assignee, and I have agreed to pay, in a current manner, any balance of said professional service charges over and above this insurance payment.  If payment is mailed directly to me I will bring in the check and explanation of benefits within 1 week of receipt.

A photocopy of this Assignment shall be considered as effective and valid as the original.

### 9.    Heritage Surgical

113.   The AOBs for Heritage Surgical contain the same language as the

AOBs for Heritage General (listed in Part I.D.8, above).

### 10.    Jersey Integrative

114.   The AOBs for Plaintiff Jersey Integrative state, in pertinent part:

ASSIGNMENT OF BENEFITS

I request that payment of authorized insurance benefits be made on my behalf to JERSEY INTEGRATIVE HEALTH AND WELLNESS (the Practice) for services, supplies or equipment provided to me by the Practice.

- 47 -

I authorize the release of my medical or other information necessary to determine these benefits or the benefits payable for the related services or equipment to the Practice, my insurance carrier or other medical entity. A copy of this authorization will be sent to the insurance company or other entity if requested.

## 11. Modern Ortho

115. The AOBs for Plaintiff Modern Ortho state, in pertinent part:

I hereby assign and convey directly to Modern Orthopaedics of New Jersey (MONJ), as my Statutory Derivative Beneficiary commonly known as "Designated Authorized Representative" or "Assignee", all medical benefits and/or insurance reimbursements, if any, otherwise payable to me for services, treatments, therapies, and/or medications rendered or provided by MONJ, regardless of its managed care network participation status. I understand that I am financially responsible for all charges regardless of my applicable insurance or benefit payments. I hereby authorize MONJ to release all medical information necessary to process my claims to the fullest extent allowed under the Health Insurance Portability Accountability Act (HIPAA).

## 12. NJSMS

116. Plaintiff NJSMS uses one of two AOB forms. One such form states, in

pertinent part:

ASSIGNMENT OF BENEFITS/DESIGNATED AUTHORIZED REPRESENTATIVE

I hereby assign and convey to the fullest extent permitted by law any and all benefit and non-benefit rights (including the right to any payments) under my health insurance policy or benefit to Dr. Dante Implicito, Dr. John D. Koerner and New Jersey Spinal Medicine and Surgery (collectively, the "Providers") with respect to any and all medical/facility services provided by the Providers to me for all dates of service. It is specifically intended by this assignment of benefits to assign to the fullest extent permitted under the law and any and all of my rights, including without limitation, the right of one or more of the

- 48 -

Provider to (i) execute, in my name and on my behalf, any form, document or instrument required under any applicable insurance policy or benefit plan to further evidence my intent as set forth herein and to avoid any delay in pursuing rights under applicable Federal and State law rules, regulations and requirements, (ii) pursue penalties for and exclusively on behalf of Providers against any insurance policy or benefit plan for failure of the plan administrator to timely produce or respond to requests (including appeals) for all information relating to any plan documents describing the rights under any insurance policy or benefit plan as required by any applicable Federal or State law, (iii) to endorse for me any checks made payable to me for benefits and claims collected toward my account, and/or (iv) to bring any appeal, lawsuit or administrative proceeding, for and on my behalf, in my name against any person and/or entity involved in the determination of benefits under any insurance policy or benefit plan.

Should this assignment be prohibited under my policy/plan, please disclose to Provider in writing such anti-assignment provision, otherwise this assignment shall be effective notwithstanding any anti-assignment clause in any policy/plan ….

This Assignment of Benefits/Designated Authorized Representative authorization shall remain in full force and effect for all current and future dates of service, until such time that all rights have been exercised under applicable Federal and State law as determined by Providers.  I may revoke or withdraw this authority upon written notice to the Providers.  In the event of any revocation, I will be responsible for all outstanding amounts then due to the Providers.

117.   The other NJSMS AOB form states, in pertinent part:

Assignment of Benefits and Claims

I hereby assign and transfer to NJ Spinal Medicine, all of my rights, title and benefits payable by my insurance carrier and/or benefits plan for services performed by NJ Spinal Medicine.

I hereby authorize NJ Spinal Medicine, to submit claims to my insurance carrier or intermediary for all services rendered by NJ Spinal

Medicine, and to exercise any appeals and other rights under my policy or benefits plan on my behalf.

I authorize and assign to NJ Spinal Medicine the right to file suit and to obtain counsel and enter into legal or other actions on my behalf and/or in my name, including arbitration/dispute resolution processes, for any claims against my insurance carrier, PIP carrier, Workers' Compensation carrier, plan administrator, payer or third party.

I authorize NJ Spinal Medicine, to appoint an attorney to represent me directly for the collection of PIP benefits, Workers' Compensation benefits and all other insurance benefits through the carriers themselves, plan administrator, payer or third party.  I authorize NJ Spinal Medicine to obtain an attorney to represent me directly in appealing a claim to the appropriate Federal Agency for all federal plans.

I authorize NJ Spinal Medicine to act on my behalf and report any suspected violations of proper claims practices to proper regulatory authorities.

I direct my insurance carrier, or its intermediaries, to issue a payment check directly to NJ Spinal Medicine.

**13.    NJSI/Somerset Ortho**

118.   The AOBs for Plaintiff NJSI/Somerset Ortho state, in pertinent part:

ASSIGNMENT OF BENEFITS:  I hereby assign to Somerset Orthopedic Associates all rights, privileges, remedies, and claims to payment for health care services provided by Somerset Orthopedic Associates to which I am entitled to under any insurance coverage.

ASSIGNMENT OF LITIGATION RIGHTS and LITIGATION CAUSES OF ACTION:  Somerset Orthopedic Associates is, at times, forced to institute litigation in order to secure payment from medical insurers for medical care which we provide to our patients.

In the event that Somerset Orthopedic Associates is required to undertake litigation in order to secure payment for medical services we

- 50 -

rendered to you, you transfer and assign any and all of your rights, privileges, remedies, and causes of action relative to your insurer, insurance coverage, and litigation to Somerset Orthopedic Associates.

119.    NJSI/Somerset Ortho Patients also execute an LPOA that states:

I, [patient], hereby appoint New Jersey Spine Institute to serve as my Agent ("Agent") and to exercise the powers and discretions set forth below:

To submit insurance claims to my health insurance carrier, benefits plan, PIP carrier, Workers' Compensation carrier, plan administrator, payor, or third party for reimbursement payments for all medical services rendered by New Jersey Spine Institute, and to exercise any appeals and other rights under my policy or benefits plan on my behalf;

To file suit and to obtain counsel and enter into legal or other actions on my behalf, including arbitration/dispute resolution processes, against my health insurance carrier benefits plan PIP carrier Workers' Compensation carrier, plan administrator, payor, or third party for any claims relating to reimbursement payments for medical services rendered by New Jersey Spine Institute.  This authorization includes the pursuit of declaratory, equitable, and compensatory relief, or other legal remedies;

To appoint an attorney to represent me directly for the collection of all insurance benefits through the carriers themselves, plan administrator payor or third party;

To appoint an attorney to represent me directly in appealing a claim to the appropriate federal agency for all federal plans;

To act on my behalf and report any suspected violations of proper claims practices to the proper regulatory authorities.

## 14.    NJ Brain and Spine

120.    The AOBs for Plaintiff NJ Brain and Spine state, in pertinent part:

I hereby authorize North Jersey Brain & Spine[8] to furnish to insurance companies, their representatives or designated attorney and requesting physicians, any information concerning my (my dependents) illness and treatments.  I hereby assign to North Jersey Brain & Spine Center all payments for medical services rendered to myself or my dependents. I agree that if my insurance company sends me a check for services rendered to me or my dependents by North Jersey Brain & Spine Center, I will endorse this check and forward it to North Jersey Brain & Spine Center within five days.

I hereby further assign to North Jersey Brain & Spine Center all of my rights under my insurance contract, including all of my rights governed by the statutes and regulations of the Employee Retirement Income Security Act (ERISA), including, without limitation whatsoever, my rights to "recover benefits" under ERISA Section 502(a)(1)(B), my rights to recover civil statutory penalties under ERISA Section 502(c)(1)(B); and my rights to pursue breach of fiduciary claims under ERISA Sections 502(a)(2) and 502(a)(3).

### 15.    NJ Bariatric

121.    For the Cigna claims identified on Exhibit A-15, the Cigna Subscribers sign Patient Information Sheets authorizing NJ Bariatric to bill and obtain payment from the Cigna Subscribers' insurance companies.

### 16.    North Jersey Laparoscopic

122.    The AOBs for North Jersey Laparoscopic state, in pertinent part:

I direct my insurer or HMO to make payment directly to North Jersey Laparoscopic Associates, LLC, at PO Box 175 Demarest, NJ  07627 and that receipt by North Jersey Laparoscopic Associates LLC of such payment shall be as if the payment was made to me directly.  This document constitutes a Limited Power of Attorney from Patient to North Jersey Laparoscopic Associates LLC to receive and deposit such

---

[8] North Jersey Brain & Spine is the former name of Plaintiff NJ Brain and Spine.

- 52 -

checks on account of sums due and owing to North Jersey Laparoscopic Associates, LLC from Patient's insurance carrier or HMO.

### 17.   Premier OBGYN

123.   The AOBs for Premier OBGYN state, in pertinent part:

Assignment of Benefits and Claims

I hereby assign and transfer to Premier OB/GYN Group, all of my rights, titles and benefits payable by my insurance carrier for services performed by Premier OB/GYN Group.

I hereby authorize Premier OB/GYN Group to submit a claim to my insurance carrier or intermediary for all services or other actions on my behalf and/or in my name, including the arbitration/dispute resolution process, for any claims against my insurance carrier, PIP carrier, Worker compensation carrier, plan administrator, payor, or third party.   The authorization includes the right to assignment to pursue declaratory relief or other legal remedies.

I authorize Premier OB/GYN Group to appoint an attorney to represent me directly for the collection of PIP benefits, Worker compensation benefits through the carriers themselves, plan administrator, payor or third party.  I authorize Premier OB/GYN Group, to obtain an attorney to represent me directly in appealing a claim to the State Health Benefits Commission for all state plans.  I authorize Premier/OBGYN Group, to represent me directly in appealing a claim to the appropriate Federal Agency for all Federal plans.

I authorize Premier OB/GYN Group, to appoint an attorney to represent me directly for the collection of PIP Benefits, Worker Compensation benefits, and all other insurance benefits through the carrier themselves, plan administrator, payor or third party.  I authorize Premier OB/GYN Group to obtain an attorney to represent me directly in appealing a claim to the State Health Benefits Commission for all state plans.  I authorize Premier OB/GYN Group, to represent me directly in appealing a claim to the appropriate Federal Agency for all Federal Plans.

I authorize Premier OB/GYN Group to act on my behalf and report any suspected violation of proper claims practices to the proper regulatory authorities.

I direct my insurance carrier, or intermediaries, to issue payment check directly to Premier OB/GYN Group.  If my insurance company will not directly pay Premier OB/GYN Group, I authorize and direct that the insurance company sends all checks and copies of Explanation of Benefits forms in connection with services of Premier OB/GYN Group, to 255 W. Spring Valley Ave. Ste 102 as my agent for delivery of said terms and use.

### 18.   Professional Orthopaedic Associates

124.   The AOBs for Professional Orthopaedic Associates state, in pertinent

part:

### ASSIGNMENT OF BENEFITS/APPOINTMENT OF ATTORNEYS

I hereby assign all rights and benefits due me from my insurance carrier to Professional Orthopaedic Associates ("POA") and authorize and empower POA to appeal a determination by a carrier to deny, reduce or terminate my benefits including, but not limited to, the filing of a lawsuit or fee arbitration.   Furthermore, I authorize and direct my insurance carrier to pay the proceeds of any benefits due me directly to POA.   A copy of this can be considered as an original for insurance purposes . . . .

In the event that the doctor elects to bring a lawsuit or petition for arbitration against the insurance carrier, I assign my rights, title and interest under any section of any insurance policy under which I am entitled to proceed for benefits.  This assignment shall allow an attorney of their choosing to bring suit or submit to arbitration their claim for any unpaid bills for services rendered becomes due.  I agree to fully cooperate with them in the collection of any benefits from the insurance carrier including fully cooperation with the chosen attorney.

125.   Professional Orthopaedic Associates also obtains LPOA forms from

their patients, that state, in pertinent part:

> In the event this assignment is held invalid for any reason, I hereby authorize POA to appoint an attorney of its choice to represent me directly against an insurer from which I may collect any and all benefits and to bring a claim in a forum of the attorney's choice.   This appointment is intended to enable the attorney to collect the bills of POA and this appointment does not authorize the selected attorney to represent me in any third-party action.  Further, this appointment will not conflict with any other attorney who currently represents me.

### 19.   Restoration Ortho

126.   The AOBs for Restorative Ortho state, in pertinent part:

**LEGAL        DESIGNATION        OF        AUTHORIZED REPRESENTATIVE   AND   POWER   OF   ATTORNEY, ASSIGNMENT OF RIGHTS TO PURSUE ERISA AND OTHER LEGAL   AND   ADMINISTRATIVE   CLAIMS   ASSOCIATED WITH   MY   HEALTH   INSURANCE   AND/OR   HEALTH BENEFIT   PLAN   (INCLUDING   BREACH   OF   FIDUCIARY DUTY)   AND   DESIGNATION   OF   AUTHORIZED REPRESENTATIVE AND RELEASE OF MEDICAL AND PLAN DOCUMENTS**

To: INSURANCE COMPANY in considering the amount of medical expenses to be incurred, I, the undersigned, have insurance and/or employee health care benefits coverage with the above captioned, and hereby assign and convey directly to the above named healthcare provider(s)[Restoration Ortho], **as my designated Authorized Representative(s),** all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services rendered from such provider(s), regardless of such provider's managed care network participation status.  I understand and agree that I am legally responsible for any and all actual total charges expressly authorized by me regardless of any applicable insurance or benefit payments.  I hereby authorize the above named provider(s) to release all medical information necessary to process my claims under HIPAA.  I hereby authorize any plan administrator or fiduciary, insurer and my attorney to release to such provider(s) any and all plan documents, insurance

- 55 -

policy and/or settlement information upon written request from such provider(s) in order to claim such medical benefits, reimbursement or any applicable remedies.  I authorize the use of this signature on all my insurance and/or employee health benefits claim submissions.  I hereby convey to the above named provider(s), to the full extent permissible under the law, including but not limited to, any ERISA claim for benefits, breach of ERISA fiduciary duty, and ERISA claims for statutory penalties for failure to produce documents or information in accordance with ERISA §502(a)(1)(B), §502(a)(3) and §502(c)(1)(B), under any applicable employee group health plans(s), insurance policies or public policies, any benefit claim, liability or tort claim, chose in action, appropriate equitable relief, surcharge remedy or other right I may have to such group health plans, health insurance issuers or tortfeasor insurer(s), with respect to any and all medical expenses legally incurred as a result of the medical services I received from the named provider(s), and to the full extent permissible under the law to claim or lien such medical benefits, settlement, insurance reimbursement and any applicable remedies including, but not limited to, (1) obtaining information about the claim to the same extent as the assignor, (2) submitting evidence; (3) making statements about facts or law; (4) making any request, or giving, or receiving any notice about appeal proceedings; and (5) any administrative and judicial actions by such provide(s) to pursue such claim, chose in action or right against any liable party or employee group health plan(s), including, if necessary, bring suit by such provider(s) against any such liable party or employee group health plan in my name with reviews under PPACA, ERISA, Medicare and applicable federal or state laws.  A photocopy of this assignment is to be considered as valid as the original.  I have read and fully understand this agreement.   Should this assignment be prohibited in part or in whole under any anti-assignment provision of my policy/plan, please advise and disclose to my providers/Restoration Orthopaedics in writing such anti-assignment provision within 30 days upon receipt of my assignment, otherwise this assignment should be reasonably expected to be effective and such anti-assignment is waived.

### 20.   Spine Surgery Associates

127.  The AOBs for Spine Surgery Associates state, in pertinent part:

I hereby assign and convey directly to the above designated provider, as my Statutory Derivative Beneficiary (SBD), commonly known as designated authorized representative or assignee, all medical benefits and/or insurance reimbursement, if any, otherwise payable to me for services, treatments, therapies, and/or medications rendered or provided by the above-named health care provider, regardless of its managed care network participation status. I understand that I am financially responsible for all charges regardless of any applicable insurance or benefit payments. I hereby authorize above designated provider to release all medical information necessary to process my claims to the fullest extent allowed under the Health Insurance Portability Accountability Act (HIPAA). I authorize the use of this signature on all my insurance and/or employee health benefits claim submissions.

### 21.  Stephen G. Silver, P.A.

128.  The AOBs for Stephen G. Silver, P.A., state, in pertinent part:

I hereby assign, transfer, and set over to my physician(s), sufficient monies and/or benefits I may be entitled from government agencies, insurance carriers, or others who are financially liable for medical costs of the care and treatment rendered to me or my dependent in said practice.  I understand I am responsible for any services not covered by my insurance.  I accept responsibility for payment of my account.

### 22.  SurgXcel

129.  Because of the nature of SurgXcel's business providing physician assistant services for primary surgeons, it relies on AOBs obtained from the primary surgeons to provide treatment at SurgXcel's facilities.  For each of the Cigna Claims identified on Exhibit A-22, upon information and belief, the primary surgeon obtained an AOB from the Cigna Subscriber that gave the primary surgeon the right to be paid benefits under the Cigna Subscriber's Plan.  The primary surgeon, in turn,

assigned to SurgXcel the right to be paid for the services that SurgXcel provided under the relevant Plan.

130. Additionally, for the claims identified on Exhibit A-22 as Third Amended Complaint Claim Numbers 1658, 1659, 1660, 1664, 1665, 1666, 1667, 1668, and 1669, SurgXcel obtained AOBs and LPOAs from the Cigna Subscribers that state, in pertinent part, as follows:

ASSIGNMENT OF INSURANCE BENEFITS/DIRECT PAYMENT/ AUTHORIZED REPRESENTATIVE /AGENT

I HEREBY ASSIGN TO SURGXCEL LLC, ALL OF MY RIGHTS. BENEFITS, PRIVILEGES, PROTECTIONS, CLAIMS, CAUSES OF ACTION, INTERESTS OR RECOVERY, OF ANY TYPE WHATSOEVER, RECEIVABLE BY ME, OR ON MY BEHALF, ARISING OUT OF ANY POLICY OF INSURANCE, PLAN, TRUST. FUND, OR OTHERWISE PROVIDING HEALTH CARE COVERAGE OF ANY TYPE TO ME (OR TO ANY OTHER THIRD PARTY RESPONSIBLE FOR ME) FOR THE CHARGES RENDERED TO ME BY SURGXCEL LLC. THIS INCLUDES, WITHOUT LIMITATION. ANY PRIVATE OR GROUP HEALTH/HOSPITALIZATION PLAN, AUTOMOBILE LIABILITY. GENERAL LIABILITY, PERSONAL INJURY PROTECTION, MEDICAL PAYMENTS, UNINSURED OR UNDERINSURED MOTOR VEHICLE BENEFITS, SETTLEMENTS/JUDGMENTS/VERDICTS. SELF-FUNDED PLAN, TRUST, WORKERS COMPENSATION, MEWA COLLECTIVE, OR ANY OTHER THIRD-PARTY PAYOR PROVIDING HEALTH CARE COVERAGE OF ANY TYPE TO ME {OR TO ANY OTHER THIRD PARTY RESPONSIBLE FOR ME) FOR THE CHARGES RENDERED TO ME BY SURGXCEL LLC ("COVERAGE SOURCE"). THIS IS A DIRECT ASSIGNMENT TO SURGXCEL LLC OF ANY AND ALL OF MY LEGAL OR EQUITABLE RIGHTS TO RECEIVE BENEFITS ARISING OUT OF ANY COVERAGE SOURCE. THESE LEGAL RIGHTS AND LEGAL CLAIMS INCLUDE, BUT ARE NOT LIMITED TO: (I) MY

- 58 -

RIGHTS TO APPEAL ANY DENIAL OR UNDERPAYMENT OF
BENEFITS ON MY BEHALF; (II) MY RIGHTS TO PURSUE
LEGAL ACTION AGAINST  ANY COVERAGE SOURCE FOR
UNPAID OR UNDERPAID BENEFITS OR FOR VIOLATING ANY
CONTRACTUAL. STATUTORY, LEGAL OR EQUITABLE
DUTIES TO ME (INCLUDING, BUT NOT LIMITED TO, ANY
AND ALL CLAIMS I MAY HAVE FOR UNPAID OR UNDERPAID
BENEFITS, BREACH OF CONTRACT, BREACH OF THE
COVENANT OF GOOD FAITH AND FAIR DEALING. BREACH
OF FIDUCIARY DUTY, DENIAL OF A FULL AND FAIR REVIEW,
QUANTUM MERUIT, OR UNJUST ENRICHMENT); (Ill) MY
RIGHTS TO REQUEST AND OBTAIN INFORMATION,
INCLUDING ANY AND ALL PLAN DOCUMENTS, FROM ANY
APPLICABLE COVERAGE SOURCE OR OTHER THIRD-PARTY
RESPONSIBLE FOR PROVIDING OR ADMINISTERING HEATH
INSURANCE BENEFITS; AND (IV) MY RIGHTS TO FILE A
COMPLAINT WITH ANY APPLICABLE FEDERAL, STATE, OR
LOCAL REGULATORY AGENCY AGAINST ANY APPLICABLE
COVERAGE       SOURCE       OR       OTHER       THIRD-PARTY
RESPONSIBLE FOR PROVIDING HEALTH INSURANCE
BENEFITS. I UNDERSTAND THAT THIS ASSIGNMENT OF
BENEFITS IS IRREVOCABLE THIS ASSIGNMENT OF
BENEFITS FULLY AND COMPLETELY ENCOMPASSES ANY
LEGAL CLAIM I MAY HAVE AGAINST ANY COVERAGE
SOURCE, INCLUDING, BUT NOT LIMITED TO MY RIGHTS TO
APPEAL ANY UNDERPAYMENT OR DENIAL OF BENEFITS ON
MY BEHALF, TO REQUEST AND OBTAIN PLAN DOCUMENTS,
TO PURSUE LEGAL ACTION AGAINST ANY COVERAGE
SOURCE. AND/OR TO FILE A COMPLAINT WITH THE NEW
JERSEY DEPARTMENT OF BANKING AND INSURANCE.
…

LIMITED POWER OF ATTORNEY

IN THE EVENT THAT THE ASSIGNMENT OF INSURANCE
BENEFITS AS SET FORTH IN THE PRECEDING SECTION. OR IS
OTHERWISE INVALID. I CONFER UPON DEWANG RAWAL,
211 RIDGE DRIVE, POMPTON LAKES, NEW JERSEY 07442. A
LIMITED POWER OF ATTORNEY TO BRING ANY LEGAL
CLAIM I MAY HAVE AGAINST ANY COVERAGE SOURCE,

INCLUDING ANY POLICY OF INSURANCE, PLAN, TRUST. FUND OR OTHERWISE, INCLUDING. BUT NOT LIMITED TO DEWANG RAWAL'S RIGHTS TO APPEAL ANY UNDERPAYMENT OR DENIAL OF BENEFITS ON MY BEHALF, TO REQUEST AND OBTAIN PLAN DOCUMENTS, AND TO PURSUE LEGAL ACTION AGAINST ANY COVERAGE SOURCE, INCLUDING BRINGING CLAIMS AGAINST ANY COVERAGE SOURCE FOR BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING, BREACH OF FIDUCIARY DUTY, DENIAL OF A FULL AND FAIR REVIEW, QUANTUM MERUIT, OR UNJUST ENRICHMENT. THERE ARE NO SPECIFIC INSTRUCTIONS FOR DEWANG RAWAL IN CARRYING OUT THIS LIMITED POWER OF ATTORNEY OTHER THAN TO ACT IN MY BEST INTEREST. THIS LIMITED POWER OF ATTORNEY DOES NOT AUTHORIZE DEWANG RAWAL TO MAKE HEALTH CARE DECISIONS FOR THE PRINCIPAL, BUT THAT THE PRINCIPAL MAY SIGN A SEPARATE DOCUMENT THAT AUTHORIZES AN AGENT TO MAKE HEALTH CARE DECISIONS FOR THE PRINCIPAL, IN ACCORDANCE WITH N.J.S. 26:2H-53 ET SEQ. OR N.J.S. 26:2H-103, ET SEQ., AS APPLICABLE IF THE PRINCIPAL SO CHOOSES: THIS LIMITED POWER OF ATTORNEY WAS PREPARED BY STACEY A HYMAN, COUNSEL K&L GATES LLP.

### 23.   Tri-State Surgery

131.   Upon information and belief, for at least some of the Cigna Claims identified on Exhibit A-23, Tri-State Surgery has obtained AOB forms containing language substantially the same as the AOB language for Spine Surgery Associates, discussed in Part I.D.20, above.

### E.   None of the Cigna Plans at Issue in this Case Prohibit the Cigna Subscribers from Assigning their Benefits to Plaintiffs

132.   None of the Cigna Plans at issue in this case prohibit the Cigna Subscribers from assigning their Plan benefits to Plaintiffs.  Most of the Cigna Plans

expressly authorize the Cigna Subscribers to assign their benefits to health care providers such as Plaintiffs; others are silent on the issue.

133.   A relatively small number of the Cigna Plans at issue in this case purport to restrict the right of Cigna Subscribers to assign their Plan benefits to health care providers.  However, even for those Plans that purport to do so, the Plans also expressly provide that the Cigna Subscriber may "authorize [CIGNA] to pay any healthcare benefits under this policy to a Participating or Non-Participating Provider."[9]  By virtue of this language, the Plans expressly authorize Cigna

---

[9] The Cigna Claims covered by Cigna Plans containing this language, based on the discovery that has been conducted in this action to date, are identified on Exhibits A-1 to A-23 and denoted with a "Yes" in the column entitled, "Purported Restriction on Assignment?"  For those relatively few Cigna Plans containing this language, the language reads substantially as follows:

> You may not assign to any party, including, but not limited to, a provider of healthcare services/items, your right to benefits under this plan, nor may you assign any administrative, statutory, or legal rights or causes of action you may have under ERISA, including, but not limited to, any right to make a claim for plan benefits, lo request plan or other documents, lo file appeals of denied claims or grievances, or to file lawsuits under ERISA. Any attempt to assign such rights shall be void and unenforceable under all circumstances.
>
> **You may, however, authorize [CIGNA] to pay any healthcare benefits under this policy to a Participating or Non-Participating Provider.** When you authorize the payment of your healthcare benefits to a Participating or Non-Participating Provider, you authorize the payment of the entire amount of the benefits due on that claim. If a provider is overpaid because of accepting duplicate payments from you and [CIGNA], it is the provider's responsibility to reimburse the

Subscribers to assign their right to payment of the Cigna Plan benefits to Plaintiffs, which in turn confers upon Plaintiffs the right to sue Cigna for the underpayments. See N. Jersey Brain & Spine Ctr. v. Aetna, Inc., 801 F.3d 369, 372-73 (3d Cir. 2015) ("We hold that as a matter of federal common law, when a patient assigns payment of insurance benefits to a healthcare provider, that provider gains standing to sue for that payment under ERISA § 502(a). An assignment of the right to payment logically entails the right to sue for non-payment.").

134.   At a minimum, for the relatively few Cigna Plans that purport to restrict the right of assignment, by separately allowing the Cigna Subscribers to authorize Cigna to pay healthcare benefits to non-participating providers, the language the Plans is ambiguous as to whether the Plans actually prohibit assignments.

135.   Moreover, even if the language of these relatively few Cigna Plans

---

overpayment to you. [CIGNA] may pay all healthcare benefits for Covered Services directly to a Participating Provider without your authorization. You may not interpret or rely upon this discrete authorization or permission to pay any healthcare benefits to a Participating or Non-Participating Provider as the authority to assign any other rights under this policy to any party, including, but not limited to, a provider of healthcare services/items. Even if the payment of healthcare benefits to a Non-Participating Provider has been authorized by you, Cigna may, at its option, make payment of benefits to you. When benefits are paid to you or your Dependent, you or your Dependents are responsible for reimbursing the Non-Participating Provider.

(emphasis added).

could be construed as prohibiting assignments, Cigna has not interpreted the Plans that way.  Rather, Cigna has consented to the assignments, or otherwise waived the applicability of any anti-assignment clauses that may be in the Cigna Plan documents, through an extended course of dealing.  Among other things, Cigna not only remits its grossly inadequate payments directly to Plaintiffs based on its misapplication of its MRC definition or the fraudulent schemes, but it forces Plaintiffs to pursue Cigna's internal appeals process, only to frustrate Plaintiffs once they are engaged in that process, without citing to any purported anti-assignment clauses.

136.   For most of the Cigna Claims, Cigna also fraudulently induces Plaintiffs into negotiating with third-party Repricing Companies for reimbursement amounts that are already due and owing to Plaintiffs by sending Plaintiffs EOBs with express directions to negotiate for higher reimbursement amounts with Cigna's Repricing Companies prior to balance billing the Cigna Subscribers.  This and other conduct described more fully below constitutes Cigna's waiver of any anti-assignment clause in the Cigna Plan documents and consent to its subscribers' assignments of Plan benefits to the Plaintiffs, or at a minimum, constitutes an extended course of dealing that is inconsistent with any anti-assignment clauses.

**F.     Cigna Fails to Reimburse Plaintiffs as Required by the Cigna Plans**

137.   When billing Cigna for services or supplies they provide to Cigna

Subscribers, Plaintiffs follow the industry standard Current Procedural Terminology ("CPT") coding system.  The CPT system is a coding system developed by the American Medical Association ("AMA") and is designed to communicate uniform information about medical services and procedures among physicians, coders, patients, and payers.  Each five-digit CPT code corresponds to a particular medical, surgical, or diagnostic service provided, and Cigna requires that Plaintiffs identify the applicable CPT codes on the bills Plaintiffs submit to Cigna.

138.   The Cigna Claims at issue in this case comprise a total of 236 claims for medically necessary, covered, emergency services rendered to Cigna Subscribers; and 1,441 claims for reimbursement for medically necessary, covered, elective services, rendered to Cigna Subscribers.  Each of the Cigna Claims at issue in this case corresponds to a particular CPT code billed to Cigna for services or supplies provided to a Cigna Subscriber.

139.   Annexed hereto as Exhibits A-1 to A-23 are charts detailing the underpayments for each Plaintiff.  Each of these charts contains, among other things, the following information (where available) for each of the Cigna Claims, based on the discovery that has been conducted in this action to date:

     a.   The patient name;

     b.   The date of service;

     c.   Whether the claim is emergency or elective;

d.  The five-digit CPT code billed to Cigna for the particular service or supply covered by the claim; [10]

e.  The Plaintiff's normal charge for the CPT code billed to Cigna;

f.  The dollar amount Cigna actually paid to the particular Plaintiff for the particular CPT code billed;

g.  The Patient Responsibility Amount under the Plan as calculated by Cigna based on documents produced in discovery to date;

h.  The unpaid balance on the claim (calculated by subtracting the Cigna paid amount and Patient Responsibility Amount from the specific Plaintiff's normal charge for the CPT code billed to Cigna corresponding to that Claim;

---

[10] For some Cigna claims, Plaintiffs billed their normal charges with "modifiers" based on nationally recognized billing requirements. A modifier is a two-digit numeric or alpha code (appearing after a hyphen following the five-digit CPT code) used in conjunction with a procedure code to describe specific circumstances about the service provided, without changing the basic description of the service. Pursuant to the terms of the Cigna Plans, certain claims with modifiers are subject to increase or decrease by a designated percentage above or below the MRC amount, in accordance with Cigna's reimbursement policies. For other claims, the modifiers do not impact the MRC rate. Because the Cigna Plans typically reference Cigna's reimbursement policies in discussing modifiers, the extent to which a modifier increases or decreases the MRC rate must abide further discovery into Cigna's reimbursement policies relating to modifiers. However, while the presence of a modifier on a particular Cigna Claim may (or may not) impact the precise amount due for the claim, it does not change the fact that the claim has been underpaid, because Cigna calculates the modifier based on the MRC amount. As described more fully herein, Cigna has miscalculated the MRC for all of the Cigna Claims.

    i.  Where available, whether the Plan calculates the MRC amount using the MRC-1 or MRC-2 methodology; and

    j.  In the case of Plans that follow the MRC-1 methodology, the percentile of the Fair Health database that the Plan uses to calculate the MRC-1 amount (ranging from the 80th to the 100th percentile of the Fair Health database).

140.  Specifically, as noted above, for emergency treatment, the Cigna Plans require Cigna to reimburse Plaintiffs their normal charges, less the Patient Responsibility Amounts calculated under the Plans as if the provider were in-network.  As detailed more fully on Exhibits A-1 to A-23, Cigna failed to do so.

141.  Moreover, for elective treatment, Cigna has failed to reimburse Plaintiffs at the appropriate MRC level, less the Patient Responsibility Amounts calculated at the out-of-network level under the Plans.

142.  Specifically, for those Plans that calculate MRC using the MRC-1 approach (i.e., based on a Plan-selected percentile of the Fair Health database) Plaintiffs typically set their normal charges at or around the 80th percentile of the Fair Health database, meaning that the MRC-1 amount typically represents Plaintiffs' normal charges for the particular CPT codes at issue, and Cigna was required to reimburse Plaintiffs at that amount less the Patient Responsibility Amounts.

- 66 -

143.   Yet, as detailed more fully on Exhibits A-1 to A-23, for the Plans that follow the MRC-1 approach, Cigna has failed to reimburse Plaintiffs for their normal charges, less the Patient Responsibility Amounts calculated at the out-of-network level under the Plans.  Instead, the total amount Cigna has paid on these claims, plus the out-of-network Patient Responsibility Amount as calculated by Cigna, has averaged just 15.2% of Plaintiffs' normal charges for the CPT codes identified on Exhibits A-1 to A-23 – well below the 80th percentile of the Fair Health database.

144.   Moreover, for those Plans that calculate MRC using the MRC-2 approach (i.e., based on a Plan-selected percentage of a schedule that Cigna is required to develop using a methodology that is similar to that employed by Medicare), Cigna has never developed such a schedule.  Thus, Plaintiffs' normal charges for each service or supply represent the MRC-2 amount.

145.   Yet, again, as detailed more fully on Exhibits A-1 to A-23, for the Plans that follow the MRC-2 approach, Cigna has failed to reimburse Plaintiffs for their normal charges, less the Patient Responsibility Amounts calculated at the out-of-network level under the Plans.  Instead, Cigna calculates the MRC-2 amount based upon the applicable Medicare rate.  The total amount Cigna has paid on claims covered by MRC-2 plans, plus the out-of-network Patient Responsibility Amount as calculated by Cigna, has averaged just 7.5% of Plaintiffs' normal charges for the CPT codes identified on Exhibits A-1 to A-23.

146.   Exhibits A-1 to A-23 detail the specific amounts by which Cigna failed to pay each Plaintiff the amounts due under the terms of the Cigna Plans for the Cigna Claims at issue in this case.  The information contained on Exhibits A-1 to A-23 is based on discovery that has been conducted between the parties to date.  Additionally, as Cigna Subscribers continue to seek treatment from Plaintiffs, additional underpaid claims continue to accrue.  Accordingly, Plaintiffs expect the amounts due, as claimed on Exhibits A-1 to A-23, will increase.

147.   **Advanced Gynecology:**  As detailed on Exhibit A-1, Cigna underpaid Advanced Gynecology by at least $111,996.81 for 12 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

148.   **AR Surgeons:**  As detailed on Exhibit A-2, Cigna underpaid AR Surgeons by at least $701,139.81 for 82 Cigna Claims, broken down as follows: $32,578.91 for 3 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $668,560.90 for 79 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the

Patient Responsibility Amount calculated at the out-of-network level under the Plans.

149. **Atlantic Orthopedics:**  As detailed on Exhibit A-3, Cigna underpaid Atlantic Orthopedics by at least $82,319.44 for 15 Cigna Claims, broken down as follows:  $71,185.76 for 13 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $11,133.68 for 2 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

150. **Bergen Surgical:**  As detailed on Exhibit A-4, Cigna underpaid Bergen Surgical by at least $582,409.95 for 45 Cigna Claims, broken down as follows: $548,219.17 for 34 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $34,190.79 for 11 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

151.   **East Coast Aesthetic:**  As detailed on Exhibit A-5, Cigna underpaid East Coast Aesthetic by at least $214,810.80 for 17 Cigna Claims, broken down as follows:  $9,684.46 for 2 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $205,126.34 for 15 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

152.   **Garden State Bariatrics:**   As detailed on Exhibit A-6, Cigna underpaid Garden State Bariatrics by at least $927,182.17 for 62 Cigna Claims, broken down as follows:  $17,465.05 for 2 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $909,717.12 for 60 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

153.   **Hackensack Vascular:**  As detailed on Exhibit A-7, Cigna underpaid Hackensack Vascular by at least $237,341.50 for 20 Cigna Claims, broken down as

follows:  $44,426.20 for 2 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $192,915.30 for 18 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

154.   **Heritage General:**   As detailed on Exhibit A-8, Cigna underpaid Heritage General by at least $583,111.94 for 45 Cigna Claims, broken down as follows:  $329,248.99 for 26 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $253,862.95 for 19 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

155.   **Heritage Surgical:**   As detailed on Exhibit A-9, Cigna underpaid Heritage Surgical by at least $1,175,801.18 for 119 Cigna Claims, broken down as follows:  $450,800.11 for 49 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the

Patient Responsibility Amount calculated at the in-network level under the Plans; and $725,001.07 for 70 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

156.   **Jersey Integrative:**   As detailed on Exhibit A-10, Cigna underpaid Jersey Integrative by at least $152,311.32 for 22 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

157.   **Modern Ortho:**   As detailed on Exhibit A-11, Cigna underpaid Modern Ortho by at least $91,891.07 for 8 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

158.   **NJSMS:**   As detailed on Exhibit A-12, Cigna underpaid NJSMS by at least $688,519.97 for 21 Cigna Claims, broken down as follows:  $211,559.53 for 6 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $476,960.44 for 15 claims for

elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

159.   **NJSI/Somerset Ortho:**  As detailed on Exhibit A-13, Cigna underpaid NJSI/Somerset Ortho by at least $977,314.81 for 100 Cigna Claims, broken down as follows:  $173,148.23 for 20 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $804,166.58 for 80 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

160.   **NJ Brain and Spine:**  As detailed on Exhibit A-14, Cigna underpaid NJ Brain and Spine by at least $11,621,042.66 for 535 Cigna Claims, broken down as follows:  $1,085,999.21 for 48 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $10,535,043.45 for 487 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed,

less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

161. **NJ Bariatric:**   As detailed on Exhibit A-15, Cigna underpaid NJ Bariatric by at least $190,036.41 for 24 Cigna Claims, broken down as follows: $4,030.30 for 2 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $186,006.11 for 22 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

162. **North Jersey Laparoscopic:**   As detailed on Exhibit A-16, Cigna underpaid North Jersey Laparoscopic by at least $63,754.80 for 4 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

163. **Premier OBGYN:**   As detailed on Exhibit A-17, Cigna underpaid Premier OBGYN by at least $210,985.85 for 15 Cigna Claims, broken down as follows:  $97,551.55 for 6 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the

Patient Responsibility Amount calculated at the in-network level under the Plans; and $113,434.30 for 9 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

164.   **Professional Orthopaedic Associates:**  As detailed on Exhibit A-18, Cigna underpaid Professional Orthopaedic Associates by at least $3,452,222.57 for 399 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

165.   **Restoration Ortho:**  As detailed on Exhibit A-19, Cigna underpaid Restoration Ortho by at least $540,057.54 for 32 Cigna Claims, broken down as follows:  $72,852.20 for 7 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $467,205.34 for 25 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

166. **Spine Surgery Associates:**  As detailed on Exhibit A-20, Cigna underpaid Spine Surgery Associates by at least $560,911.02 for 72 Cigna Claims, broken down as follows:  $146,792.20 for 16 claims for emergency services, for which Cigna failed to pay this practice's normal charges for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the in-network level under the Plans; and $414,118.82 for 56 claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

167. **Stephen G. Silver, P.A.:**  As detailed on Exhibit A-21, Cigna underpaid Stephen G. Silver, P.A., by at least $75,280.15 for 8 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

168. **SurgXcel:**  As detailed on Exhibit A-22, Cigna underpaid SurgXcel by at least $300,850.20 for 14 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

169.   **Tri-State Surgery:**  As detailed on Exhibit A-23, Cigna underpaid Tri-State Surgery by at least $38,870.49 for 6 Cigna Claims for elective services, for which Cigna failed to pay the appropriate MRC amount under the Plan for the particular CPT codes billed, less the Patient Responsibility Amount calculated at the out-of-network level under the Plans.

### G.    Plaintiffs Exhaust Available Internal Appeals Remedies

170.   Available appeals avenues under the Cigna Plans applicable to the Cigna Claims have either been exhausted or rendered futile by Cigna's refusal to correctly process appeals according to 29 C.F.R. § 2560.503-1.

171.   The Cigna Plans generally provide for administrative appeal of claim decisions to be processed by Cigna.   The Plaintiffs routinely file such internal appeals with the result being that Cigna adheres to their initial decision.   Moreover, the Plaintiffs have timely requested such internal appeals for the claims under the Cigna Plans at issue.

172.   Because seeking appeals results in little or no adjustment to the initial payment, and because Cigna refuses to provide any meaningful response to these appeals, or in many cases, simply reaffirms its initial reimbursement without explanation, it would be futile for the Plaintiffs to continue to seek internal or external appeals with Cigna for any further claims payments.

173.   Regardless of whether Cigna has conducted or refused to conduct the appeal procedures set forth in Cigna's own documents, Cigna has failed to fully pay the Plaintiffs for the healthcare services they have provided to Cigna Subscribers in accordance with the requirements of the Cigna Plans.

174.   Moreover, Cigna has failed to follow the proper notice and appeal requirements pursuant to 29 C.F.R. § 2560.503-1(g) that require Cigna to adequately explain the basis for its dramatic underpayments to the Plaintiffs.  In particular, Cigna has issued adverse benefit determinations as defined under 29 C.F.R. § 2560.503-1(m) for the Cigna Claims and has failed or refused to:  (a) provide the specific reason or reasons for the denial of claims; (b) provide the specific Plan provisions relied upon to support the denials; (c) provide the specific rule, guideline or protocol relied upon in making the decision to deny claims; (d) describe any additional material or information necessary to perfect a claim, such as the appropriate diagnosis/treatment code; and (e) notify the relevant parties that they are entitled to have, free of charge, all documents, records and other information relevant to the claims for benefits.

175.   In addition, in their appeals to Cigna for the Cigna Claims, many of the Plaintiffs have requested in vain the following information related to the denials of the Cigna Claims:  (a) all contracts detailing any and all contractual obligations with Cigna; (b) plan documents specifically identifying a "Legislative Fee" schedule; (c)

the identity of the "Originating Payer" [the Plan]; (d) the "reassociation" and trace information from the Plan; (e) plan documents specifically identifying the adjustment reason utilized in the EOB; and (f) the Cigna definition and/or explanation of all standardized Claim Adjustment Reason Code utilized in its ERA. Cigna has refused to provide the above requested information in violation of 29 U.S.C. § 1133(2), and 29 C.F.R. §§ 2560.503-1(h) and (m)(8).

176.   Exhaustion is therefore deemed futile pursuant to 29 C.F.R. § 2560.503-1(l) because Cigna failed to provide a clear basis for its denials and has refused to produce the requested documents necessary for Plaintiffs to evaluate the Cigna Claims denials.  Cigna thus offered no meaningful administrative process for challenging its denials of the Cigna Claims.

177.   This action is timely commenced within six years after the Plaintiffs were notified by Cigna that it was rejecting or dramatically underpaying Plaintiffs' claims for the services provided to Cigna Subscribers, and otherwise within six (6) years after each of the Plaintiffs' claims against Cigna accrued.

178.   In addition, to the claims herein based on Cigna's breach of fiduciary duty and related claims are also timely filed within six (6) years from March 2018, when Plaintiffs first began to suspect Cigna's fraudulent activities and misrepresentations in derogation of its fiduciary duties. *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir. 1996); 29 U.S.C. § 1113.

## II.      Cigna's Multiple RICO Violations

### A.      Overview

179.    Even worse than Cigna's simple refusal to pay Plaintiffs, as required by the terms of its Plans and applicable law, are the fraudulent and other unlawful tactics that Cigna has used to conduct and participate in the affairs of the Cigna Plans.  In doing so, Cigna has engaged in multiple violations of RICO, 18 U.S.C. §§ 1961-1968.

180.    Each of the ASO Plans is an enterprise within the meaning of 18 U.S.C. § 1961(4), in that each has an independent legal existence.

181.    Cigna has conducted or participated in the affairs of these enterprises through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and (5), and conspired to do so.  In doing so, Cigna has violated 18 U.S.C. §§ 1962(c) and 1962(d).

182.    Moreover, Cigna has invested the proceeds of its racketeering activity into one or more enterprises, and conspired to do so.  In doing so, Cigna has violated 18 U.S.C. §§ 1962(a) and 1962(d).

183.    This pattern of racketeering activity involves Cigna's multiple and repeated use of the mails and wires in furtherance of at least four distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

184.    The pattern of racketeering activity also involves Cigna's multiple and repeated acts of embezzlement and/or conversion of the ERISA ASO Plans funds in violation of 18 U.S.C. § 664.

185.    Plaintiffs have been injured in their business and property through Cigna's multiple RICO violations and, thus, have standing to bring this action under RICO's civil enforcement provision, 18 U.S.C. § 1964(c).

**B.    The RICO Enterprises**

186.    At all relevant times, all of the subject ERISA ASO Plans have been "enterprises," within the meaning of 18 U.S.C. § 1961(4), as each is an independent legal entity distinct from Cigna, and each is an employee welfare benefit plan within the meaning of 29 U.S.C. § 1002(1).

187.    The non-ERISA plans for which Cigna acts as third party administrator and/or provides ASO services are likewise entities with independent legal existences distinct from Cigna, and thus are also enterprises within the meaning of 18 U.S.C. § 1961(4) (as used herein, the ERISA ASO Plans and the non-ERISA plans for which Cigna acts as third party administrator and/or provides ASO services are referred to as the "Cigna Plan Enterprises").

188.    At all relevant times, the Cigna Plan Enterprises have been and continue to be engaged in activities affecting interstate commerce, including but not limited to,

providing health insurance coverage benefits through employer self-funded health benefit plans of insurance to patients across state lines.

189.   The Cigna Plan Enterprises exist for the legitimate purpose of providing the Cigna Subscribers with health insurance coverage for medically necessary treatment provided by in-network and out-of-network providers under the terms of the Plans.  However, Cigna conspired to conduct or participate in the conduct of the affairs of the Cigna Plan Enterprises through a separate and distinct "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5).

### C.   Cigna's Pattern of Racketeering Activity

190.   Since at least 2013 (and likely earlier), and continuing through the present, Cigna has conducted and participated in the conduct of the affairs of the Cigna Plan Enterprises, through a pattern of racketeering within the meaning of 18 U.S.C. § 1961(5), and conspired to do so.

191.   The pattern of racketeering activity includes multiple acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, and embezzlement or conversion for Cigna's own use of the Cigna Plan Enterprises assets in violation of 18 U.S.C. § 664.

192.   Cigna (a) used the mails and wires (b) in the foreseeable furtherance of (c) a scheme or artifice to defraud (d) involving material deceptions (e) with the intent to deprive Plaintiffs and other similarly situated out-of-network providers of property.

193.   Cigna's schemes to defraud, predicate acts of mail and wire fraud and predicate acts of embezzling or converting the Cigna Plan Enterprises assets in furtherance of these schemes to defraud are described in detail in Section II.D, below. Cigna's racketeering acts together have the following features:

### 1.   Relatedness

194.   Cigna's acts of racketeering are not isolated events.   Rather, all are related to each other in that they have similar purposes, results, participants, victims, methods of commission, and other distinguishing characteristics.   All of the acts were done for the benefit of Cigna and in furtherance of Cigna's agenda.

195.   Cigna's predicate acts of racketeering were and continue to be directed at the same overarching goals of harming Plaintiffs financially by deceiving Plaintiffs, Plaintiffs' patient Cigna Subscribers, and the Cigna Plan Enterprises that:  (a) based on (non-existent) contracts with Cigna or third-party Repricing Companies, Plaintiffs accepted deep discounts on their rate of reimbursement for Cigna covered claims; (b) based on (non-existent) contracts with Repricing Companies, as well as other adjustments made by Cigna through the use of improper coding combinations, Cigna and the Repricing Companies are entitled to cost-containment fees; (c) pursuant to the Cigna issued Patient EOB, Cigna Subscriber patients are not required to pay any amounts not reimbursed to Plaintiffs or in addition to the incorrectly calculated Patient Responsibility Amount; (d) pursuant to the Cigna issued Provider EOB, large portions

of the Cigna claims submitted for reimbursement are not-covered, and require Plaintiffs to negotiate with Cigna's contracted Repricing Companies to obtain amounts due and owing to them under the terms of the Cigna Plans.

196.   Cigna has specifically targeted out-of-network providers, including Plaintiffs, in pursuit of its unlawful goals.  Cigna's schemes to defraud are aimed at depriving Plaintiffs of monies owed to them under the terms of the Cigna Plans. Plaintiffs are the intended and actual victims of each separate act of racketeering described herein.

197.   Cigna has participated in, authorized, and/or ratified the specific acts of mail and wire fraud and embezzlement and conversion alleged herein.  It has issued false and misleading transmissions and statements over the mails and wires designed to mislead Plaintiffs, the Plaintiffs' Cigna Subscriber patients, and the Cigna Plan Enterprises that Cigna has saved the Cigna Plan Enterprises and Cigna Subscribers money by obtaining favorable discounts from Plaintiffs.  It has also used the mails and wires to create the false impression that Cigna pays what it is legally obligated to pay out-of-network providers for services rendered to Cigna Subscribers, to the significant financial detriment of Plaintiffs.

198.   Cigna and its officers and employees expressly designed and authorized the racketeering acts and participated actively in them.

### 2.      Continuity

199.   Cigna's related racketeering acts have extended from at least 2013 to the present.

200.   Cigna's related predicate acts also involve a continued threat of long-term racketeering activity.

201.   Upon information and belief, Cigna's schemes to defraud and acts of embezzlement and conversion of Cigna Plan funds have generated hundreds of millions of dollars in revenue for itself and the third-party Repricing Companies.

202.   The related predicate acts therefore involve a continued threat of long-term racketeering activity.  There is no foreseeable ending point to Cigna's acts of racketeering against Plaintiffs and similarly situated out-of-network providers.

203.   In addition, the predicate acts and offenses described herein are Cigna's regular way of doing business and thereby threaten long-term illegal conduct against the public at large.

### D.      Cigna Uses the Mails and Wires in Furtherance of Multiple Schemes to Defraud, in Violation of 18 U.S.C. §§ 1341 and 1343

204.   Cigna's schemes to defraud have operated to deceive Plaintiffs, the Cigna Subscribers, and/or the Cigna Plan Enterprises into believing, *inter alia,* that: (a) Plaintiffs are in-network and that Plaintiffs' claims should therefore be processed as in-network claims; (b) Plaintiffs' claims submitted to Cigna for reimbursement should be paid at deeply discounted amounts based on contracts with Cigna or

Repricing Companies that do not actually exist or at amounts not agreed to under the few global agreements between Repricing Companies and individual Plaintiffs; (c) Cigna provides savings to Cigna Subscribers by negotiating discounts with providers, such as Plaintiffs, and as a result, the Cigna Subscribers owe little or nothing on an out-of-network provider claim; and (d) large portions of the out-of-network provider claims are not covered and that Plaintiffs must negotiate with Repricing Companies and accept drastic underpayments for amounts due and owing under the terms of the Cigna Plans.

205.   Through all of Cigna's schemes to defraud, Cigna deprives Plaintiffs of money and property, including money due and owing to Plaintiffs under the Cigna Plans; and unnecessary time and administrative expense seeking to obtain payments to which they are already entitled under the Cigna Plans.

206.   Cigna, its officers, and agents, have used the wires and mails to effectuate Cigna's schemes to defraud by transmitting material misrepresentations and omissions about:  (i) the Plaintiffs' non-existent contractual relationships with Cigna and/or Repricing Companies; (ii) the cost-containment fees allegedly "earned" by Cigna under its ASO contracts with the individual Cigna Plans; (iii) the non-existent "discounts" allegedly accepted by Plaintiffs; and (iv) the "negotiations" Cigna fraudulently forces Plaintiffs to enter into to obtain payments that are properly due and owing to Plaintiffs under the Cigna Plans.  The time, place, and nature of

these misrepresentations are described more fully in Sections II(D)(1) through (5), below, and in the "RICO Scheme(s) to Defraud" columns of Exhibits A-1 to A-23.

207.   Cigna's false representations were material in that they were capable of influencing the decisions of those to whom the statements were directed in ways having an adverse financial impact on the Plaintiffs.  At all relevant times, such adverse financial impact was not only foreseeable, but was and is the specifically intended result of Cigna's fraudulent schemes.  Cigna intended and intends for the Cigna Plan Enterprises, Cigna Subscribers and out-of-network providers, such as Plaintiffs, to act in reliance on Cigna's material misrepresentations and concealments, by accepting that Cigna appropriately reimburses Plaintiffs for the medically necessary treatment they provided to the Cigna Subscribers.

208.   In fact, the Cigna Plan Enterprises, Cigna Subscribers and out-of-network providers, such as Plaintiffs, have relied on Cigna's material misrepresentations to the Plaintiffs' detriment, precisely as Cigna intended.  Due to Cigna's misrepresentations that Plaintiffs have accepted discounts for their services, the Cigna Plan Enterprises incorrectly believe Cigna is saving the Plans money, the Cigna Subscribers believe they are saving money, and the Plaintiffs believe they must negotiate with a Repricing Company for additional payments despite their entitlement to be paid under the terms of the Cigna Plans.  Plaintiffs thereby have lost money and are forced to expend limited administrative resources seeking to

obtain payments to which they are already entitled—a direct and intended result of Cigna's schemes to defraud.

209.   Cigna acted with the specific intent to deceive and for the purpose of depriving Plaintiffs of property.  Cigna specifically intended to cause Plaintiffs such injury.

210.   All acts of mail and wire fraud alleged herein were ordered by Cigna and performed by persons acting as agents on behalf of Cigna.  In fact, Cigna's name is on the various HIPAA standard transactions to the Cigna Plan Enterprises and Plaintiffs, as well as on the Patient EOBs and Provider EOPs, that have been used in furtherance of Cigna's schemes to defraud.

### 1.      The Contradictory EOB Scheme

211.   In furtherance of the Contradictory EOB Scheme, Cigna tells Plaintiffs on the EOP forms that the amounts Cigna has held back from Plan funds are "not covered" by the Plans or are subject to "adjustments," and that the patient owes the balance. But on the EOB forms to the Cigna Subscribers *for the same claim*, Cigna reports that Plaintiffs have agreed to a "discount" and the patient has "saved" the rest.

212.   Specifically, once a claim is processed, Cigna will transmit to the provider, through the wires, an ERA which must contain certain information that complies with the standard transaction rules.  The provider may also receive or

request a paper EOP through the mails, which must match the information on the ERA.  Cigna, however, is not required to comply with any standard rules regarding Patient EOBs, which are sent by Cigna through the mails and/or wires.

213.   When Cigna wrongfully underpays a Cigna claim, it will represent to the provider on the Provider EOP that the reduction represents the "[a]mount not covered."  Cigna misleads the provider into believing that the Provider EOP contains the same information that is sent to the patient.  Thus, the description of "amount not covered" included on the Provider EOP states:

> This is the portion of your bill that's not covered by your plan.  You may or may not need to pay this amount.  See the Notes section on the following pages for more information.  The total amount of what is not allowed and/or is not covered is $[ ] of which you owe $[ ].

214.   Cigna will also send the patient beneficiary a paper EOB.  On the Patient EOB, however, Cigna designates the exact amount classified as "not covered" on the Provider EOP as a "Discount" to conceal its intentional practice of underpaying claims from both the Provider and Patient.  Cigna describes this "Discount" on the Patient EOB as follows:  "CIGNA negotiates discounts with healthcare professionals and facilities to help you save money" to intentionally mislead the patient to believe that their provider, including Plaintiffs, agreed to the represented "Discount."

215.   The Cigna Patient EOB will then state what the patient purports to owe, which is a fraction of the amount that Cigna has told Plaintiffs on the Provider EOB is "not covered" (and thus subject to the patient being balance billed).

216.   Representatives of Cigna have admitted to Plaintiffs' representatives that the use of "Discount" to describe the amount adjusted by Cigna on the Patient EOB is a misrepresentation of the "amount not covered."  But Cigna is unable to explain the discrepancy between the terms on the Patient EOBs and Provider EOPs or why the Provider EOPs contain no "discount."

217.   In fact, Cigna's representatives have acknowledged that Cigna intentionally misrepresents to out-of-network Cigna Subscribers that they have received a "discount."  According to Cigna, this term is appropriate for identification of the adjusted amount on an in-network provider claim, but for the out-of-network claims Patient EOBs, the "discount isn't really a discount."

218.   Finally, the Cigna Patient EOB includes a "You saved" section, which represents how much the patient purportedly "saved" through the "Discount" and what the plan paid.

219.   Because the provider receives completely different information on the Provider EOP, the provider has no idea that Cigna has unilaterally issued an improper "Discount" to the Cigna Subscriber based on misrepresentations regarding a non-existent contract.  The provider is only made aware that Cigna incorrectly told

their patient that the provider agreed to Discount its charges if the patient calls the provider.

220.   Cigna avoids this confrontation, however, by instructing the provider on the initial Provider EOP to not balance bill the patient and to instead contact the Repricing Company to negotiate additional payment.

221.   As an example of Cigna's misleading statements in furtherance of the Contradictory EOB scheme, NJ Brain and Spine timely submitted an electronic claim for reimbursement in the amount of $60,000 for medically necessary emergency services provided to Patient 1 on April 27, 2016.   (*See* Exhibit C). Notably, in the course of electronic processing of the claim, Cigna informed NJ Brain and Spine that all of its incurred charges, except one procedure for $4,100, were accepted by the Cigna Plan for payment on June 9, 2016. (*Id.* at 12).  However, on June 23, 2016, one of Cigna's contracted Repricing Companies, MultiPlan, faxed NJ Brain and Spine a pre-payment offer to reimburse $1,415.76 or 2.5% of the covered incurred charges.   (*Id.* at 14-15).   After NJ Brain and Spine rejected MultiPlan's offer, MultiPlan faxed NJ Brain and Spine another "offer" $3,100, or 5.5% of the covered incurred charges.  (*Id.* at 16-19).  When NJ Brain and Spine did not accept this paltry amount, on July 11, 2016, another of Cigna's contracted Repricing Companies, Stratose (now Zelis), sent NJ Brain and Spine through the

mail and wires a final "offer" of $2,500, or 4.5% of the covered incurred charges. (*Id.* at 20).

222.   When this offer was not accepted, on August 17, 2016, Cigna processed the claim for Patient 1 and sent NJ Brain and Spine, through the mail and wires, a Provider EOP wherein Cigna stated that the covered balance owed to NJ Brain and Spine pursuant to Patient 1's Plan was $2,965.43, or 5.3% of the covered incurred charges.  (*Id.* at 9-12).  Notably, this amount was less than the $3,100 offer from MultiPlan and more than two of the offers from MultiPlan and Stratose.  Cigna was therefore willing to at least pay $3,100 from the outset, but also intended to mislead NJ Brain and Spine into believing that it was only entitled to a fraction of this amount to induce NJ Brain and Spine into accepting the drastic underpayments offered by MultiPlan and Stratose and to waive its right to seek the actual amount it was entitled to under the terms of the Cigna Plan for the emergency medically necessary services it provided to Patient 1.  When NJ Brain and Spine refused to accept the Repricing Company offers, Cigna arbitrarily calculated the $2,965.43 "allowed amount" based on an incorrect application of MRC 2, and paid NJ Brain and Spine even less than the Repricing Companies' best offer.  (*Id.*).

223.   Patient 1's Provider EOP states that Cigna "adjusted" the claim by $54,937.54. Notably, the Provider EOP for Patient 1 states that: "PATIENT IS NOT LIABLE IF YOU ACCEPT THE ERS ALLOWABLE AMOUNT.  CONTACT

ZELIS AT 888.346.8488 BEFORE BILLING THE PATIENT." (*Id.*)   Zelis (formerly Stratose) is one of the Repricing Companies and co-conspirators contracted with Cigna to extract contract negotiations from out-of-network providers to accept drastic underpayments and waive any further rights to seek additional payment.

224.   The EOB sent to Patient 1, which Cigna sent through the mails or wire, tells a different story.  Patient 1's Patient EOB states that of the $55,900 of covered incurred charges, Patient 1 "saved" $54,937.54 through a "Discount," as described and defined above.  (*Id.* at 3).  This same EOB also states that Patient 1 "saved" 93% on this claim, including the discount.  (*Id.*).

225.   Additional examples of claims for which Cigna sent EOBs to patients falsely describing a "discount" or "savings," while sending a Provider EOP for the same claim falsely stating that the underpaid amounts were "not covered," are annexed hereto as Ex. C (filed under seal), pp. 3-4; Ex. D (filed under seal), pp. 3-4; Ex. E (filed under seal), pp. 1-3 and 6.  These and other examples are also denoted with, "Contradictory EOB," in the column entitled, "RICO Scheme(s) to Defraud," on Exhibits A-1 to A-23.

226. Cigna's false and misleading statements in furtherance of its Contradictory EOB Scheme have directly harmed Plaintiffs.  Sometimes, Plaintiffs are misled into believing that the underpaid amounts are indeed "not covered" by

the Cigna Plans and, therefore, into accepting the paltry "offers" from Cigna's repricing companies. Sometimes, Plaintiffs are misled into not balance billing the Cigna Subscribers for the amounts Cigna indicates on the Provider EOPs are "not covered." Plaintiffs who balance bill the Cigna Subscribers for the amounts reported as "not covered" on the Provider EOPs risk damage to their good will and reputations based on the fact that Cigna has misinformed the Cigna Subscribers that the underpaid amounts represented "discounts" and "savings." And in all cases, Plaintiffs are forced to incur unnecessary time and expense pursuing amounts to which they are entitled under the Cigna Plans.

## 2.    The Fictitious Contracting Scheme

227. Relatedly, pursuant to the Fictitious Contracting Scheme, Cigna misrepresents to Plaintiffs and the Cigna Plans that Plaintiffs have non-existent "contracts" with Cigna or the Repricing Companies by which Plaintiffs purportedly agreed to accept "discounts" from its billed charges.

228.   To ensure consistency in electronic exchange of data among health care providers, health care plans, clearinghouses, vendors, and other health care business associates, the federal Healthcare Insurance Portability and Accountability Act ("HIPAA") has established national standards for health care Electronic Data Interchange ("EDI") that Cigna is required to follow for electronic healthcare

transactions.  Cigna misstates that Plaintiffs have "contracts" with Cigna or repricing companies at various stages of its processing of electronic health care transactions.

229.  For example, when Cigna pays a claim differently than it is billed, Cigna is required to communicate its reason for doing so electronically or by mail on the Provider EOP form.  Cigna explains its reasoning using industry standard "claim adjustment reason codes" ("CARC Codes").  In denying or underpaying Plaintiffs for the Cigna Claims, Cigna often improperly inputs CARC Code "CO-45" on the Provider EOP form, with "CO" signifying "Contractual Obligation" and "-45" signifying "Charge exceeds fee schedule/maximum allowable or contracted legislated fee arrangement."  *See, e.g.,* Ex. F (filed under seal), p. 2; Ex. G (filed under seal), p. 1.  In doing so, Cigna falsely represents that the underpayment is the result of a contractual obligation between a particular Plaintiff and Cigna.

230.  Cigna makes similar and even more brazen misstatements elsewhere in the EDI process.  For example, among the standard EDI transaction types are a health care claim status request ("276 transaction"), which providers can send electronically to Cigna and receive a health care claim status response ("277 transaction") back from Cigna.  In many of the 277 transaction responses in which Cigna is communicating to one of the Plaintiffs the non-payment or underpayment of a claim, Cigna falsely states that "[t]he claim/line has been paid. Processed according to contract provisions (Contract refers to provisions that exist between the Health Plan and a Provider of

Health Care Services)."  Examples of claims for which Cigna issued 277 transaction forms using this language appear on Exhibit A-15 (NJ Brain & Spine), Claim #s 529-32.

231.  Although Cigna's misrepresentations about Plaintiffs' purported "contracts" with Cigna are ostensibly directed to Plaintiffs in the Provider EOPs and 277 transaction responses, Cigna communicates the information contained in these forms directly to the Cigna Plans.  Indeed, through the Provider EOPs, Cigna is causing the Cigna Plans to underpay the Plaintiffs purportedly because of non-existent "contractual obligations" Plaintiffs supposedly have with Cigna.

232.   Cigna's misrepresentations in furtherance of its Fictitious Contracting Scheme have damaged Plaintiffs by causing the Cigna Plans not to pay Plaintiffs amounts due and owing to them.  Cigna Plan funds are instead diverted from Plaintiffs to allow Cigna to pay itself and its contracted repricing companies "cost containment fees" on the purported "savings" that Cigna has purportedly achieved for the Plans, discussed below.

### 3.    The Repricing Reduction Scheme

233.  Through the Repricing Reduction Scheme, Cigna conspires with Repricing Companies to pay itself, from embezzled and/or converted Cigna Plan Enterprise assets, extra "cost-containment fees."

234.   Cigna's cost-containment process generally works as follows:

a.      A health care provider may enter into an out-of-network contract with a third party Repricing Company, whereby the provider agrees to have its billed charge reduced in accordance with a specified contract rate or schedule.  Under the contract, the provider accepts payment of this reduced claim (including the patient's cost-share obligation) as payment in full.   Notably, for the very few Plaintiffs that have contracts with Repricing Companies, they do not accept adjusted reimbursement rates greater than between 10 to 25% of their incurred charges.

b.      Cigna's ASO agreements with the ASO Plans, which agreements are drafted by Cigna, state that Cigna "may apply discounts available under available third-party contracts or through negotiation of the billed [incurred] charges."   In these instances, Cigna will apply those discounted rates to the provider's billed charge, calling it the "allowed amount" of the claim, notwithstanding that the "allowed amount" resulting from these third-party contracts is typically well below the allowed amounts payable under the Plans.

c.      Cigna's cost-containment fee is approximately 29% to 35% "of net savings," which is the difference between the claim priced under the alleged third-party Repricing Company contract and the provider's billed charge. Cigna is permitted under the ASO agreement with the Cigna Plans to pay itself these "cost-containment fees" directly from the Cigna Plans' bank accounts.

d.     Upon information and belief, Cigna pays 7% to 11% of the 29% to 35% cost-containment fees to their contracted Repricing Companies for their services.  The cost-containment fees paid to Cigna and the Repricing Companies are calculated on the basis of a percentage of savings, which provides an incentive for Cigna and the Repricing Companies to conspire to pay Plaintiffs the least amount on a claim to maximize their profits.

235.   Upon information and belief, Cigna pays itself and the Repricing Companies cost-containment fees irrespective of whether the cost-containment process actually saves the specific Plan any money.  Indeed, it collects this fee even when the cost-containment process ends up costing a Cigna Plan Enterprise *more* than what the plan terms would provide.  As Cigna brazenly admits in its form ASOs with the Cigna Plan Enterprises, "applying cost-containment discounts may result in higher payments than if the MRC is applied."

236.   Exhibit H (filed under seal) illustrates illustrate how Cigna's cost-containment program benefits Cigna to the detriment of Plaintiffs.  The claims covered by Exhibit H are all covered by the same ERISA-governed Cigna Plan.  The listed Plaintiffs timely submitted 48 claims for medically necessary services rendered to Cigna Subscribers.  The providers' normal charges for the CPT codes billed to Cigna for these claims were $950,174.00.  Cigna calculated the Patient Responsibility Amounts for these claims as totaling $18,637.83, and paid the listed

Plaintiffs a total of $26,215.81.   On the Patient EOBs for these claims, Cigna represented to the Cigna Subscribers that Cigna was applying "discounts" totaling $905,320.36 based on non-existent agreements between the Plaintiffs and a Repricing Company.   Based on these alleged "discounts," upon information and belief, Cigna paid itself $262,542.90, or more than *ten times* the amounts Cigna paid to the Plaintiffs.

237.   Cigna nonetheless seeks to justify this arrangement by claiming in the ASO that, "whereas application of MRC may result in the patient being balance billed for the entire unreimbursed amount, applying these discounts avoids balance billing and substantially reduces the patient's out-of-pocket cost."

238.   This statement is false for multiple reasons.   First, as described above, Cigna intentionally miscalculates the MRC amounts due under all of the Cigna Plans.   Moreover, applying discounts avoids balance billing only when a provider has actually contracted with a Repricing Company to accept an agreed upon discount and agreed to forego balance billing the patients.   Where providers such as Plaintiffs do not have such contracts, however, the cost-containment process serves solely as a vehicle for Cigna to improperly earn additional profits at Plaintiffs' expense.

239.   Cigna has applied its "cost-containment" process in furtherance of the Repricing Reduction scheme to most of the Cigna Claims.   Examples of such claims

are denoted with "Repricing Reduction," in the column entitled, "RICO Scheme(s) to Defraud," on Exhibits A-1 to A-23.

240.   Cigna's representations are clearly false as applied to Plaintiffs, who have not contracted with a Repricing Company to accept an agreed-upon discount and forego balance billing the patient.   Indeed, Cigna's cost-containment fee is calculated when the claim is initially processed, regardless of whether Plaintiffs have agreed to the discount.

241.   Cigna's uses of the mails and wires in furtherance of the Repricing Reduction Scheme have damaged Plaintiffs by diverting Cigna Plan funds away from Plaintiffs to allow Cigna to pay itself and its contracted repricing companies "cost containment fees" on the purported "savings" that Cigna has purportedly achieved for the Plans.   Cigna's conduct has also forced Plaintiffs to incur unnecessary administrative costs in attempting to recover funds due and payable to Plaintiffs under the Cigna Plans.

### 4.      The Fraudulent Negotiations Scheme

242.   Cigna conspires with these Repricing Companies, through the Fraudulent Negotiations Scheme, to extract improper discounts from out-of-network providers, including Plaintiffs, through misleading and coercive settlement negotiations.

243.   Cigna falsely informs out-of-network providers on the Provider EOP sent by Cigna through the mails and/or wires that the claims have been adjudicated in accordance with the Cigna Plan terms and that the unpaid balance is "not covered" under the Plans.  Cigna then instructs the provider not to balance bill their patients prior to contacting one of Cigna's contracted Repricing Companies.   Plaintiff providers will typically first exhaust internal appeals with Cigna before contacting the Repricing Company.  The initial determination is generally upheld or Cigna may pay slightly more on the claim, which still results in a drastic underpayment.  Once internal appeals are exhausted, Cigna will direct the Plaintiffs to contact the specific Repricing Company who allegedly negotiated each Cigna Claim if not listed on the Provider EOP.

244.   When a Plaintiff or its representative contacts the Repricing Company, after pressing the Repricing Company for proof of an agreement between the Repricing Company and the Plaintiff, the Repricing Company confirms that there is no such contract or negotiation on file between the Plaintiff and Repricing Company related to the specific Cigna Claim at issue.  If the Plaintiff then demands higher payment, the Repricing Company will send a settlement offer and terms agreement through the mails and/or wires, starting with only a small addition to what the provider was initially paid, which explains several "benefits" to accepting the offer while requiring that the Plaintiff agree to not balance bill the Cigna Subscriber for

any difference in reimbursement beyond the Cigna Subscriber's cost-sharing requirement.

245.  The Repricing Companies confirm that, where Cigna sends an out-of-network claim to a Repricing Company for cost containment review, irrespective of whether an actual contract between an out-of-network provider and Cigna or a Repricing Company exists, or at any agreed upon rates with a Repricing Company under a global agreement, the Repricing Company determines the amount Cigna initially pays on the claim, and Cigna then adopts the Repricing Company's suggested reimbursement amount—which is drastically below the required reimbursement rate under the terms of the Cigna Plans, and initially processes the claim at that amount.

246.  While some providers, including Plaintiffs, persist in their efforts to gain reimbursement of the amount due and owing to them under terms of the Cigna Plans for the services provided to Cigna Subscribers for some claims, each such "negotiation" requires many hours of calls to Cigna and the Repricing Companies, as well as back-and-forth written negotiations.  Plaintiffs do not have the administrative resources or capacity needed to fight all the underpayments on the large number of claims submitted to Cigna for reimbursement.  Unfortunately, but consistent with its scheme, Cigna wins this war of attrition far more often than not.

247.  As an illustration of this scheme, the normal charges for services provided by Advanced Gynecology to Patient 2 on June 7, 2018, were $18,647.00. (*See* Ex. G at 1 and 6).  Cigna falsely stated in the Patient EOB that only $1,731.08, or 6.8%, of the normal charges were covered based on a "Discount," of which Cigna attributed $1,135.10 as Patient 2's responsibility.  Cigna initially paid Advanced Gynecology $595.98 of the covered incurred charges.  (*Id.* at 1 and 6).  The initial Patient EOB for Patient 2 also instructed Advanced Gynecology not to balance bill the patient before contacting Repricing Company Zelis.  (*Id.* at 6).  Advanced Gynecology unsuccessfully appealed the claim for Patient 2.  (*See id.* at 8-13).

248.  Zelis then sent through the mail a letter settlement offer dated December 5, 2018.  (*Id.* at 14-15).  This offer stated:

> Zelis, specializes in developing strong relationships with providers nationwide.  This is especially vital in the unpredictable changes in the healthcare industry.  Although we do not pay claims, we do compare out-of-network billed services to usual, customary, and reasonable charges, managed care allowable fee schedules and Medicare reimbursement.
>
> This case has been referred to me.  I would like to expedite the normal process by reaching a satisfactory agreement in advance of provision of services.  The advantages of reaching such an agreement are:  **1) The claim will not be subject to further bill review and to include late charges. 2) Payment processing will receive top priority. 3) You will not have to spend valuable time fielding calls concerning claim status.  4) Patient's responsibility will be reduced, when applicable. 5) This employer may be encouraged to refer additional members to your office when future needs arise ….**

(*Id.* at 14).

- 103 -

249.   The Offer also included a form "Terms" sheet which included a "Proposed Payment Amount" of $3,367.39 for Patient 2's claim.  (*Id.* at 15).  The Terms sheet also included the following statement:

> This is a One-time Agreement only for the patient and date(s) of service indicated above.  Payment from the Payor will be subject to any benefit plan terms such as deductibles, co-insurance, co-pays and exclusions per the plan guidelines.  Provider agrees not to balance bill the Payor, administrator and/or patient for the difference between the Total Billed Amount and the Proposed Payment Amount in accordance with the terms of this Agreement.  Any interest or penalties relating to the claims processed by the Payor will be waived by the Provider.  The proposed payment amount may be reduced by prior payments already made on this claim.  Zelis is not financially responsible and/or liable for any payments to the Provider.  This agreement does not constitute, nor should it be construed as, a guaranty of payment by the Payor.

(*Id.*).

250.   The example Offer and Terms sheet for Patient 2 is representative of those generally mailed to out-of-network providers by Cigna and its Repricing Company to facilitate their scheme to extract unreasonably low reimbursement rates from Plaintiffs.  Cigna ignores the terms of the Cigna Plans and legal requirements for prompt/reasonable payment, purposefully underpaying out-of-network providers and intentionally delaying the claims adjudication process in hope that providers will simply give up and accept Cigna's or the Repricing Company's offers in order to get *some* reimbursement and extricate themselves from the endless "appeals" process.

251.   The Offer and Terms sheet further demonstrate that out-of-network providers like Plaintiffs are given the option of accepting a drastic underpayment while waiving their rights to amounts actually due to Plaintiffs under the Cigna Plans plus interest on delayed payments, and to balance bill the patient, or choose what's behind Door #2: Cigna will 1) subject an out-of-network bill to further review and delay, 2) assign the out-of-network claim a lower priority for processing, 3) purposefully frustrate the appeals and adjudication process requiring providers to expend substantial administrative resources wasting endless hours filing appeals and fielding calls with Cigna and its Repricing Companies, 4) declare large amounts of the claim "not covered," and 5) engage in patient steering by encouraging employers to not refer additional Cigna Subscribers to that out-of-network provider.

252.   If the Plaintiff provider persists and does not accept the initial offer, the dance continues for numerous rounds. When the provider either accepts or refuses a settlement offer, the claim is then sent back to Cigna for reprocessing.  Cigna often reissues new Provider and Patient EOBs through the mails and/or wires.  This process can be repeated several times before the Plaintiff provider is (or is not) reimbursed the appropriate amount.  If a provider refuses low offers, they are underpaid based on Cigna's misapplication of its definition of MRC based on an alleged proprietary schedule or database. In the relatively few instances in which a

Plaintiff does not give up, it can sometimes negotiate payments upwards of 60%, 70%, or even 100% of incurred charges.

253.   Cigna and the Repricing Companies consider the actual required reimbursement amount under the Cigna Plans largely irrelevant for negotiation purposes.  In many cases, the Repricing Companies have even admitted to Plaintiffs' representatives that their ceiling for negotiations, as instructed by Cigna, is 100% of the amount of the claim CPT codes (which is inclusive of the Cigna Subscribers' deductible and co-insurance requirement amounts), initially accepted for processing. Cigna, however, instructs the Repricing Company on the maximum amount it may offer during negotiations, which often starts at slightly above 10% of incurred charges initially paid by Cigna.

254.   The example of Patient 2 further demonstrates Cigna's conspiracy with Repricing Companies to intentionally underpay out-of-network providers.  Although Cigna authorized Zelis to settle Patient 2's claim for $3,367.39 (*See* Ex. H at 14-15), when Advanced Gynecology rejected this offer, Cigna failed to reimburse Advanced Gynecology anything additional from the initial underpayment based on its improper application of MRC 2.

255.   Additional examples of claims for which Cigna has made similar statements over the mails and wires in furtherance of the Fraudulent Negotiation

Scheme are denoted with "Fraudulent Negotiation," in the column entitled, "RICO Scheme(s) to Defraud," on Exhibits A-1 to A-23.

256.   Cigna's uses of the mails and wires in furtherance of the Fraudulent Negotiation Scheme have damaged Plaintiffs by again diverting Cigna Plan funds away from Plaintiffs, and by again forcing Plaintiffs to incur unnecessary administrative costs in attempting to recover funds due and payable to Plaintiffs under the Cigna Plans.

### 5.   More Examples of Cigna's Uses of the Mails and Wires in Furtherance of its Fraudulent Schemes

257.   Cigna, both individually and through its conspiracy with the Repricing Companies, has caused Plaintiffs substantial financial harm through its fraudulent schemes.  The following are additional examples of the ongoing pattern of fraudulent conduct by Cigna and the Repricing Companies.

### *Patient 3*

258.   Patient 3 sought medically necessary spine surgery from Plaintiff NJSI/Somerset Ortho on November 14, 2017.  NJSI/Somerset Ortho submitted a timely claim to Cigna for the medically necessary services provided to Patient 3, for which the entire incurred amount of $47,106 was accepted into Cigna's adjudication system for processing.  (*See* Exhibit F at 2).  Cigna processed the claim and sent NJSI/Somerset Ortho an initial Provider EOP on January 5, 2018, which applied an improper coding combination of "PR" and "45" to 93% of the incurred charges.

(*Id.*).   This  coding  combination  improperly  shifts  the  amount  owed  over  the allowable  amount,  or  $3,362.66,  to  the  patient.   Cigna  reimbursed  NJSI/Somerset Ortho  $2,460.70,  or  5%  of  the  total  incurred  charges,  and  attributed  $901.96  to Patient 3's responsibility.  (*Id.*).

259.   Prior  to  mailing  the  Provider  EOP  to  NJSI/Somerset  Ortho,  on December  5,  2017,  Medical  Audit  Review  Services  ("MARS"),  a  Repricing Company  contracted  with  Cigna,  faxed  NJSI/Somerset  Ortho  a  letter  settlement offer of payment on Patient 3's claim for $2,016.14, *less* than the 5% eventually paid by Cigna, in exchange for NJSI/Somerset Ortho's waiver of rights to seek additional payment  on  the  claim.   (*Id.* at 3-4).   The  MARS  offer  stated  that  Patient  3's  Plan "includes  specific  limits  and  guidelines"  and  without  signature  of  the  offer, NJSI/Somerset  Ortho  could  be  subject  to  a  reimbursement  for  Patient  3's  claim  "as low as 110% of Medicare."  (*Id.*).

260.   NJSI/Somerset Ortho rejected the initial MARS payment offer the same day.   MARS then faxed a second offer the following day for more than two times the  initial  offer,  or  $4,371.44,  and  again  threatened  that  if  NJSI/Somerset  Ortho failed  to  sign  the  offer,  they  could  receive  a  reimbursement  "as  low  as  110%  of Medicare."  (*Id.* at 5-6). [11]  NJSI/Somerset Ortho rejected the offer and asked MARS

---

[11] The threat by MARS that failure to sign its offers could result in a reimbursement "as low as 110% of Medicare" is representative of language generally used by MARS to induce signature by Plaintiffs.

to send the claim to Cigna for processing.  (*Id.* at 5).  Cigna then issued the reimbursement for $2,460.70.  (*Id.* at 2).

261.   On May 22, 2018, NJSI/Somerset Ortho appealed the claim for Patient 3 to Cigna.  (*Id.* at 9-10).  The appeal documentary support for the reasonable and customary amount, or 80th percentile of Fair Health amount for the medical procedure provided by NJSI/Somerset Ortho to Patient 3 in a similar geographic location, which at $41,105, was over fifteen times the amount Cigna paid to NJSI/Somerset Ortho.  (*Id.* at 7-16).

262.   On December 20, 2018, Cigna responded to NJSI/Somerset Ortho's appeal and upheld its initial payment decision.  (*See id.* at 17-20).  Cigna's appeal response letter, falsely stating that Cigna uses "a methodology similar to Medicare to determine reimbursement for the same or a similar service within a geographic market," and falsely representing that the amount initially paid was the "Maximum Reimbursable Charge."  (*Id.* at 18).  Because NJSI/Somerset Ortho rejected the MARS offers (which incidentally state that "[t]he agreement will provide payment clarity" (*id.* at 4 and 6), Cigna reverted to a misapplication of Cigna's MRC definition to drastically underpay NJSI/Somerset Ortho for the claim for Patient 3.

## *Patient 4*

263.   Patient 4 sought medically necessary treatment from Plaintiff NJ Brain and Spine on July 10, 2019.  NJ Brain and Spine submitted a timely claim to Cigna

for the medically necessary services provided to Patient 4, which services Cigna previously confirmed were covered.  Cigna processed the claim and sent Patient 4 an initial Patient EOB through the mail and by wire, which stated the following:

    a.  Incurred charges $79,000;

    b.  Discount $75,066.06;

    c.  Cigna Plan Enterprise paid $0.00;

    d.  Patient 4 owed $3,933.94; and

    e.  Savings 95%.

(Ex. D at 3).  Cigna received the claim on August 5, 2019, and processed it on September 10, 2019. (*Id.* at 5).

264.   The initial Provider EOP for Patient 4, however, stated that the $75,066.06 attributable to a "discount" on the Patient EOB, was "Not Covered." (*Id.* at 10).  Cigna attributed the full allowed amount to Patient 4's deductible on the Patient and Provider EOBs.  (*Id.* at 5 and 10).

265.   Prior to processing the claim for Patient 4 on September 10, 2019, on August 21, 2019, Cigna sent the claim to the repricing company, MultiPlan, who faxed NJ Brain and Spine through an initial settlement offer letter for $6,516.78. (*Id.* at 12-13).  The letter falsely stated that, if NJ Brain and Spine did not accept the settlement, "this claim is subject to a payment as low as 110% of Medicare rates based on the guidelines and limits on the plan for this patient." (*Id.* at 12).  NJ Brain

- 110 -

and Spine rejected the offer and received two additional offers on August 28 and 30, 2019, containing the substantially the same language. (*Id.* at 14-17). The offer sent on August 28 was for the same amount initially offered by MultiPlan, and the offer sent on August 30 was for a slightly increased amount of $8,130.20. (*Id.*). When NJ Brain and Spine rejected these offers, Cigna processed the claim, paying nothing to NJ Brain and Spine for this claim based on a non-existent "discount" taken by Cigna based on Cigna's misapplication of its MRC definition.

266. To date, Cigna has not made any additional payment to NJ Brain and Spine for the claim for Patient 4.

### *Patient 5*

267. Patient 5 sought medically necessary treatment from NJ Brain and Spine on July 19, 2018. On December 3, 2018, NJ Brain and Spine submitted a timely claim to Cigna for the medically necessary services provided to Patient 5, which services were previously confirmed as covered by Cigna. The total incurred charges for the primary surgeon were $97,200.00. (Ex. I (filed under seal) at 2-6). On February 25, 2019, Zelis faxed NJSMS a settlement letter offer of $4,923.19, or 5% of the covered incurred charges for the primary surgery. (*Id.* at 12-13). This letter stated that this offer was "100% of Medicare." (*Id.*). NJ Brain and Spine rejected this offer and on February 28, 2019, Zelis faxed NJ Brain and Spine an increased offer of $19,684.00 for the primary surgery. (*Id.* at 14-17). This offer

letter stated that this offer was the "MRC Max Plan Offer." (*Id.*).  NJ Brain and Spine rejected this offer as well.

268.  On March 8, 2019, NJ Brain and Spine received a Provider EOP from the Cigna Plan Enterprise and Patient 5 received a Patient EOB for the Patient 5 primary surgery claim, billed at $97,200, for an allowable amount of $8,387.14, of which Cigna paid $3,117.04 to NJ Brain and Spine and attributed the rest to Patient Responsibility.  (*Id.* at 7-9).  The Patient EOB contained a discount of $88,812.86 (*Id.* at 2-6).  The same amount was listed as not covered on the Provider EOP.  (*Id.* at 7-9).

269.  Zelis first offered NJ Brain and Spine 100% of Medicare as a reimbursement which was nearly half of what Cigna eventually reimbursed NJ Brain and Spine on the claim for Patient 5.  Zelis then offered NJ Brain and Spine what it characterized as an "MRC" offer of $19,684 for Patient 5's claim.  The arbitrary amount eventually reimbursed to NJ Brain and Spine for Patient 5's claim demonstrates that, despite an alleged MRC definition for out-of-network reimbursement based on a schedule proprietary to Cigna as an alternate to a provider's normal charges, that Cigna arbitrarily assigns amounts as "MRC" to its own benefit.  Beyond the non-existent discount taken by Cigna on the claim for Patient 5, Cigna's own contracted Repricing Company admitted in the February 28, 2019 letter settlement offer that the eventual payment to NJ Brain and Spine for

Patient 5's claims was inappropriately underpaid through Cigna's misapplication of the MRC definition contained in the Plan for Patient 5.

**E.     Cigna Embezzles and Converts Funds from the ERISA ASO Plans, in Violation of  18 U.S.C. § 664**

270.    Upon information and belief, when Cigna accepts for processing a claim covered by an ERISA ASO Plan, Cigna draws the full incurred charge amount for each CPT code from the Cigna Plan bank account and moves it into a Cigna owned bank account.  Cigna has never denied drawing the providers' entire charge from the Cigna Plans' bank account.  Cigna is required, as the Cigna Plans' agent, to pay Plaintiffs directly from the Cigna Plans' bank account to the out-of-network providers' bank account.  45 C.F.R. § 164.

271.    Cigna, however, pays only a small portion of this amount to Plaintiff providers, embezzling or converting the remaining Cigna Plan funds that are due and owing to Plaintiffs under the Cigna Plans, in a Cigna-owned interest bearing bank account.

272.    Based on this contracted agency relationship between Cigna and the Cigna Plan bank accounts, Cigna has access to Cigna Plan assets and is able, per the ASO agreement, to move the entire value of a claim accepted by the Plan for processing, to the Cigna owned account.  Cigna then transfers a pre-determined reimbursement amount through the wires from their bank account to the provider's bank account through an EFT.  The standard transaction regulations require that for

an out-of-network provider, the financially responsible party, or the Cigna Plan, must be the originator of the payment.

273.    The standard transaction data provided by Cigna, however, demonstrates that Cigna violates this rule by issuing the ACH payment from the Cigna bank account instead of the Cigna Plan Enterprise's bank account.  In order to make such payments, Cigna must already be in possession of the Plan funds.

274.   To further complicate the traceability of the transactions, Cigna requires out-of-network providers to use clearinghouses to make the ACH payments. Every time a payment is filtered through an ACH payment, its transaction number changes.  Accordingly, providers are unable to verify that the proper amount has been paid to them by tying the amount approved by the Cigna Plan Enterprise and deducted from the Cigna Plan Enterprise bank account by Cigna to the reimbursement amount on the ERA.

275.   To further prevent the Cigna Plans from discovering Cigna's conduct, Cigna's form ASO language with the Cigna Plans specify that a Plan may audit, at its own cost, a mere 225 claims from the previous two years not previously audited every year if the employer has over 5,000 employees or every two years otherwise. The form ASO only permits claims adjustments to be made for those 225 audited claims.  Through limiting the Cigna Plans' rights in the Cigna-drafted ASO agreements, Cigna minimizes the likelihood that a Cigna Plan audit would reveal

Cigna's large-scale payment scheme.  Moreover, Cigna is fully aware that employers very rarely invoke the audit provision in their ASO agreements.

276.   In fact, Cigna's ASO agreements with the Cigna Plans, sent through the mails or wires, assert that Cigna may earn cost-containment fees, which it may withdraw directly from the Cigna Plan bank account, when an out-of-network provider has a contract with either Cigna or one of its Repricing Company.

277.   Not only does Cigna fraudulently represent that the Plaintiffs' Cigna Claims underpayments are based on non-existent contracts between Plaintiffs and Cigna or one or more Repricing Companies, but the cost-containment fees are calculated as a percentage of savings.

278.   Cigna also misrepresents that the Cigna Plans must fund the Plan bank account for the full value of the claims, cost-containment fees and taxes to ensure the Cigna Plans are not under-funded.  In reality, Cigna underpays the Cigna Claims from the Cigna Plans' assets and wrongfully retains and earns interest on Cigna Plans' assets on amounts that are due and owing to Plaintiffs under the terms of Cigna's ASO Agreements with the Cigna Plans.

279.   After extremely arduous provider appeals and negotiations with the Repricing Companies, Cigna sometimes makes additional payments on claims months and years after the initial underpayment.  Cigna will reprocess these claims as if they are new claims within their system, but Cigna will already be in possession

of the full dollar amount of the initial claim.  The subsequently processed "new" claims do not require additional communications between Cigna and the Cigna Plans because Cigna will not need to remove additional funds from the Cigna Plans' bank accounts to pay these claims.

280.  Cigna wrongfully profits by embezzling and/or converting Cigna ERISA Plans assets improperly retained that are due and owing to Plaintiffs under the terms of the Cigna ERISA Plans; earning interest on these amounts; and embezzling and/or converting Cigna ERISA Plans assets into cost-containment fees calculated as a percentage of savings on the same amount wrongfully retained by Cigna.

281.  Through this conduct, Cigna has engaged in multiple its acts of embezzlement and conversion of the Cigna Plans' assets in violation of 18 U.S.C. § 664.

282.  This conduct by Cigna, in turn, directly harms Plaintiffs by again improperly diverting Cigna Plan assets to Cigna that are due and payable to Plaintiffs; and by again forcing Plaintiffs to incur unnecessary administrative costs in attempting to recover funds due and payable to Plaintiffs under the Cigna Plans.

   **F.    The Impact of Cigna's Conduct**

283.    As the foregoing examples make clear, Cigna and the Repricing Companies have no intention of processing Plaintiffs' claims for reimbursement in

good faith and in accordance with the terms of the applicable Cigna Plans.  Instead, Cigna uses the claims processing function as a means of enriching itself, and incentivizing its Repricing Companies to do so, by drastically under-paying out-of-network providers such as Plaintiffs while retaining for itself and its Repricing Companies the balance of the funds it has drawn down from the Cigna Plan Enterprises.  Cigna advances these goals through numerous uses of the mails and wires in furtherance of its schemes to defraud.  Only in the rare instances in which tenacious providers repeatedly challenge the severe underpayments, and after protracted and administratively burdensome efforts at negotiations, will Cigna or the Repricing Companies release additional funds to Plaintiffs.

284.   Cigna's acts in furtherance of its schemes to defraud in violation of 18 U.S.C. §§ 1341 and 1343, and its acts of embezzlement and wrongful conversion of the Cigna Plan Enterprise assets in violation of 18 U.S.C. § 664, represent a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

285.   Cigna's fraudulent schemes and embezzlement and conversion have caused Plaintiffs to suffer significant financial harm.  In addition to the pecuniary losses described above, Plaintiffs have incurred millions of dollars in time, person-hours and other administrative expenses communicating with Cigna and the Repricing Companies, both through written and oral means, in attempts to recover proper reimbursements on claims submitted by Plaintiffs for the medically necessary

treatment provided to Cigna Providers.  As alleged throughout the Second Amended Complaint, Cigna has desired to cause Plaintiffs precisely these types of devastating business losses.

286.   Unfortunately, the severe economic harm Plaintiffs have suffered is not the only fallout from Cigna's illegal conduct.  Cigna's conduct also results in indirect patient steering that has interfered with Plaintiffs' relationships with their patients. These attacks are also likely to lead to additional monetary losses for Plaintiffs.

287.   Worst of all, there is no end in sight.  Unless and until the Courts or law enforcement officials compel an end to Cigna's claims administration schemes, Cigna will continue to illegally and aggressively underpay Plaintiffs every day.  This will ultimately force Plaintiffs to accept unreasonably low in-network contracts that do not cover their operating costs, or more likely drive them out of business.

## CAUSES OF ACTION

## COUNT ONE

## (Violation of ERISA § 502(a)(1)(B))

288.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

289.   Under ERISA Section 502(a)(1)(B), a "participant or beneficiary" may bring a civil action to, *inter alia*, "recover benefits due him under the terms of his

plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B).

290.   Plaintiffs, as the assignees of the Cigna Subscribers who seek treatment from Plaintiffs, have standing to pursue their claims against Cigna under Section 502(a)(1)(B).

291.   As detailed above, most of the Cigna Plans expressly authorize the Cigna Subscribers to assign their rights to benefits under the Cigna Plans to the Plaintiffs, including the right of direct payment of benefits under the Cigna Plans to the Plaintiffs, or are silent on the issue of the assignability of claims or benefits under the Cigna Plans.

292.   Moreover, while a relatively small number of Cigna Plans purport to restrict the right of assignment, those Plans also make clear that the Cigna Subscribers may "authorize [CIGNA] to pay any healthcare benefits under this policy to a Participating or Non-Participating Provider." Thus, these Plans also expressly allow the Cigna Subscribers to assign their benefits to Plaintiffs. Cigna, in administering the Cigna Plans, has construed the Plans as such, having engaged in an extended course of dealing, described more fully above, of paying benefits to Plaintiffs (albeit in insufficient amounts) and otherwise engaging directly with Plaintiffs in the processing of the Cigna Claims. Through this extended course of dealing, a, Cigna has waived any purported anti-assignment provisions, ratified the

- 119 -

assignment of benefits to Plaintiffs, and waived or is estopped from using any purported anti-assignment provisions against the Plaintiffs.

293. As noted above, for Emergency Care under the Cigna Plans, the ACA Greatest of Three Regulation and the Cigna Plans themselves require Cigna to pay Plaintiffs for the difference between their normal charges and the amounts the Cigna Subscribers would have paid in cost-sharing had they received treatment from an in-network facility. As described above, this requirement is incorporated into all of Cigna's ASO Plans and Fully-Insured Plans.

294. Moreover, for elective claims, each of the Cigna Plans require Cigna to pay Plaintiffs the MRC-1 or MRC-2 amount, less the patients' cost-sharing obligations under the Plans.

295. As detailed above, the MRC-1 amount under the Cigna Plans is generally calculated based on the lesser of the providers' normal charges for the service or supply or the amounts reimbursable under a Plan-selected percentile of the FAIR Health database, ranging between the 80th and 100th percentile. As detailed above, the Plaintiffs typically set their normal charges based on the 80th percentile of the FAIR Health database and, therefore, the MRC-1 amount is equivalent to the Plaintiffs' normal charges.

296. As detailed above, the MRC-2 amount under the Cigna Plans is generally calculated based on the lesser of the providers' normal charges for the

service or supply, or a Plan-selected percentage of a schedule that Cigna has "developed" based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.    However, Cigna has not developed any such schedule; therefore, the MRC-2 amount is also equivalent to the Plaintiffs' normal charges.

297.    Cigna breached the terms of the Plans as to all Plaintiffs and as to both emergency and elective treatment the Plaintiffs provided to the Cigna Subscribers.

298.    Specifically, as detailed on Exhibits A-1 to A-23, for the Cigna Claims for Emergency Services, Cigna violated the terms of the Plans by failing to pay Plaintiffs for the difference between their normal charges and the amounts the Cigna Subscribers would have paid in cost-sharing had they received treatment from an in-network facility.

299.    Moreover, as also detailed on Exhibits A-1 to A-23, for the Cigna Claims for elective services, Cigna likewise violated the terms of the Plans by failing to calculate the MRC-1 and MRC-2 claims as required by the terms of the Plans.

300.    Specifically, for each of the CPT codes listed on Exhibits A-1 to A-23, Cigna should have calculated MRC-1 based on Plaintiffs' normal charges or, at the very least, the $80^{th} - 100^{th}$ percentile of the Fair Health database; and it should have calculated MRC-2 based on Plaintiffs' normal charges.

301.   Instead, however, Cigna incorrectly calculated the MRC-1 at well below Plaintiffs' normal charges, and indeed well below the 80th percentile of the Fair Health database.  Moreover, Cigna incorrectly calculated the MRC-2 amounts at well below Plaintiffs' normal charges.

302.   Defendants' miscalculation of the amounts due and payable under the Cigna Plans for each of the Cigna Claims violates the terms of the Cigna Plans, for which Plaintiffs are entitled to relief under ERISA 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B).

303.   Moreover, as a result of, among other acts, Cigna's numerous procedural and substantive violations of ERISA, any appeals are deemed exhausted or excused, and Plaintiffs are entitled to have this Court undertake a *de novo* review of the issues raised herein.

304.   Thus, under 29 U.S.C. § 1132(a)(1)(B), the Plaintiffs are entitled to recover unpaid/underpaid benefits from Cigna, in the amounts detailed on Exhibits A-1 to A-23, or as otherwise to be determined at trial.  The Plaintiffs are also entitled to declaratory and injunctive relief to enforce the terms of the Cigna Plans and to clarify their right to future benefits under such Plans, as well as their attorneys' fees and costs.

## COUNT TWO

### (Breach of Fiduciary Duties of Loyalty and Due Care in Violation of ERISA)

305.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

306.   Pursuant to 29 U.S.C. § 1132(a)(3), a civil action may be brought by "a participant, beneficiary, or fiduciary to (A) enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan."

307.   The Plaintiffs, as the assignees of ERISA members and beneficiaries under the Plans, are entitled to assert a claim for relief for Cigna's breach of fiduciary duty of loyalty and care under 29 U.S.C. § 1104(a)(1)(A) and (B).

308.   Cigna is an ERISA a "fiduciary" of the Cigna Plans within the meaning of 29 U.S.C. § 1002(21)(A) because, at a minimum, it exercises authority or control respecting management or disposition of Cigna Plan assets.

309.   As an ERISA fiduciary, Cigna was required to make claim payment decisions under the Cigna Plans for the exclusive purpose of providing benefits to participants and beneficiaries, including Plaintiffs as their assignees, and defraying reasonable expenses in administering the Cigna Plans.  29 U.S.C. § 1104(a)(1)(A).

- 123 -

This duty requires Cigna to avoid self-dealing or financial arrangements that benefit the fiduciary at the expense of its beneficiaries.

310.   As an ERISA fiduciary, Cigna also owed and owes Plaintiffs a duty of care, defined as an obligation to act prudently, with the care, skill, prudence and diligence that a prudent fiduciary would use in the conduct of an enterprise of like character. 29 U.S.C. § 1104(a)(l)(B).

311.   As an ERISA fiduciary, Cigna was also prohibited from causing the Plans to engage in any transaction Cigna knows or should know constitutes a transfer to, or use by or for the benefit of Cigna, of any of the Cigna Plans' assets and must not deal with the Cigna Plan assets in Cigna's own interest or for its own account in accordance with 29 U.S.C. § 1106(a)(1)(D) and (b)(1).

312.   Cigna violated its ERISA duties of loyalty and care, and engaged in prohibited transactions, through myriad acts of self-dealing, described more fully above.  Among other things, Cigna diverted Cigna Plan funds belonging to Plaintiffs and used them to pay itself and its third-party repricing companies exorbitant "cost-containment fees."  Cigna also unlawfully used the Cigna Plan funds for its own benefit and dealt with the assets of the Cigna Plans' assets to a Cigna owned interest bearing bank account and through use of fraudulent misrepresentations made to Plaintiffs, that Plaintiffs were not entitled to the full value of the claims accepted by the Plans to be paid in full.

- 124 -

313.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), Plaintiffs are entitled to equitable relief to remedy Cigna's self-dealing and other violations of its ERISA fiduciary duties, including declaratory and injunctive relief.  Plaintiffs are also entitled to seek equitable relief under ERISA Section 409(a), 29 U.S.C. § 1109(a), including that Cigna restore to the ERISA ASO Plans any profits Cigna improperly earned through use of Cigna Plan assets and that Cigna is removed as the ERISA ASO Plans' claims administrator.

## COUNT THREE

### (Violation of 18 U.S.C. § 1962(c))

314.    The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

315.    Each of the Plaintiffs is a "person" within the meaning of 18 U.S.C. § 1961(3).

316.    Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

317.    Each of the Cigna Plans is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (described above as the "Cigna Plan Enterprises"). The Cigna Plan Enterprises were engaged in activities affecting interstate and foreign commerce at all times relevant to this Second Amended Complaint.

318.    Cigna is associated with the Cigna Plan Enterprises and has conducted or participated, directly or indirectly, in the conduct of the Cigna Plan Enterprises in

- 125 -

relation to the Plaintiffs through a pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) and (5).

319.   The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), described more fully above, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, namely the Fictitious Contracting Scheme, the Repricing Reduction Scheme, the Contradictory EOB Scheme and the Fraudulent Negotiations Scheme, in violation of 18 U.S.C. §§ 1341 and 1343.   It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the ERISA ASO Plans, in violation of 18 U.S.C. § 664.

320.   Cigna has also used the wires and mails in furtherance of its schemes to defraud by, among other things, disseminating false and misleading information over the wires (for example, by electronic transmission to the Plaintiffs through HIPAA standard transactions for claims submission and processing and through electronic fund transfers), and by mail.

321.   For example, as set forth more fully above, Cigna has engaged in schemes fraudulently misrepresenting information to the Cigna Plan Enterprises, Cigna Subscribers and Plaintiffs, that non-existent contracts exist with Cigna and/or third-party Repricing Companies or that for the few existing Repricing Company

contracts with individual Plaintiffs, that the contract terms permit Cigna to drastically discount the amount reimbursed to Plaintiffs.

322.   Through these schemes, discussed more fully above, Cigna communicates with ERISA ASO Plans, through ASO agreements negotiated through the wires and/or mails, and through its communications in the processing of electronic health care transactions, falsely stating that the amounts underpaid to the Plaintiffs are justified and accurate under the terms of the ERISA ASO Plans.

323.   Cigna issues Patient EOBs to Cigna Subscribers through the mails or wires, incorrectly stating that their Plaintiff provider accepted a discount and misrepresenting the patient's cost-sharing responsibility.  Meanwhile, Cigna issues the Provider EOPs through the mails or wires, for the same transaction, which tells the provider that the same amount of the alleged discount on the Patient EOB is, in fact, not covered under the ERISA ASO Plans.  Cigna also fraudulently induces Plaintiffs to enter into negotiations with Cigna and/or its contracted Repricing Companies to obtain the amounts to which Plaintiffs are actually entitled under the Cigna Plans.

324.   Cigna has engaged in these racketeering activities with the specific intent to defraud, described more fully above.  Among other things, Cigna ignores the standard transaction payment requirements for out-of-network providers, and instead seeks to deceive the Cigna Plan Enterprises through ASO contracts, drafted

- 127 -

by Cigna, that permit Cigna to transfer the Cigna Plan Enterprise assets into its own bank account, wrongfully retain large portions of such assets, and to calculate and retain cost-containment fees from these assets based on false pretenses. Cigna also seeks to mislead the Cigna Subscriber to believe that Cigna saved them large amounts, often upwards of 90% of their provider's incurred charges, stating that the providers agreed to fictitious negotiated discounts. Cigna also misleads Plaintiffs to believe that large percentages of the claims they submit for treatment provided to the Cigna Subscribers are not covered by the Cigna Plan Enterprises and that they should accept unreasonably underpaid settlement amounts through fraudulent negotiations with Cigna's contracted Repricing Companies.

325. Moreover, as described more fully above, Cigna has committed these activities in furtherance of its schemes to defraud and for the purpose of depriving Plaintiffs and the Cigna Plan Enterprises of money and other property.

326. Cigna has also embezzled or converted Cigna Plan trust assets by, among other things, retaining, earning interest on and earning administrative fees as a percentage of, fraudulently retained Cigna Plan Enterprise assets that are owed to Plaintiffs under the terms of the Cigna Plans.

327. Cigna's activities described herein in violation of 18 U.S.C. § 1962(c) have obstructed, delayed, or otherwise affected interstate commerce.

328.   As a direct result of Cigna's violation of 18 U.S.C. § 1962(c), Plaintiffs have suffered substantial injury and direct to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to:  (i) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for treatment of Cigna Subscribers; (ii) lost revenue from Cigna's intentional diversion of Cigna Plan funds that are otherwise due and payable to Plaintiffs; (iii) lost revenue from patients being dissuaded from seeking healthcare from Plaintiffs; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

## COUNT FOUR

### (Violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c))

329.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

330.   Each of the Plaintiffs is a "person" within the meaning of 18 U.S.C. § 1961(3).

331.   Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

332.   Each of the Cigna Plans is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) (described above as the "Cigna Plan Enterprises"). The Cigna Plan Enterprises were engaged in activities affecting interstate and foreign commerce at all times relevant to this Second Amended Complaint.

- 129 -

333.   Cigna has conspired with one or more non-party Repricing Companies, within the meaning of 18 U.S.C. § 1962(d) to violate the provisions of 18 U.S.C. § 1962(c).

334.   Specifically, Cigna and one or more of the non-party Repricing Companies, each agreed and intended, or adopted the goal of furthering or facilitating, the following endeavor:  to conduct or participate, directly or indirectly, in the management and operation of the affairs of the Cigna Plan Enterprises through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

335.   The pattern of racketeering activity under 18 U.S.C. § 1961(1) and (5), described more fully above, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.  It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the ERISA ASO Plans, in violation of 18 U.S.C. § 664.

336.   For example, as set forth more fully above, Cigna has conspired with one or more non-party Repricing Companies and other entities to engage in schemes to fraudulently misrepresent information to the Cigna Plan Enterprises, Cigna Subscribers and Plaintiffs and conceal its intention to underpay the Plaintiffs' claims, through the Fictitious Contracting Scheme, the Repricing Reduction Scheme, the

Contradictory EOB Scheme and the Fraudulent Negotiations Scheme, that non-existent contracts exist with Cigna and/or third-party Repricing Companies, that permit Cigna to discount the amount reimbursed to Plaintiffs.  Through these improper discounts, including the conspiracy through the Fraudulent Negotiations Scheme, whereby Cigna contracts with the Repricing Companies to coerce and intimidate Plaintiffs into accepting drastic underpayments in exchange for waiving their rights to additional payment or the ability to balance bill patients, Cigna embezzles and/or converts Cigna Enterprise assets that are due and owing to Plaintiffs under the terms of the Cigna Plans, increased administrative fees calculated as a percentage of savings on the discount taken and interest earned on the discounted Cigna Plan Enterprise assets.

337.   Moreover, as described more fully above, Cigna has conspired with one or more non-party Repricing Companies to engage in these racketeering activities with the specific intent to defraud, described more fully above.  Among other things, Cigna seeks to deceive the Plaintiffs through the mails and/or wires through the Fictitious Contracting Scheme and the Repricing Reduction Scheme, that the drastically reduced claims were justified based on fictitious contracts between Plaintiffs and Cigna and/or its non-party Repricing Companies or non-existent permitted reimbursement reductions according to the terms of the few global

agreements between individual Plaintiffs and Repricing Companies, and that Plaintiffs, therefore, have agreed to discounted reimbursement rates.

338.    Cigna also misleads the Cigna Plan Enterprises by contracting to permit application of the cost-containment process to those claims where a Provider has contracted with a Repricing Company under the guise that it will save the Cigna Plan Enterprises money, when in fact, Cigna applies the cost-containment process to every single out-of-network claim through the Repricing Reduction Scheme, in order to "earn" cost-containment fees of 29% to 34% of the amount not paid to the Plaintiffs, or the alleged "savings."   Cigna also seeks to mislead the Cigna Subscribers through the Contradictory EOB Scheme, through the mails and wires to believe that it saved them large amounts, often upwards of 90% of their provider's incurred charges, through negotiations for discounts with the Repricing Companies that have not occurred.  Cigna also misleads Plaintiffs through the mails and wires, also through the Contradictory EOB Scheme, to believe that large percentages of the claims they submit for treatment provided to the Cigna Subscribers are not covered by the Cigna Plan Enterprises and that they should accept unreasonably underpaid settlement amounts through fraudulent negotiations with Cigna's contracted Repricing Companies.

339.    In addition, as described more fully above, Cigna and the non-party Repricing Companies have conspired to commit these activities in furtherance of

Cigna's schemes to defraud and for the purpose of depriving Plaintiffs and the Cigna Plan Enterprises of money and other property.  Cigna has embezzled or converted Cigna Plan Enterprise assets by among other things, retaining, earning interest on and earning administrative fees as a percentage of (net a percentage of savings paid to the non-party Repricing Company), fraudulently retained Cigna Plan Enterprise assets that are owed to Plaintiffs under the terms of the Cigna Plans.

340.   Cigna has also used the wires and mails in furtherance of its schemes to defraud by, among other things, disseminating false and misleading information over the wires (for example, by electronic transmission to the Plaintiffs through HIPAA standard transactions for claims submission and processing and through electronic fund transfers), and by mail.

341.   Cigna's activities described herein in furtherance of its conspiracy to violate 18 U.S.C. § 1962(c) separately violate 18 U.S.C. § 1962(d).  Cigna's violations of 18 U.S.C. § 1962(d) have likewise obstructed, delayed, or otherwise affected interstate commerce.

342.   As a direct result of Cigna's unlawful conspiracy, under 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(c), and its unlawful acts of racketeering undertaken in furtherance of the conspiracy, described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to:  (i) lost revenue from Cigna's

intentional underpayment of claims submitted for reimbursement for treatment of Cigna Subscribers; (ii) lost revenue from Cigna's intentional diversion of Cigna Plan funds that are otherwise due and payable to Plaintiffs; (iii) lost revenue from patients being dissuaded from seeking healthcare from Plaintiffs; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

### COUNT FIVE

### (Violation of 18 U.S.C. § 1962(a))

343.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

344.   Each of the Plaintiffs is a "person" within the meaning of 18 U.S.C. § 1961(3).

345.   Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

346.   Cigna and the Repricing Companies are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a).  Cigna and the Repricing Companies were engaged in activities affecting interstate and foreign commerce at all times relevant to this Second Amended Complaint.

347.   Cigna has directly and indirectly invested and used the proceeds of its pattern of racketeering activity in the establishment or operation of itself and the Repricing Companies, in violation of 18 U.S.C. § 1962(a).

348.   The pattern of racketeering activity, the proceeds of which were invested in the establishment or operation of these enterprises, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, namely, the Fictitious Contracting Scheme, the Repricing Reduction Scheme, the Contradictory EOB Scheme and the Fraudulent Negotiations Scheme, in violation of 18 U.S.C. §§ 1341 and 1343, described more fully above.  It also includes Cigna's multiple, repeated, and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the ERISA ASO Plans, described more fully above, in violation of 18 U.S.C. § 664.

349.   Cigna's activities described herein in violation of 18 U.S.C. § 1962(a) have obstructed, delayed, or otherwise affected interstate commerce.

350.   Cigna's investment and use of the proceeds of its pattern of racketeering activity in the establishment or operation of itself and the Repricing Companies, in violation 18 U.S.C. § 1962(a), has directly injured Plaintiffs.  This injury includes diversion of Cigna Plan Funds otherwise due and payable to Plaintiffs away from Plaintiffs and into Cigna and its Repricing Companies.

351.   Specifically, as detailed more fully above, Cigna extracts "cost-containment" fees from the Plans through their misrepresentations and embezzlement and conversion of Plan assets. Cigna then invests these "cost-

containment" fees into themselves and their contracted repricing companies. Doing so directly harms Plaintiffs by obstructing Plaintiffs' access to the Plan funds to which they are lawfully entitled—indeed, the "cost-containment fees" are calculated based on a percentage of "net savings," or the difference between Plaintiffs' billed charges and the amount by which the claim is underpaid.

352.   As a direct result of Cigna's violation of 18 U.S.C. § 1962(a), Plaintiffs have suffered and will continue to suffer substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to: (i) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for treatment of Cigna Subscribers; (ii) lost revenue from Cigna's intentional diversion of Cigna Plan funds that are otherwise due and payable to Plaintiffs;; and (iii) lost revenue from patients being dissuaded from seeking healthcare from Plaintiffs; and (iv) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

## COUNT SIX

### (Violation of 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(a))

353.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

354.   Each of the Plaintiffs is a "person" within the meaning of 18 U.S.C. § 1961(3).

- 136 -

355. Cigna is a "person" within the meaning of 18 U.S.C. § 1961(3).

356. Cigna and the Repricing Companies are "enterprises" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(a). Cigna and the Repricing Companies were engaged in activities affecting interstate and foreign commerce at all times relevant to this Second Amended Complaint.

357. Cigna has conspired with one or more non-party Repricing Companies, within the meaning of 18 U.S.C. § 1962(d) to violate the provisions of 18 U.S.C. § 1962(a).

358. Specifically, Cigna and one or more of the non-party Repricing Companies, each agreed and intended, and/or adopted the goal of furthering or facilitating, the following endeavor: directly or indirectly investing the proceeds of Cigna's pattern of racketeering activity in the establishment or operation of Cigna and the Repricing Companies, in violation of 18 U.S.C. § 1961(a).

359. The pattern of racketeering activity, the proceeds of which intended to be invested in the establishment or operation of Cigna and the Repricing Companies, includes Cigna's multiple, repeated, and continuous uses of the mails and wires in furtherance of distinct but interrelated schemes to defraud, namely the Fictitious Contracting Scheme, the Repricing Reduction Scheme, the Contradictory EOB Scheme and the Fraudulent Negotiations Scheme, in violation of 18 U.S.C. §§ 1341 and 1343, described more fully above. It also includes Cigna's multiple, repeated,

- 137 -

and continuous acts of embezzlement, theft, or unlawful conversion or abstraction of assets of the ERISA ASO Plans, described more fully above, in violation of 18 U.S.C. § 664.

360.   Cigna's activities described herein in furtherance of its conspiracy to violate 18 U.S.C. § 1962(a) have obstructed, delayed, or otherwise affected interstate commerce.

361.   Cigna's conspiracy to invest and use the proceeds of its pattern of racketeering activity in the establishment or operation of itself and the Repricing Companies, in violation 18 U.S.C. § 1962(a), has directly injured Plaintiffs.  This injury includes diversion of Cigna Plan Funds otherwise due and payable to Plaintiffs away from Plaintiffs and into Cigna and its Repricing Companies.  Cigna is also able to invest and use the funds so diverted to maintain a robust network of Repricing Companies and others through which Cigna can continue to inflict harm on Plaintiffs, as described more fully above.

362.   As a direct result of Cigna's unlawful conspiracy, under 18 U.S.C. § 1962(d), to violate 18 U.S.C. § 1962(a), and its unlawful acts of racketeering undertaken in furtherance of the conspiracy, described herein, Plaintiffs have suffered substantial injury to their business or property within the meaning of 18 U.S.C. § 1964(c), including, but not limited to:  (i) lost revenue from Cigna's intentional underpayment of claims submitted for reimbursement for treatment of

Cigna Subscribers, and intentional diversion of Cigna Plan funds that are otherwise due and payable to Plaintiffs; (ii) lost revenue from patients being dissuaded from seeking healthcare from Plaintiffs; and (iii) the costs in time, person-hours, and other administrative expense incurred because of Cigna's unlawful conduct.

## COUNT SEVEN

### (Breach of Contract – non-ERISA)

363.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

364.   To the extent that some of the Cigna Plans are not employee welfare benefit plans governed by ERISA (such as plans issued by government employers and individual insurance plans), they are nonetheless valid and enforceable insurance contracts.

365.   As set forth above, Plaintiffs, as the assignees of the Cigna Subscribers who seek treatment from Plaintiffs, also have standing to pursue their claims against Cigna under the Cigna Plans not governed by ERISA.

366.   As detailed above, most of the Cigna Plans expressly permit the Cigna Subscribers from assigning their rights to benefits under the Cigna Plans to the Plaintiffs, including the right of direct payment of benefits under the Cigna Plans to the Plaintiffs, or are silent on the issue of the assignability of claims or benefits under the Cigna Plans.

- 139 -

367.   Moreover, while a relatively small number of Cigna Plans purport to restrict the right of assignment, those Plans also make clear that the Cigna Subscribers may "authorize [CIGNA] to pay any healthcare benefits under this policy to a Participating or Non-Participating Provider."  Thus, these Plans also expressly allow the Cigna Subscribers to assign their benefits to Plaintiffs.  As with the ERISA-governed Cigna Plans, Cigna, in administering the non-ERISA-governed Cigna Plans, has construed the Plans as such, having engaged in an extended course of dealing, described more fully above, of paying benefits to Plaintiffs (albeit in insufficient amounts) and otherwise engaging directly with Plaintiffs in the processing of the Cigna Claims.  Through this extended course of dealing, Cigna has waived any purported anti-assignment provisions, ratified the assignment of benefits to Plaintiffs, and waived or is estopped from using any purported anti-assignment provisions against the Plaintiffs.

368.   For Emergency Care under the Cigna Plans (as with the ERISA-governed Cigna Plans), the Cigna Plans themselves require Cigna to pay Plaintiffs for the difference between their normal charges and the amounts the Cigna Subscribers would have paid in cost-sharing had they received treatment from an in-network facility.

- 140 -

369.   Moreover, for elective claims, each of the Cigna Plans require Cigna to pay Plaintiffs the MRC-1 or MRC-2 amount, less the patients' cost-sharing obligations under the Plans.

370.   As detailed above, the MRC-1 amount under the Cigna Plans is generally calculated based on the lesser of the providers' normal charges for the service or supply or the amounts reimbursable under a Plan-selected percentile of the FAIR Health database, ranging between the 80th and 100th percentile.  As detailed above, each of the Plaintiffs set their normal charges based on the 80th percentile of the FAIR Health database and, therefore, the MRC-1 amount is equivalent to the Plaintiffs' normal charges.

371.   As detailed above, the MRC-2 amount under the Cigna Plans is generally calculated based on the lesser of the providers' normal charges for the service or supply, or a Plan-selected percentage of a schedule that Cigna has "developed" based upon a methodology similar to a methodology utilized by Medicare to determine the allowable fee for the same or similar service within the geographic market.   However, Cigna has not developed any such schedule; therefore, the MRC-2 amount is also equivalent to the Plaintiffs' normal charges.

372.   Cigna breached the terms of the non-ERISA-governed Cigna Plans as to all Plaintiffs and as to both emergency and elective treatment the Plaintiffs provided to the Cigna Subscribers.

373.    Specifically, as detailed on Exhibits A-1 to A-23, for the Cigna Claims for Emergency Services, Cigna violated the terms of the Plans by failing to pay Plaintiffs for the difference between their normal charges and the amounts the Cigna Subscribers would have paid in cost-sharing had they received treatment from an in-network facility.

374.    Moreover, as also detailed on Exhibits A-1 to A-23, for the Cigna Claims for elective services, Cigna likewise violated the terms of the Plans by failing to calculate the MRC-1 and MRC-2 claims as required by the terms of the Plans.

375.    Specifically, for each of the CPT codes listed on Exhibits A-1 to A-23, Cigna should have calculated MRC-1 based on Plaintiffs' normal charges or, at the very least, the $80^{th} - 100^{th}$ percentile of the Fair Health database; and it should have calculated MRC-2 based on Plaintiffs' normal charges.

376.    Instead, however, Cigna incorrectly calculated the MRC-1 and MRC-2 amounts as equating to the rates payable under the Medicare system, regardless of the Plan involved.

377.    By virtue of the AOB Contracts executed by the Cigna Subscribers, Plaintiffs were assigned the right to receive payment under the Plans for the services rendered to the Cigna Subscribers.  Pursuant to said AOB Contracts, Cigna is contractually obligated to pay Plaintiffs for these services.

378.   Defendants' miscalculation of the amounts due and payable under the Cigna Plans for each of the Cigna Claims violates the terms of the Cigna Plans.

379.   Moreover, Cigna failed to make payment of benefits to Plaintiffs in the manner and amounts required under the terms of the Cigna Plans.

380.   As the result of Cigna's failure to comply with the terms of the Cigna Plans, Plaintiffs, as assignees, have suffered damages and lost benefits for which they are entitled to recover damages from Cigna, including unpaid benefits, restitution, interest, and other contractual damages sustained by the Plaintiffs.

## COUNT EIGHT

### (Breach of the Covenant of Good Faith and Fair Dealing – non-ERISA)

381.   The foregoing allegations are re-alleged and incorporated by reference as if fully set forth herein.

382.   As set forth more fully above, if any of the Cigna Plans are not employee welfare benefit plans governed by ERISA, they are nonetheless valid and enforceable insurance contracts.  As such, the Cigna Plans contain an implied duty of good faith and fair dealing.

383.   Cigna, as the obligors under the Cigna Plans, owed the Cigna Subscribers a duty of good faith and fair dealing with respect to said Cigna Plans.

384.   As set forth more fully above, the Cigna Subscribers received healthcare services from Plaintiffs and executed AOB Contracts, among other

documents, in which they assigned to Plaintiffs their right to benefits under the Cigna Plans for the services that Plaintiffs provided to the Cigna Subscribers.

385.   By virtue of these assignments, Cigna also owes this duty of good faith and fair dealing to Plaintiffs.

386.   Moreover, *N.J.S.A.* 17:29B-3, *et seq*., defines the public interests of New Jersey and prohibits unfair methods of competition and unfair or deceptive acts or practices in the business of insurance.

387.   Cigna breached its duty of good faith and fair dealing owed to Plaintiffs, as assignees of rights and benefits under the Plans, in a number of ways, described more fully above.

388.   Without limitation, Cigna's breaches include, but are not limited to, Cigna:

a.   using predetermined reimbursement rates to maximize Cigna's profits at the expense of Plaintiffs and the Cigna Subscribers, through Cigna's application of the cost-containment process;

b.   failing to provide the Plaintiffs with adequate written explanations for the failure to pay all or a portion of Plaintiffs' claims for the services provided to the Cigna Subscribers;

c.   failing to pay the Plaintiffs' charges for the healthcare services provided to the Cigna' Subscribers, and failing to provide adequate

written explanations for the refusal to pay all or a portion of such claims, within the statutorily prescribed time frames;

d.  making false and misleading statements in the course of its the processing of electronic health care transactions to substantiate application of Cigna's cost-containment program when no contracts with Cigna or Repricing Companies exist;

e.  providing patently inadequate explanations for its under-payments Plaintiffs;

f.  not attempting in good faith to effectuate prompt, fair and equitable settlement of claims for which liability had become reasonably clear;

g.  compelling the Plaintiffs to institute litigation to recover amounts due under the Plans by refusing to pay claims properly;

h.  failing to promptly provide a reasonable explanation of the basis in the Cigna Plans in relation to the facts or applicable law for nonpayment and underpayment Plaintiffs' claims;

i.  violating applicable statutory and regulatory provisions governing the business of insurance;

j.  committing unfair and deceptive acts and practices in handling the Plaintiffs' claims;

- 145 -

k.  making use of funds which should have been paid to the Plaintiffs pursuant to their claims for benefits under the Plans;

l.  fraudulently communicating to the Cigna Subscribers that Plaintiffs accepted discounts on the Cigna Claims and, as a result, improperly calculating the Cigna Subscribers' Patient Responsibility Amounts;

m. fraudulently communicating to Plaintiffs that large portions of the Cigna Claims were not covered amounts based on non-existent agreements;

n.  earning interest on the funds which should have been paid to Plaintiffs pursuant to their claims for benefits under the Cigna Plans; and

o.  earning increased administrative fees as a percentage of savings on the funds which should have been paid to Plaintiffs pursuant to their claims for benefits under the Cigna Plans by applying the cost-containment process.

389.   Cigna's conduct in derogation of its duty of good faith and fair dealing under the Plans has deprived Plaintiffs of their reasonable expectations and benefits as assignees of benefits under the Cigna Plans.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs hereby request a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs demand judgment in their favor against Cigna as follows:

A.      Declaring that Cigna has breached the terms of the Cigna Plans with regard to out-of-network benefits;

B.      Awarding Plaintiffs all benefits due under the Cigna Plans, including the amounts set forth on Exhibits A-1 to A-23;

C.      Awarding injunctive and declaratory relief to prevent Cigna's continuing actions detailed herein that are unauthorized and prohibited by the Cigna Plans and applicable law;

D.      Declaring that, by reason of Cigna's failure to comply with applicable claims procedure regulations, and that "deemed exhaustion" under such regulations is in effect as a result of Cigna's actions;

E.      Declaring that Cigna violated their fiduciary duties under § 404 of ERISA, 29 U.S.C. § 1104, and awarding injunctive, declaratory and other equitable relief to redress such violations;

- 147 -

F.      Declaring that Cigna violated their fiduciary duties by engaging in prohibited transactions as a fiduciary to the ERISA ASO Plans under § 406 of ERISA, 29 U.S.C. § 1106, and awarding injunctive, declaratory and other equitable relief to redress such violations, including disgorgement of profits earned as a result of Cigna entering into the prohibited transactions and Cigna's removal as the ERISA Cigna Plan claims administrator;

G.      Compensatory and consequential damages resulting from injury to Plaintiffs' businesses and property by reason of Cigna's violations of 18 U.S.C. § 1962, as set forth above and to be further established at trial, subject to trebling under 18 U.S.C. § 1964(c);

H.      Permanently enjoining Cigna from continuing to administer claims processing for the Cigna Plans;

I.      Appointing an independent fiduciary at Cigna's expense to readjudicate all of the Cigna Claims processed by Cigna, and to reimburse to Plaintiffs all amounts Cigna was required to reimburse Plaintiffs pursuant to the Plan documents plus interest;

J.      Ordering Cigna to pay all reasonable costs and expenses of the independent fiduciary in re-adjudicating the Cigna Claims and the reasonable costs and expenses associated with correcting all improperly adjudicated claims identified in this Third Amended Complaint;

K.      Awarding lost profits, contractual damages, and compensatory damages in such amounts as the proofs at trial shall show;

L.      Awarding restitution for payments improperly withheld by Cigna;

M.      Declaring that Cigna has violated the terms of the relevant Plans and/or policies of insurance covering the Cigna Subscribers;

N.      Awarding reasonable attorneys' fees, as provided by common law, federal or state statute, or equity, including 18 U.S.C. § 1964(c) and 29 U.S.C. § 1132(g);

O.      Awarding costs of suit;

P.      Awarding pre-judgment and post-judgment interest as provided by common law, federal or state statute or rule, or equity; and

Q.      Awarding all other relief to which Plaintiffs are entitled.

Respectfully submitted,

**K&L GATES, LLP**

By:  /s/ Anthony P. La Rocco
Anthony P. La Rocco
anthony.larocco@klgates.com
One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4014 Telephone
(973) 848.4000 Facsimile

*Attorneys for Plaintiffs*

Dated:  August 22, 2022

## <u>CERTIFICATION UNDER LOCAL CIVIL RULE 11.2</u>

I certify that the matter in controversy is not the subject matter of any other action pending in any court or of any pending arbitration or administrative proceeding.

Respectfully submitted,

**K&L GATES, LLP**

By: /s/ Anthony P. La Rocco
Anthony P. La Rocco
anthony.larocco@klgates.com
One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4014 Telephone
(973) 848.4000 Facsimile

*Attorneys for Plaintiffs*

Dated: August 22, 2022

## <u>LOCAL CIVIL RULE 201.1 CERTIFICATION</u>

I certify under penalty of perjury that the matter in controversy is not eligible for compulsory arbitration because the damages recoverable by Plaintiffs exceed the sum of $150,000, exclusive of interest and costs.

Respectfully submitted,

**K&L GATES, LLP**

By:  <u>/s/ Anthony P. La Rocco</u>
Anthony P. La Rocco
<u>anthony.larocco@klgates.com</u>
One Newark Center, 10th Floor
Newark, New Jersey 07102
(973) 848.4014 Telephone
(973) 848.4000 Facsimile

***Attorneys for Plaintiffs***

Dated:  August 22, 2022